claim that the SBRM Amendment effects a "conversion" of the NEFOP from one controlled by NMFS to an industry-funded program. This is not the case. The SBRM Amendment provides a mechanism for the Councils to develop and propose industry-funded observer programs that would serve to supplement the existing NMFS-funded observer program, but this action neither implements nor requires such a program. Currently, the Councils are free to develop and propose such a system (as was done in Amendment 13 to the Sea Scallop FMP); the SBRM Amendment allows the Councils to use the framework adjustment process to propose a similar program instead of requiring a full FMP amendment. NMFS fully anticipates that any such program would include an observer set-aside mechanism, such as exists for the sea scallop fishery. As noted above and by other commenters, such a mechanism mitigates many of the concerns raised by the commenters.

NMFS disagrees with the commenter that such a system, should one be proposed by a Council and implemented by NMFS, would result in industry "control" of the observer program. The regulations at 50 CFR 648.11(h) and (i) provide extensive and detailed procedures that must be followed by all observer service providers in order to obtain and maintain NMFS certification as valid service providers. These regulations specifically address the issues of potential conflicts of interest (§ 648.11(h)(6)), harassment of or interference with observers (§ 648.11(h)(5)(vii)(F)), and data transparency (§ 648.11(h)(5)(vii)(A)). Regarding the concerns raised about the availability of the "raw" observer data, the regulations at § 648.11(h)(5)(vii)(A) require that, in addition to providing summary data within 12 hours of landing, that the observer service providers "provide the raw (unedited) data collected by the observer to NMFS within 72 hours of the trip landing." Regarding the commenters' opinion that the plan creates an economic incentive to evade observation, this claim does not take into account that observer set-aside programs in many ways may actually create an incentive to be observed, as a set-aside program would grant a vessel extra quota, trips, DAS, or increased possession limits in exchange for carrying an observer.

The commenters are also incorrect that the plan "discourages" marine mammal monitoring. NMFS acknowledges in the SBRM Amendment the importance of its mandate under other applicable laws, such as the MMPA and the Migratory Bird Act, but the focus of the SBRM is on those living marine resources defined as fish and bycatch under the Magnuson-Stevens Act. Only the Magnuson-Stevens Act requires an SBRM to be established, and the Magnuson-Stevens Act specifically excludes certain types of organisms, specifically marine mammals and birds, from the definitions.

The commenters are mistaken to conclude that the "SBRM is based on a flawed model." The actual SBRM established as a result of this action is wholly severable from the provision that authorizes the Councils to develop and propose an industry-funded observer program through a framework adjustment rather than an amendment to an FMP. The SBRM does not implement, require, or rely upon any industry-funded observer programs that may be developed and proposed by a Council in the future.

*Comment 4:* An organization representing a coalition of fishing interests involved in the Atlantic herring fishery submitted comments critical of the field sampling protocols and procedures used by at-sea observers to monitor bycatch occurring in fisheries that pump their catch directly from the codend into the vessel hold. The commenters asserted that the current observer protocols for the herring fishery contain loopholes that were not addressed in the SBRM Amendment, due to the potential for unobserved catch to be released from the net without being brought on board the vessel for the observer to monitor. The commenters expressed concern regarding the lack of mandated observer coverage on at-sea processing vessels, which transfer catch from the codend of catcher vessels to the hold of the processor vessel and about how pair trawls are treated if an observer is aboard only one of the paired vessels. The commenters also expressed concern that the filtering procedures described in the SBRM Amendment would result in exclusion of certain fishing modes (such as mid-water trawls) from observer coverage due to low levels of coverage in the past ("the SBRM ensures that [the mid-water trawl] mode will be unobserved in perpetuity").

*Response:* All fishing vessels permitted by NMFS to operate in the Northeast Region under one or more of the FMPs subject to the SBRM Amendment are currently obligated to carry a NMFS-certified observer on any trip for which they are requested by the Regional Administrator to do so (at § 648(a), (b), (c), and (d)). This requirement does not change, and is, in fact, reinforced in section 1.7 of the amendment. This requirement, by definition, applies to herring at-sea processors. The commenters incorrectly claim that the SBRM excludes some fishing modes from observer coverage; in fact, according to the results of the importance filter adopted in the amendment, the coverage allocated to the New England mid-water trawl fishing mode, cited by the commenters as "unobserved in perpetuity," would be 316 days, nearly twice the coverage level in 2004 and would represent 11.5 percent of trips taken in 2004. The commenters appear to misunderstand the function of the importance filters, which is to eliminate certain species (those for which the total discards in a fishing mode is a negligible proportion of either the total discards of that species across all fishing modes, or for which the total discards of that species is a negligible proportion of total fishing-related mortality of that species) from the calculation of the observer coverage allocation within a fishing mode (the allocation being no less than the highest coverage level of all species remaining after the importance filter is applied). Under no circumstances do the importance filters eliminate any fishing modes from the observer allocation process. This can be seen in Appendix C of the amendment in a table illustrating the results of applying the SBRM to the 2004 dataset. There is some level of observer coverage assigned to each of the 39 fishing modes addressed in the SBRM Amendment. In addition, the commenters asserted that the SBRM Amendment did not address the field sampling protocols to be used in collecting data by at-sea fisheries observers. This is incorrect. Section 1.7 of the SBRM Amendment stipulates that "The NEFOP shall serve as the primary mechanism to obtain data on discards in all Northeast Region commercial fisheries managed under one or more of the subject FMPs," and that "all data obtained by the NEFOP under this SBRM shall be collected according to the techniques and protocols established and detailed in the Fisheries Observer Program Manual (NEFOP 2006a) and the Biological Sampling Manual (NEFOP 2006b)." This section of the SBRM Amendment goes on to identify the minimum data fields to be collected by Northeast Region observers. The Fisheries Observer Program Manual and the Biological Sampling Manual provide general as well as specific instructions for at-sea observers operating on mid-water trawl, purse seine, and pair trawl vessels; these instructions and sampling priorities explicitly account, to the extent

_00000017812



# Greater Atlantic Region Bulletin
NOAA Fisheries, Greater Atlantic Regional Fisheries Office, 55 Great Republic Drive, Gloucester, MA 01930

For Information Contact:  
Sustainable Fisheries Division  
(978) 281 – 9315

http://www.nero.noaa.gov/  
Date Issued: 2/28/2014

## Atlantic Sea Scallop Fishery
Fishing Year 2014 Observer Set-Aside Compensation Rates  
*Effective Date: March 1, 2014*

The Greater Atlantic Regional Fisheries Office (GARFO) and the Northeast Fisheries Science Center (NEFSC) of NOAA's National Marine Fisheries Service have worked together to calculate the initial observer set-aside compensation rate for fishing year (FY) 2014. We will revisit these rates in June once Framework 25 is implemented, if approved, to see if any mid-year adjustments are necessary.

### FY 2014 Initial Compensation Rates

The compensation rate for open areas for limited access vessels fishing under DAS is **0.07 DAS per DAS fished** (the vessel is charged 0.93 DAS for each DAS fished with an observer onboard). This rate is slightly lower than the open area rates from recent years (e.g., 0.08 DAS per DAS fished in FYs 2012 and 2013) due to higher anticipated open area effort in FY 2014, in addition to our attempt to equalize this compensation rate with that for access areas.

Although there are no FY 2014 allocated access area trips at the start of the fishing year, limited access scallop vessels may take FY 2013 compensation trips broken in the last 60 days of FY 2013 in the first 60 days of FY 2014 (i.e., through April 29, 2014). The compensation rate for these compensation trips is **150 lb** in addition to the vessel's possession limit for the trip for each day or part of a day an observer is onboard.

Although limited access general category (LAGC) individual fishing quota (IFQ) vessels will not be able to fish within the access areas at the start of FY 2014, they may possess an additional **150 lb per trip** in open areas when carrying an observer.



We selected these compensation rates because we expect that they provide sufficient compensation for the observer fee while also providing sufficient observer coverage based on anticipated coverage levels needed for the start of FY 2014.

For limited access vessels on access areas trips, the compensation rate provides an average buffer of approximately $1,010 per day over the $675 per day cost of the observer at the expected price of scallops. For limited access vessels on open area trips, the buffer is approximately $1,325. For LAGC vessels, the compensation rate provides an average buffer of approximately $1,010 per trip over the $675 per day cost of the observer at the expected price of scallops, assuming trips are one day in length.

*For small entity compliance guides, this bulletin complies with section 212 of the Small Business Regulatory Enforcement and Fairness Act of 1996. This notice is authorized by the Regional Administrator of the National Marine Fisheries Service, Greater Atlantic Region.*

_00000017813

A300

We intend for these excess funds to account for variations in the fishery, such as lower scallop price and landings per day fished (also called landings per unit effort (LPUE)), without creating financial incentive to extend an observed trip.

PLEASE NOTE: These are initial rates because we may consider changing the compensation rate as we gather fishery information throughout FY 2014, such as scallop price, length of trips, LPUE, and overall rate of observer set-aside usage.

_00000017814



February 3, 2017

100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585

Dear Herring Committee Members,

      I am writing to request that the Committee reconsider the economic impacts of the Council's decision last month on the IFM Amendment Atlantic Herring Alternatives, which selected 50% ASM coverage or 50% EM/portside coverage for Category A and B herring vessels. According to Table 95, on page 299 of the EA, the annual Return to Owner (RTO), or gross revenue, for "herring/mackerel vessels" such as the MWT fleet, is 15%. In contrast, the RTO for" squid vessels", such as the SMBT fleet, which fishes herring seasonally, is only 7%. Therefore, SMBT vessels, which have a smaller daily harvest capacity due to vessel configuration/size/procedures than MWT vessels, are already working on substantially lower gross revenues than MWT vessels with much larger daily capacity. Therefore, the reduction in daily revenue by the decision to apply 50% industry funded monitoring coverage across all A and B herring vessels regardless of daily capacity, will impact SMBT vessels disproportionately. Even with the projected reduction in RTO resulting from 50% ASM or EM coverage, MWT vessels would still have a higher RTO than the 7% RTO SMBT vessels currently have without any industry funded monitoring costs. This is an inequitable situation that has resulted from treating all vessels in a permit category in a similar manner despite the fact that they have significantly different daily capacity and operating procedures.

      Furthermore, the Council decision particularly impacts Seafreeze vessels in a disproportionate manner. We have been very open with the Council as to the nature of our fishing operations, which are unique and unlike other A and B herring vessels of any gear type. We have repeatedly indicated the significant costs that would be borne by our vessels for herring IFM on trips that do not land herring. On Table 96, page 301-302 of the EA, vessels such as ours that declare into multiple fisheries at once to maintain operational flexibility, will be forced to pay $39,313 a year for herring ASM on trips that do not land herring, according to the Council decision. This cost is in addition to the cost of herring ASM on trips that actually do land herring. This same cost for single MWT vessels is approximately $2,264 a year and for paired MWT vessels $1,394 a year, since these vessels typically only fish for herring/mackerel, as opposed to our vessels which fish for multiple other species at the same time. Seafreeze vessels will be forced to pay these exorbitant costs for herring observers out of revenue from species such as squid. This is not justifiable.

      There are at least 12 SMBT category A and B herring vessels registered with NMFS, 11 of which are home ported in or fish out of Rhode Island. If these vessels are prohibited from herring fishing due to lack of profitability, a significant percentage of the herring fleet will be lost. According to NMFS, even

_00000017815

100% ASM coverage on SMBT vessels will have a "negligible" effect on tracking catch caps, but it will not have a negligible economic effect on Seafreeze vessels or other SMBT vessels. Since NMFS has also concluded that the benefits of increased monitoring should equal or outweigh the costs of monitoring, and since a negligible management benefit will be far outweighed by a disproportionate economic cost to our vessels, we respectfully request that the Committee reconsider these impacts and recommend a revised set of alternatives to the Council.

Sincerely,
Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs<br>Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

_00000017817

A304

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips. Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips. Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery. For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring. The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring. However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings. If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips. If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips. The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

|  |  |  |  |  |
|---|---|---|---|---|
| 100% Coverage |  |  |  |  |
| Total ASM Cost – 75% Coverage | $58,970 | $3,396 | $2,091 | $64,457 |
| Total ASM Cost – 50% Coverage | $39,313 | $2,264 | $1,394 | $42,971 |
| Total ASM Cost – 25% Coverage | $19,657 | $1,132 | $697 | $21,486 |
| Total EM Cost, Year 2 – $325 per day |  | $2,073 | $1,276 | $3,349 |
| Total EM Cost, Year 2 – $187 per day |  | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1 Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of