# United States Court of Appeals
# for the First Circuit

———————————————

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs-Appellants*,

*v.*

US DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; RICHARD SPINRAD, in his official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; JANET COIT, in her official capacity as Assistant Administrator for NOAA Fisheries,
*Defendants-Appellees*.

———————————————

On Appeal from
the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

———————————————————————————

## APPELLANTS' OPENING BRIEF

———————————————————————————

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants Relentless Inc., Huntress Inc., and Seafreeze Fleet LLC provide the following disclosure statement.

Appellants Relentless Inc. and Huntress Inc. are wholly owned by Appellant Seafreeze Fleet LLC. Appellant Seafreeze Fleet is a limited liability company with no parent corporation, and no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ...............................................................................

TABLE OF AUTHORITIES ................................................................. ii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................ viii

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF THE CASE ................................................................. 2

SUMMARY OF THE ARGUMENT ............................................................ 3

ARGUMENT ......................................................................................... 3

    I.      STANDARD OF REVIEW ............................................................ 3

    II.     FACTS AND PROCEEDINGS BELOW ......................................... 4

        A.     Procedural History .......................................................... 4

        B.     Atlantic Herring, the Herring Fishing Fleet and the Fishing Sector ....... 5

        C.     Stakeholder Comments and Reaction to the Final Rule ........................ 14

        D.     The Decision Below ........................................................ 19

    III.    THE MSA DOES NOT PROVIDE FOR ASM IN THE NEW ENGLAND FISHERY 20

        A.     The MSA Is Carefully Balanced to Protect Fish Stocks and Fishers .... 22

        B.     Congress Created Monitoring, Including Industry-Funded Monitoring in Certain Fisheries but Did Not Do So in New England .......................... 27

C.    It Is Arbitrary and Capricious in the Extreme to Allow Some Fishers to Harvest More Herring Without ASM While Requiring Appellants to Do So ............................................................................................... 36

D.    *Chevron* Does Not Save the Final Rule as the Appellees' Interpretation Is Unreasonable and Aggrandize Their Own Power at the Expense of Congress's ................................................................................................ 38

V.    THE FINAL RULE FAILS TO COMPLY WITH THE REGULATORY FLEXIBILITY ACT .......................................................................................................... 47

VI.   THE FINAL RULE FORCES APPELLANTS INTO A MARKET AGAINST THEIR WILL .......................................................................................................... 50

CONCLUSION ............................................................................................................. 52

CERTIFICATE OF COMPLIANCE ................................................................................. 53

CERTIFICATE OF SERVICE ........................................................................................ 54

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) ........................................................................20

*AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*,
  141 S. Ct. 1341 (2021) ........................................................................20

*Anglers Conservation Network v. Pritzker*, 1
  39 F. Supp. 3d 102 (D.D.C. 2015) .....................................................31

*Assoc. Fisheries of Maine, Inc. v. Daley*,
  127 F.3d 104 (1st Cir. 1997) ..............................................................49

*Atlantic Fish Spotters Ass'n v. Evans*,
  321 F.3d 220 (1st Cir. 2003) ............................................... 32, 35, 39

*Campanale & Sons, Inc. v. Evans*,
  311 F.3d 109 (1st Cir. 2002) ............................................... 22, 33, 34

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................... 19, 28, 41

*Ebert v. Poston*,
  266 U.S. 548 (1925) ............................................................................32

*Ethyl Corp. v. EPA*,
  51 F.3d 1053 (D.C. Cir. 1995) ...........................................................41

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................29

*Goethel v. Pritzker*,
  Civ. No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 26, 2016) ......27

*Goethel v. U.S. Dep't of Commerce*,
  854 F.3d 106 (1st Cir. 2017) ..............................................................22

*Gulf Fisheries Ass'n v. Nat'l Marine Fisheries Serv.*,
  968 F.3d 454 (5th Cir. 2020) ............................................... 29, 30, 41

*Gutierrez-Brizuela v. Lynch*,
  834 F.3d 1142 (10th Cir. 2016) .........................................................28

*Hadaja, Inc. v. Evans*,
  263 F. Supp. 2d 346 (D.R.I. 2003) .....................................................47

*Hall v. Evans*,
  165 F. Supp. 2d 114 (D.R.I. 2001) .............................................. 45, 47

*Herman v. Hector I. Nieves Transp., Inc.*,
  244 F.3d 32 (1st Cir. 2001) ................................................................34

*Iselin v. U.S.*,
  270 U.S. 245 (1926) ............................................................................33

*Kisor v. Wilkie*,
　139 S. Ct. 2400 (2019) .............................................................. 28, 41

*La. Pub. Serv. Comm'n v. FCC*,
　476 U.S. 355 (1986) .....................................................................29

*Little Bay Lobster Co. v. Evans*,
　No. Civ. 00-007-M., 2002 WL 1005105 (D.N.H. May 16, 2002)......................49

*Loper Bright Enter. v. Raimondo*,
　21-5166 (D.C. Cir. filed July 19, 2021) .............................................27

*Loper Bright Enter., Inc. v. Raimondo*,
　No. CV 20-466 (EGS), 2021 WL 2440511 (D.D.C. June 15, 2021)..............5, 30

*Lovgren v. Locke*,
　701 F.3d 5 (1st Cir. 2012) ....................................................... 3, 27, 35

*Loving v. U.S.*,
　517 U.S. 748 (1996) .....................................................................33

*Mass. ex rel. Div. of Marine Fisheries v. Daley*,
　170 F.3d 23 (1st Cir. 1999) ...........................................................45

*Michigan v. EPA*,
　135 S. Ct. 2699 (2015) ............................................................ 40, 41

*Nat'l Cable Television Ass'n, Inc. v. United States*,
　415 U.S. 336 (1974) .....................................................................43

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
　142 S. Ct. 661 (2022) ...................................................................20

*Nat'l Fed'n of Indep. Business v. Sebelius*,
　567 U.S. 519 (2012) ................................................................ 50, 51

*NLRB v. SW General, Inc.*,
　137 S. Ct. 929 (2017) .............................................................. 35, 36

*Russello v. United States*,
　464 U.S. 16 (1983) ......................................................................30

*Sabri v. U.S.*, 541 U.S. 600 (2004) .......................................................31

*U.S. v. Cusick*,
　No. 11cr10066-LTS, 2012 WL 442005 (D. Mass. Feb. 9. 2012)......................32

*Valent v. Comm'r of Social Sec.*,
　918 F.3d 516 (6th Cir. 2019)............................................................28

*Western Sea Fishing Co. v. Locke*,
　722 F. Supp. 2d 126 (D. Mass. 2010) ...........................................6, 44

**Constitutional Provisions**

U.S. Const. art. I, § 1 ...................................................................................... 21, 33
U.S. Const. art. I, § 7 ..........................................................................................21
U.S. Const. art. I, § 8 ..........................................................................................21

**Statutes**

16 U.S.C. § 1858(g)(1)(D) ..................................................................................33
16 U.S.C. § 1801(b)(1) ........................................................................................22
16 U.S.C. § 1801(b)(4) ........................................................................................22
16 U.S.C. § 1801(b)(5) .................................................................................. 24, 25
16 U.S.C. § 1801, *et seq* .....................................................................................22
16 U.S.C. § 1802(11) ..........................................................................................22
16 U.S.C. § 1811(a) ............................................................................................22
16 U.S.C. § 1827 .................................................................................................26
16 U.S.C. § 1851(a) ............................................................................................23
16 U.S.C. § 1851(a)(1) ............................................................................ 23, 24, 43
16 U.S.C. § 1851(a)(2) .................................................................................. 23, 44
16 U.S.C. § 1851(a)(6) .................................................................................. 23, 45
16 U.S.C. § 1851(a)(7) .................................................................................. 23, 46
16 U.S.C. § 1851(a)(8) .................................................................................. 24, 46
16 U.S.C. § 1852(a)(1) ........................................................................................24
16 U.S.C. § 1852(a)(1)(A) ...................................................................................24
16 U.S.C. § 1852(a)(1)(B) ...................................................................................24
16 U.S.C. § 1853 .................................................................................................25
16 U.S.C. § 1853(a) ...................................................................................... 25, 33
16 U.S.C. § 1853(a)(1)(C) ...................................................................................31
16 U.S.C. § 1853(b) .............................................................................. 25, 38, 39
16 U.S.C. § 1853(b)(8) ...................................................................... 28, 29, 33, 42
16 U.S.C. § 1853(c) ............................................................................................24
16 U.S.C. § 1853a(c)(6)(D)(i) .............................................................................27
16 U.S.C. § 1854(d) ............................................................................................26
16 U.S.C. § 1854(d)(2)(B) ...................................................................................26
16 U.S.C. § 1855(d) ............................................................................................24
16 U.S.C. § 1855(f) ...............................................................................................4
16 U.S.C. § 1855(f)(1) .........................................................................................48
16 U.S.C. § 1857 .................................................................................................19

16 U.S.C. § 1858(g)(1)(D)................................................................39
16 U.S.C. § 1862(a) .............................................. 26, 32, 40, 42
16 U.S.C. § 1862(b)(1)......................................................................40
16 U.S.C. § 1862(b)(2)......................................................................40
16 U.S.C. § 1881a(a)(1).....................................................................25
18 U.S.C. § 209..................................................................................31
28 U.S.C. § 1291 .................................................................................1
31 U.S.C. § 1341(a)(1)......................................................................31
31 U.S.C. § 3302(b)...........................................................................31
31 U.S.C. § 9701(b)...........................................................................31
5 U.S.C. § 10......................................................................................48
5 U.S.C. § 601 et seq.........................................................................47
5 U.S.C. § 604....................................................................................48
5 U.S.C. § 604(b)...............................................................................48
5 U.S.C. § 611(a)...............................................................................48
5 U.S.C. § 706(2)(D)..........................................................................48
5 U.S.C. §§ 701-706.............................................................................4

## Rules

50 C.F.R. § 648.14(e).......................................................................19
50 C.F.R. § 648.200(f) ........................................................................9
50 C.F.R. § 648.204 ..........................................................................10
50 C.F.R. § 648.4(a)(10)(iv)-(v) ......................................................10

## Administrative Code

H.R. Rep. 101-393 (Dec. 15, 1989) ................................................42
S. Rep. No 101-414 (Aug. 2, 1990) ................................................42

## Other Authorities

GARFO, Industry-Funded Monitoring Amendment: Atlantic Herring Fishery (last visited Jan. 25, 2022) *available at* https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf...................................................................................18

NEFMC, Atlantic Herring (last visited Jan. 25, 2022) *available at*
https://www.nefmc.org/management-plans/herring .............................................7
NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999) *available at*
https://s3.amazonaws.com/nefmc.org/herring_FMP.PDF ................................7, 8
NEFMC, Observer Policy Committee (Industry-Funded Monitoring) (last visited
Jan. 25, 2022) *available at* https://www.nefmc.org/committees/observer-policy-
committee ..........................................................................................................4
NOAA Fisheries, Annual Commercial Landing Statistics (last visited Jan. 25,
2022) *available at* https://foss.nmfs.noaa.gov/apexfoss/f?p=215:200::::::: ...........6
NOAA Fisheries, Atlantic Herring (archived by Internet Archive Wayback
Machine on Oct. 16, 2020) *available at*
https://web.archive.org/web/20201016190456/https://www.fisheries.noaa.gov/sp
ecies/atlantic-herring ............................................................................................7
NOAA Fisheries, Atlantic Herring (last visited Jan. 25, 2022) *available at*
https://www.fisheries.noaa.gov/species/atlantic-herring .................................5, 10
NOAA Fisheries, Atlantic Herring Framework 8 Interim Final Rule: 2021-2023
Quotas Bulletin (Mar. 29, 2021),
https://www.fisheries.noaa.gov/bulletin/atlantic-herring-framework-8-interim-
final-rule-2021-2023-quotas ..................................................................................7
NOAA Fisheries, Atlantic Herring Regulated and Closed Areas (last visited Jan.
25, 2022) *available at* https://www.fisheries.noaa.gov/new-england-mid-
atlantic/sustainable-fisheries/atlantic-herring-regulated-and-closed-areas........6, 9
NOAA Fisheries, Bycatch (last visited Jan. 25, 2022) *available at*
https://www.fisheries.noaa.gov/topic/bycatch ....................................................12
NOAA Fisheries, Fishing Gear: Bottom Trawls (last visited Jan. 25, 2022)
*available at* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-
bottom-trawls ........................................................................................................9
NOAA Fisheries, Industry-funded Monitoring in the Atlantic Herring Fishery (last
updated Jan. 25, 2022) *available at*
https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-
herring-fishery.....................................................................................................18
Phillip Hamburger, *Chevron Bias*, 84 Geo. Wash. L. Rev. 1187 (2016) ................28
The Declaration of Independence para. 12 (U.S. 1776) ............................................2

# GLOSSARY

| | |
|---|---|
| ACL | Annual Catch Limit |
| APA | Administrative Procedure Act |
| ASM | At-sea Monitor |
| FMP | Fishery Management Plan |
| FRAP | Federal Rules of Appellate Procedure |
| FRCP | Federal Rules of Civil Procedure |
| FRFA | Final Regulatory Flexibility Analysis |
| GARFO | Greater Atlantic Regional Fisheries Office |
| IFM | Industry-Funded Monitoring |
| IRFA | Initial Regulatory Flexibility Analysis |
| LAPP | Limited Access Privilege Program |
| MAFMC | Mid-Atlantic Fishery Management Council |
| MSA | Magnuson Stevens Act |
| NEFMC | New England Fishery Management Council |
| NEFOP | Northeast Fisheries Observer Program |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NPFMC | North Pacific Fishery Management Council |
| RFA | Regulatory Flexibility Act |
| RTO | Returns-to-owner |
| SBRM | Standardized Bycatch Reporting Methodology |

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Local Rule 34.0(a), Appellant respectfully requests that the Court schedule oral argument in this case. This case presents important legal questions about the scope of an agency's ability to grant itself power not laid out by statute, the scope and nature of *Chevron* deference, and whether the Magnuson Stevens Act governing the important New England fisheries has been followed. Oral presentation will aid the Court in seeking clarification from counsel for all parties and in its resolution of these weighty issues.

# JURISDICTIONAL STATEMENT

On September 20, 2021, the District of Rhode Island granted Appellees' motion for summary judgment and denied Appellants' motion for summary judgment. ADD1-32. Appellants Relentless Inc., Huntress Inc. and Seafreeze Fleet LLC filed a timely notice of appeal on October 20, 2021. A164; *see* FRAP 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1.      Did the District Court err in holding the Magnuson-Stevens Act ("MSA") allows Appellees to create the office of At-sea Monitors ("ASM") and force regulated fishers to pay for them?

2.      Did the District Court err in holding that the Final Rule was not arbitrary and capricious and contrary to law under Administrative Procedure Act review?

3.      Did the District Court err in holding that Appellees properly accounted for the National Standards under the MSA?

4.      Did the District Court err in holding the Final Rule properly complied with the Regulatory Flexibility Act ("RFA")?

5.      Did the District Court err in holding that the Appellees could create a new market for ASM and force Appellants into it?

**STATEMENT OF THE CASE**

Appellees, without statutory authority, created a new federal office and have imposed the cost of such on small, regulated businesses.  Not only has Congress failed to explicitly grant this authority to Appellees, but in analogous cases Congress has capped such costs well below those imposed here.  The people of New England famously rebelled against George III because he, "erected" "new offices and sent hither swarms of officers to harass" them "and eat out their substance." *See* The Declaration of Independence para. 12 (U.S. 1776).  This unlawful imposition is as blameworthy.

Appellants, Relentless Inc. ("Relentless"), Huntress Inc. ("Huntress"), and Seafreeze Fleet LLC ("Seafreeze"), were correct that the Department of Commerce ("the Department"), the National Oceanic and Atmospheric Administration ("NOAA"), the National Marine Fisheries Service ("NMFS"), and the individual defendants in their official capacities (collectively "Appellees") have implemented an unlawful and unconstitutional ASM mandate on the nation's Atlantic herring fishermen, and the lower court erred in holding otherwise. Specifically, the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment and the February 7, 2020 Final Rule, which implements the IFM Amendment, are unlawful as exceeding the powers granted those agencies by the MSA and its National Standards.  Both fail to withstand scrutiny under the APA and

the RFA.  Finally, the creation of a market Appellants must enter against their will exceeds the Appellees' power.  The lower court's decision should be reversed with instructions to enjoin the enforcement of the IFM Amendment by the Final Rule and set it aside. *See* A307–783 ("IFM Amendment"); *see also* A240–268 ("Final Rule").

## SUMMARY OF THE ARGUMENT

The court below held that the animating MSA section, purporting to support promulgating the IFM Amendment and Final Rule, was ambiguous. But the district court determined that, under *Chevron* step two analysis, the agency had the power to issue them and that they otherwise adhered to the standards under the APA.  The court also decided that neither the IFM Amendment nor the Final Rule traduced either the RFA or the MSA's National Standards.  Further, the court found that it did not violate the Constitution to force Appellants into a new market created solely to make them pay for new federal offices not designated by Congress.  These rulings were in error and this Court should reverse.

## ARGUMENT

## I.  STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012) (citation omitted).  Judicial review of regulations promulgated under the MSA is governed by the APA.  *Id.*  The review is limited to the administrative record and the regulation can be overturned if the

agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. §§ 701-706 and 16 U.S.C. § 1855(f)).

## II.    FACTS AND PROCEEDINGS BELOW

### A. Procedural History

The IFM Amendment and Final Rule are the culmination of almost seven years of design and development by the NEFMC, MAFMC, and NMFS. *See* NEFMC, Observer Policy Committee (Industry-Funded Monitoring) (last visited Jan. 25, 2022) *available at* https://www.nefmc.org/committees/observer-policy-committee. Part of this design and development was to elide Congressional prohibitions on burdening fishers in the New England fisheries. The IFM Amendment and Final Rule allow industry-funded monitoring in NEFMC FMPs, except for those under joint management with MAFMC, *e.g.*, mackerel. *See* A240. On or about April 20, 2017, the NEFMC finalized its preferred alternatives and adopted the IFM Amendment. *See id.* A year later, on April 19, 2018, the NEFMC "refined" its industry-funded monitoring recommendations. *Id.* On September 19, 2018, the NEFMC published a Notice of Availability for the IFM Amendment in the Federal Register. *See* A221–222. The Notice of Availability permitted interested parties to submit comments regarding adoption of the IFM Amendment for a 60-day period ending on November 19, 2018. *Id.* On November 7, 2018, while the IFM Amendment comment period was still open, the proposed rule implementing the IFM Amendment was published in the Federal Register. A198–220 ("Proposed Rule"). The Proposed Rule permitted interested parties to submit comments

4

regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id*. On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* A248.

On March 4, 2020, Plaintiffs-Appellants timely filed a Complaint challenging the Final Rule in the court below. While the matter was pending, the Defendants-Appellees attempted to have the matter transferred to the District of Columbia and consolidated with the case of *Loper Bright Enter., Inc. v. Raimondo*, No. CV 20-466 (EGS), 2021 WL 2440511 (D.D.C. June 15, 2021) ("*Loper Bright*"). On August 25, 2020, the district court denied the motion, partially on the basis that that case was not identical in law and fact to the instant matter. A160. The parties then cross-moved for summary judgment, and on September 20, 2021, the district court denied Plaintiffs-Appellants motion for summary judgment on all counts and granted in on behalf of Defendants-Appellees. ADD1-32. This appeal was filed timely on October 28, 2021. A164.

## B. Atlantic Herring, the Herring Fishing Fleet and the Fishing Sector

Atlantic herring, or *Culpea harengus*, are small schooling fish from the family *Clupeidae*. Atlantic herring are found across the North Atlantic, but in the western North Atlantic they are distributed from Labrador, Canada to Cape Hatteras, North Carolina. *See* NOAA Fisheries, Atlantic Herring (last visited Jan. 25, 2022) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring.

In federally managed waters, the Atlantic herring population is concentrated from New England to New Jersey. *See* NOAA Fisheries, Atlantic Herring Regulated and Closed Areas (last visited Jan. 25, 2022) *available at* https://www.fisheries.noaa.gov/new-england-mid-atlantic/sustainable-fisheries/atlantic-herring-regulated-and-closed-areas. Atlantic herring is a biologically important species as it is vital to the marine food chain, but it is also economically important in its own right.[1] The commercial herring fishery has operated in New England for hundreds of years and since 2010, the fishery has consistently landed over $20 million in Atlantic herring each year. *See* NOAA Fisheries, Annual Commercial Landing Statistics (last visited Jan. 25, 2022) *available at* https://foss.nmfs.noaa.gov/apexfoss/f?p=215:200:::::: (select dataset "Commercial" for years 2019-2010 in region type "New England" for species "Herring, Atlantic" and run report).

At the time the IFM Amendment and Final Rule were promulgated, NOAA had indicated that Atlantic herring were not overfished, nor subject to overfishing. *See* NOAA Fisheries, Atlantic Herring (archived by Internet Archive Wayback Machine on Oct. 16, 2020) *available at* https://web.archive.org/web/20201016190456/https://www.fisheries.noaa.gov/spec

---

[1] The "silver darlings" of song and folklore. *Western Sea Fishing Co. v.* Locke, 722 F. Supp. 2d 126, 130 (D. Mass. 2010).

ies/atlantic-herring. The 2018 stock assessment also indicated that Atlantic herring stock levels were well above their target levels. *Id.* Despite this, the 2018 herring stock assessment led to a nearly 70 percent reduction in herring quotas for 2019. *See* NOAA, Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 at 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648). And the quotas have continued to drop in accord with new assessments that the stock is "overfished, but not subject to overfishing." NOAA Fisheries, Atlantic Herring Framework 8 Interim Final Rule: 2021-2023 Quotas Bulletin (Mar. 29, 2021), https://www.fisheries.noaa.gov/bulletin/atlantic-herring-framework-8-interim-final-rule-2021-2023-quotas.

In federal waters, the NEFMC manages Atlantic herring under the Atlantic Herring FMP. *See* NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999) *available at* https://s3.amazonaws.com/nefmc.org/herring_FMP.PDF. The Atlantic herring population is distributed across the jurisdictional boundaries of the NEFMC and MAFMC, which consulted on the Atlantic Herring FMP. *See id*. Since its March 1999 adoption, the Atlantic Herring FMP has been subject to nine amendments and eight framework adjustments. *See generally* NEFMC, Atlantic Herring (last visited Jan. 25, 2022) *available at* https://www.nefmc.org/management-plans/herring (an additional framework adjustment is under development). The Atlantic Herring FMP

sets out, in its original form and through amendments and framework adjustments, numerous primary management measures including:

a.      adopting a total catch limit, or ACL (this is the maximum amount of fish that can be sustainably harvested each year), which is distributed across time and areas;

b.      controlling and limiting catch as the ACL is neared, as well as closing off areas when the ACL is reached;

c.      losing spawning areas and designating essential Atlantic herring habitat;

d.      mandatory permitting of certain Atlantic herring vessels, operators, dealers, and processors, as well as vessel, gear, and possession restrictions;

e.      requiring certain data reporting; and,

f.      defining overfishing of Atlantic herring.

*See generally supra* Final Atl. Herring FMP.

The NEFMC revises quota and management specifications every three years.

## A.      Fishing Vessels and Business Practices

There are three primary gear types used to catch and harvest Atlantic herring: midwater trawl, purse seine, and bottom trawl.  The only type pertinent to this appeal are small mesh bottom trawls which are used by Relentless and Huntress's vessels. Bottom trawlers generally harvest herring by using nets fitted with weights and

special gear that allow the net to stay open as it is trawled along the ocean floor. The nets are fitted with mesh that confine the fish as they are pulled to the surface. *See* NOAA Fisheries, Fishing Gear: Bottom Trawls (last visited Jan. 25, 2022) *available at* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls.

Midwater trawl and purse seine are responsible for most of the Atlantic herring landings. *See* A247 (noting differences in revenue between gear types). So, the ACL for herring is largely already reached by these types of vessels and not those operated by Appellants.

Under the Atlantic Herring FMP, there are four regulated Atlantic herring fishing management areas: Areas 1 (subdivided into Areas 1A and 1B), 2, and 3. *See supra* Atlantic Herring Regulated and Closed Areas. The NEFMC allocates a stock-wide annual catch limit across these four management areas ("sub-ACLs"). *See* 50 C.F.R. § 648.200(f). Area 1 includes state and federal inshore (Area 1A) and offshore (Area 1B) waters in the Gulf of Maine that are adjacent to the states of Maine, New Hampshire, and Massachusetts. *See supra* Atlantic Herring Regulated and Closed Areas. Area 2 includes state and federal waters in the South Coastal Area that are adjacent to the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, and North Carolina. *See id.* Area 3 includes all federal waters in the Georges Bank. *See id.* Permits for Atlantic herring vessels are divided by permit type—limited and open access— and permit

category—A, B, C, D, E, and F—which place restrictions where vessels can fish and how much herring they can possess. 50 C.F.R. § 648.4(a)(10)(iv)-(v); *Id.* § 648.204; *see also supra* Atlantic Herring (under "Commercial Fishing" tab).

Only Categories A and B are impacted by the IFM Amendment and the Final Rule. *See* A243. Category A permits are "All Areas Limited Access" permits. Vessels holding Category A permits can possess an unlimited amount of herring in all areas. Appellants' vessels, F/Vs *Relentless* and *Persistence* each hold Category A permits. A162 ¶ 4.

Appellants Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. Appx. A162 ¶ 5. They are subject to the IFM Amendment and the Final Rule. Both Relentless and Huntress are corporations organized under Rhode Island law and operating out of North Kingstown, Rhode Island. Relentless owns the pseudonymous F/V *Relentless* and Huntress owns the F/V *Persistence*. Both vessels are high-capacity freezer trawlers that alternatively, but sometimes simultaneously, harvest Atlantic herring, Loligo and Illex squids (*Doryteuthis* (*Amerigo*) *pealeii*, and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). *See* A288–301 ("June 30, 2015 Comment Letter"), A288.

Both ships use a unique at-sea freezing technique that allows the vessels to stay at sea longer than other vessels in the Atlantic herring fishery and provides each vessel flexibility in what catch it harvests during fishing trips. *Id*. Both vessels hold several permits and operate across the jurisdictional boundaries of the NEFMC and the MAFMC. Appellants typically declare[2] into herring, squid, and mackerel fisheries on the trips they take from late November through April because they harvest all those species alternatively but sometimes simultaneously during the season. *See* A288. That is, they may take each species, some, or all species during any given trip. This flexible style of fishing allows Appellants to cover operating costs by switching over to a different species based on what they encounter.

Prior to every trip, Appellants are required to call and notify observers of their gear type for each trip. For herring/mackerel trips, Appellants have noticed a higher-than-average observer rate than NMFS has claimed is average for the herring fishery. A292. For example, from November 2014 to April 2015 the *F/V Relentless* had 50% herring/mackerel observer coverage. *Id.* Appellants informed the Appellees of this fact with no substantive response. There remains nothing in the regulations that ensures Appellants do not absorb a disproportionate number of either ASM or just government on-board monitors. Under Appellants' style of fishing, it is possible to

---

[2] "Declaring" means informing regulatory authorities of what species a vessel intends to pursue on any given trip.

have a declared herring/mackerel trip, that is selected for observer coverage, that only harvests squid and butterfish. A288 (noting a 10-day herring/mackerel trip that did not land any herring). Under the IFM Amendment and Final Rule, Appellants may be forced to carry a herring ASM on a declared herring trip that does not end up harvesting herring. Appellants would then be forced to pay for the ASM from other-species revenue, not Atlantic-herring revenue. A223–233 ("Nov. 4, 2016 Comment Letter"), A227.

While other vessels in the herring fishery conduct multi-species trips—herring and mackerel, managed by MAFMC under its own FMP, school together and are regularly harvested together—the record reveals no other vessels besides F/Vs *Relentless* and *Persistence* in the Atlantic herring fleet that declare into and/or harvest squid and butterfish on the same trip as declared Atlantic herring trips. Appellants process their catch and freeze at sea. *See* A291. Under Appellants' process, all catch is brought aboard, hand sorted on a conveyor belt, hand packaged, and then frozen. *Id*. Any discards or unwanted bycatch[3] are also hand sorted and retained in discard baskets. *Id*. In comparison to other vessels in the Atlantic herring fishery, F/Vs *Relentless* and *Persistence* have more limited catching and processing capacity, longer trips, and higher overhead costs. For example, Appellants are

---

[3] Bycatch are the fish taken that are not meant to be harvested. *See* NOAA Fisheries, Bycatch (last visited Jan. 25, 2022) *available at* https://www.fisheries.noaa.gov/topic/bycatch.

limited up to about 125,000 pounds of catch per day due to limited freezing capacity, compared to other vessels in the herring fleet which can harvest in excess of 500,000 pounds of catch per day. *See* A234–239 ("Dec. 24, 2018 Comment Letter"), A238. Appellants' trips typically last 7-14 days at sea, compared to 2-3 days for other vessels in the herring fleet. *Id.* F/Vs *Relentless* and *Persistence* require twice as many crew members to operate, compared to other vessels in the herring fleet. *Id*. Because ASM are paid per day, the costs to these Appellants are higher per trip than they are for the rest of the fishing fleet. *Id.* This regulatory inequity threatens Appellants' use of the flexible style of fishing they have developed and even the use of their vessels with enormous sunk costs. The Final Rule could result in fishing trips losing rather than making money.

There are exceptions to having to carry ASMs in the Final Rule but none of them can be used by Appellants largely because of their style of fishing. They cannot use dockside inspection. The exception that excludes ASMs from vessels taking less than 50mt of herring *per trip*, rather than per day greatly burdens Appellants who are out for 10-14 days rather than 2-4. A238. It is also undisputed that Appellants style of fishing does not create more bycatch or do more damage to the fishing stocks than other fishing methods or vessels, indeed less bycatch than others. A292. Yet they are singled out for far more observers, perhaps because their boats are more comfortable and stay out longer, allowing ASM and observers to more easily make

their monthly quota of sea-days.  In any event, there is no explanation or protection from this disproportionate treatment in the Final Rule.

## C.  Stakeholder Comments and Reaction to the Final Rule

On December 18, 2018, while the comment period for the Proposed Rule was still open, the Secretary of Commerce notified the NEFMC in an unpublished letter that the Secretary approved the IFM Amendment. *See* A240; *see also* A269–271 ("Pentony Letter").  Appellants, through their sister company, Seafreeze Ltd., as well as other industry stakeholders, submitted comments during the Proposed Rule's comment period. *See* A234–239.

The IFM Amendment was contentious and controversial. A191–197, A193 ("Oliver Mem."). Many of the comments concerning it were by fishermen who stated the proposed regulations were unaffordable, particularly considering other restrictions on herring and mackerel catches. *Id.* at A193; and *see*, *e.g.*, A167–170; A171; A182; A184. The lack of consistency in assigning ASM was also criticized. *See* A172; A174; A183; A185; A186; A187. Including by Appellants here.  *See* A188. The current government-funded observer rate was what *Congress* funded; the new requirement was imposed because the regulators wanted more monitoring than Congress would fund.  *See* A173.

On June 30, 2015, Meghan Lapp detailed exactly how Appellants' vessels operated and how because of the longer trips, flexible fishing schedule, and low

bycatch rates F/Vs *Relentless* and *Persistence* would be disproportionately affected by the proposed IFM Amendment. *See generally* A288–301. That letter also raised concerns over the high cost of ASM coverage for these vessels and requested that the Committee create a separate category under any IFM Amendment that would account for the unique issues that arise from operating freezer vessels. *Id*. at A288, A291. On November 4, 2016, Ms. Lapp submitted a comment which clearly noted the deficiency of failing to account for the daily catch harvesting capacity of small mesh bottom trawl vessels. *See generally* A223–233. The Nov. 4, 2016 Comment Letter indicated disagreement with the funding mechanism for additional monitoring, *i.e.*, industry-funding, because the monitoring is inherently a public function, and it said that "[p]ublic funds should be used for public purposes." A224. The letter also indicated that costs to Seafreeze's vessels would be disproportionate relative to the rest of the herring fleet because of its style of fishing. *See* A224–227. This comment also deals with two completely unaddressed problems with the Final Rule: (1) Appellants will be paying for herring monitoring with other marine harvests; and, (2) they also would lose the flexibility of harvesting different species for which they carry permits. *Id.* The proposed regulations would burden Relentless and Huntress's vessels and fishing style with no concomitant advance in conservation goals. A227. Ms. Lapp also submitted an undated letter raising concerns with the IFM Amendment to the Herring Committee. *See* A165–166,

Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Council Members (undated) ("Undated Comment Letter"). The Undated Comment Letter inquired about the availability of independent economic analysis of the amounts herring vessels typically catch and about requesting a separation or exemption between vessels that are herring-focused versus vessels that are mixed species-focused like F/Vs *Relentless* and *Persistence*. A165–166. By letter dated February 3, 2017, Ms. Lapp clearly laid out the unique harm industry-funded monitoring would cause to Appellants and requested that the NEFMC reconsider the economic impacts of its decision to select 50 percent ASM monitor coverage. *See* A302–306 ("Feb. 3, 2017 Comment Letter").

The Feb. 3, 2017 Comment Letter again raised Seafreeze's concerns over the disproportionate costs borne by its vessels, including the fact that under the IFM Amendment, it would be forced to pay $39,313 a year for herring ASM on trips that do not land herring. *See* A302. Ms. Lapp wrote again on March 30, 2017 and noted that it was small-mesh bottom trawlers like *F/Vs Relentless* and *Persistence* that had the most days, 111, with no herring caught but where monitoring costs were paid. *See* A175–181 ("Mar. 30, 2017 Comment Letter"), A177. The single midwater trawlers and paired midwater trawlers had 6 and 4 such days respectively. *Id*. As the Mar. 30 Comment Letter notes, the IFM Amendment Draft determined that there were disproportionate monitoring costs associated with small-mesh bottom trawls

compared to other styles of trawling. *See* A177, A180–181. Ms. Lapp wrote again on December 24, 2018 to point out that the MSA did not allow the cost-sharing proposals made in the Final Rule. *See* A235. For the fisheries where cost sharing is allowed, the MSA capped costs at 3% of ex-vessel revenue. *See id.* The Dec. 24, 2018 Comment Letter also notes that Appellees could not get around statutory prohibitions on charging industry fees by forcing Appellants into a market they did not wish to enter. *See* A236.

Despite the comments of the Appellants and others, the Appellees forged ahead and implemented the Final Rule containing all of the objectionable requirements and rejecting all counter-proposals.

The $700-800 per day cost of ASM proposed in the Final Rule is twice as high as the cost in the high-value Alaskan fishery, which is where the MSA authorizes industry-funded ASM. *See* A246. The Appellees' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See* A248–253. Appellants' comments and concerns, including a requested exclusion for small-mesh bottom trawlers that process and freeze at sea, were rejected by the Final Rule. *Id*.

The IFM Amendment and the Final Rule establish a 50 percent monitoring coverage target for ASM. *See* A248, A251. This target is achieved by combining SBRM of the NEFOP plus IFM coverage. *See* A243, A244. The Atlantic herring

vessel owners pay for the IFM sampling cost—approximately $710 per day—and NOAA Fisheries purportedly pays for IFM administrative costs. *See* A241. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, Industry-funded Monitoring in the Atlantic Herring Fishery (last updated Jan. 25, 2022) *available at* https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-herring-fishery. The IFM Amendment forces many Atlantic herring vessel owners, including Appellants, to enter forced negotiations with private ASM providers that are approved and trained by NOAA. *See* GARFO, Industry-Funded Monitoring Amendment: Atlantic Herring Fishery at 4 (last visited Jan. 25, 2022) *available at* https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf. The information and data that ASM collect is directed by NOAA Fisheries and the NEFMC. *See* A244. As small-mesh bottom trawls, F/Vs *Relentless* and *Persistence* are not eligible for the ASM alternative—electronic monitoring with portside sampling—thus, they can only comply with the IFM mandate by carrying and bearing the cost of an ASM. *See* A245. The IFM Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the IFM Amendment will reduce Returns to Owners by almost ***20 percent***. *See* A244, A251.

The Final Rule also develops a standard process to implement and revise industry-funded monitoring programs in the Atlantic herring and other FMPs under

NEFMC's jurisdiction. A241. Starting April 1, 2020, vessels issued Category A or B permits, including F/Vs *Relentless* and *Persistence* are required to pay for ASM on trips NEFMC selects for IFM coverage. *See* A246. Rather than obtaining an exemption for harvesting less than 50 mt per **day**, the Final Rule allows such exemptions per **trip**. A244. This despite the fact that ASM are paid *per day*. The Final Rule states that the ASM are not "observers" and have different functions from that office. *See id.* It states "in contrast to observers, ASM would not collect whole specimens, photos or biological samples…" *Id*. Although, the ASM are not "observers" according to the regulation they are federal agents performing federal, not industry, tasks and interfering with their duties is a federal crime. *See* 16 U.S.C. § 1857; 50 C.F.R. § 648.14(e).

### D. The Decision Below

The District Court's opinion, ADD1-32, found for Defendants-Appellees on each Count of the Complaint. The district court determined that congressional intent was ambiguous, and so it moved to *Chevron* step two and found the Appellees' interpretation of their own power reasonable, applied deference and allowed the regulation. *Id.* at ADD8-18 (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). It rejected Plaintiffs-Appellants argument that without clear authorization for such a program, it was unambiguous that Appellees did not have such power. *Id.* at ADD11-13. It held that National Standards One,

Two, and Six through Eight were not violated by the challenged regulations. *Id.* at ADD18-27.[4]  The court also found Appellees' actions under the RFA not violative of that act.  *Id.* at ADD28-30.  Finally, the district court rejected the argument that by creating a new market that did not exist before the regulation and forcing Plaintiffs-Appellants into it, was not a violation of the Commerce Clause as Appellants are voluntary participants in the herring market.  *Id.* at ADD30-32.

## III.    THE MSA DOES NOT PROVIDE FOR ASM IN THE NEW ENGLAND FISHERY

The Supreme Court in a series of recent cases has thoroughly rejected claims of broad authority by agencies to create their own power to impose new and novel regulations based on vague and ambiguous language in a statute.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022) (statutory authority to regulate workplace safety was not authority to regulate general health); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485 (2021) (statutory grant of authority to prevent spread of communicable diseases did not include a moratorium on evictions);  *AMG Capital Mgmt., LLC  v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021) (rejecting FTC's 40-year claim of disgorgement remedy based on the statutory grant of  ability to obtain injunctions).

---

[4] The Court also rejected Plaintiffs-Appellants argument that the approval of the Final Rule before the comment period ended was unlawful.  Plaintiffs-Appellants do not press the argument here but the issuance and timing of the Pentony Letter approving the Final Rule should have the Court cast a more searching eye on the Appellees' claims concerning response to comments.

Again and again, in the last year the Supreme Court has admonished the agencies (and some lower courts) not to infer power when none is given.

Not only is there no language granting the power to require the herring fishery in New England to fund the ASM, but there are many statutes limiting analogous costs, fees, and impositions of this kind to amounts far below what the Appellees inflicted here. This is not a case of mere statutory silence leaving a "gap" to fill but of active intent to prevent the agencies from imposing such costs on the New England fishery while allowing them (with certain protections) in more lucrative fisheries. The impressive efforts by Congress to prevent agencies in general and Appellees in particular not to seek revenue or services from the regulated would be stymied if this Court interprets the statutes here to require Congress to continue to play "whack-a-mole" with agency attempts to evade the actual limits on the power Congress has imposed.

Appellees assert that they can require a regulated party to pay for ASM of the fish stocks that belong to the government when: 1) Congress has explicitly authorized it by statute; and 2) when Congress has not authorized it by statute but has allowed the placement of such monitors on private vessels. This position, were it to prevail, would allow the Appellees to evade the congressional controls constitutionally assigned by its powers to lay and collect taxes, appropriate, and spend. U.S. Const. art. I, §§ 1, 7, 8. The Supreme Court and this Circuit have been

very clear that the plain language of the statute governs, not the desire and will of the agency. Here the statute plainly allows on-board monitors to be placed on vessels, but it nowhere states the Appellees can create analogous unfunded monitors to provide a service for the government and charge the regulated for them.

## A. The MSA Is Carefully Balanced to Protect Fish Stocks and Fishers

The MSA was adopted to protect, manage, and grow our nation's fishery resources. To achieve these goals, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. 16 U.S.C. § 1801, *et seq*. The MSA grants the Department of Commerce the ability to exercise "sovereign rights" to conserve and manage fisheries resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the Exclusive Economic Zone ("EEZ"). 16 U.S.C. §§ 1801(b)(1), 1811(a). Generally, the EEZ extends from the seaward boundary of each of the coastal States to 200 nautical miles offshore. 16 U.S.C. § 1802(11); *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106, 108 (1st Cir. 2017); *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 110 (1st Cir. 2002). The MSA provides for the development and implementation of FMPs for fisheries. 16 U.S.C. § 1801(b)(4). FMPs are implemented with the goal of continually achieving and maintaining optimum yield within each fishery. *Id*.; *see Goethel*, 854 F.3d at 109; *Campanale & Sons, Inc.*, 311 F.3d at 110-11. All FMPs, and their implementing

regulations, must be prepared and executed in accordance with ten fishery conservation and management "National Standards." 16 U.S.C. § 1851(a).

This Appeal concerns five of these standards that are implicated by the IFM Amendment and the Final Rule:

1. National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1).

2. National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." *Id.* § 1851(a)(2).

3. National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." *Id.* § 1851(a)(6).

4. National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* § 1851(a)(7).

5. National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements …, take into account the importance of fishery resources to fishing communities by utilizing economic

and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8).

The MSA establishes eight Regional Fishery Management Councils ("Councils"). *Id.* § 1852(a)(1). The Councils share fishery conservation, management, and regulatory responsibilities with Commerce and NOAA. Two of the eight Councils are relevant to the action challenged here: NEFMC and MAFMC. *See id.* The NEFMC consists of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. *Id.* § 1852(a)(1)(A). The MAFMC consists of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. *Id.* § 1852(a)(1)(B). The Councils prepare, monitor, and revise FMPs. *Id.* § 1801(b)(5). The Councils, in conjunction with the Secretary, may also propose regulations implementing or modifying an FMP or plan amendment. *Id.* § 1853(c); *cf. id.* § 1855(d). The Councils also provide a forum through which the fishing industry, as well as other interested parties, can take an active role in advising, establishing, and administering FMPs.

*Id.* § 1801(b)(5). The MSA prescribes the required and discretionary provisions of FMPs. *Id.* § 1853.

Among other requirements, FMPs must include conservation and management measures; fishery descriptions; certain yield assessments; essential fish habitat identification; fishery impact statements; criteria for identifying overfishing within the fishery; standardized reporting methodology for bycatch analysis; and a mechanism for setting annual catch limits. *Id.* § 1853(a). FMPs may also include fishery permits; designation of limited or closed-off fishing zones; limitations on catch and sale of fish; prohibitions and requirements related to gear types; requirements for carrying observers on board to collect conservation and management data; and reservation of portions of allowable catch for use in scientific research. *Id.* § 1853(b). The MSA authorizes information collection but does not contemplate or even use the term "at-sea monitor." Instead, the MSA permits information collections that are beneficial for developing, implementing, or revising FMPs. *Id.* § 1881a(a)(1). If a Council determines such information collection is necessary, it may request that the Secretary implement the collection. *Id.* If the Secretary determines that the collection is justified, then the Secretary has the duty to promulgate regulations implementing the collection program. *Id.*

The MSA provides no general grant to any Appellee of the right or ability to collect fees from regulated parties for data collection. It explicitly authorizes the

collection of fees in certain circumstances for specific purposes. But it does not generally allow industry funding of agency wishes. The statute does authorize the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of LAPPs and certain community development quota programs. *Id.* § 1854(d). Crucially for the Court's statutory analysis here, such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. *Id.* § 1854(d)(2)(B).

Only one Council can implement fees for observers (analogous to ASM). The Congress *explicitly* permitted the NPFC to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. *Id.* § 1862(a). There is no such provision for the NEFMC- or MAFMC-managed fisheries. That absence is telling and dispositive of the unlawful power asserted here by Appellees. The MSA also explicitly permits the Secretary to charge fees to foreign fishing vessels that harvest fish in the United States of America's jurisdictional waters to pay for observers. *Id.* § 1827. That is the sum of statutory authorizations. In fact, there is a prohibition on charging the regulated entities for collecting data except for the LAPPs and NPFMC.

NOAA explicitly said the Final Rule was designed this way because the MSA prohibited it from accepting funds from industry without sending it to the Treasury. Alaska can collect fees to put in a fund to offset costs, but New England doesn't.

A342. It also noted that LAPPs allowed some offsets, but they were not authorized here. *Id.* Appellees explicitly noted that LAPPs allow them to receive funds from industry to defray observer costs but such costs are capped at 3% and implementing them is "complex and often take[s] several years." A343; *see generally* A191–197.

Congress provided an extra step for approving LAPPs in New England. *Lovgren*, 701 F.3d at 17 (describing the referendum of permit holders required and citing 16 U.S.C. § 1853a(c)(6)(D)(i)). Congress did not provide a detailed authorization for imposing such costs on industry, but somehow allow the agencies to smuggle in 20% cost hikes on the same fishers simply by allowing observers on fishing vessels and end-running the statute.

## B. Congress Created Monitoring, Including Industry-Funded Monitoring in Certain Fisheries but Did Not Do So in New England

The district court cited *Goethel v. Pritzker*, Civ. No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 26, 2016), an unreported case out of the District of New Hampshire, in defense of Appellees' adoption of the IFM Amendment and promulgation of the Final Rule. *See id.*, *aff'd on statute of limitations ground*, 854 F.3d 106, 108 (1st Cir. 2017). It also cited *Loper Bright*, which the district court already found has significant differences from this case, but which is also on appeal in the D.C. Circuit. *See Loper Bright Enter. v. Raimondo*, 21-5166 (D.C. Cir. filed July 19, 2021).

In *Goethel* the lower court dismissed a challenge to an industry-funded ASM requirement in the groundfish fishery on statute of limitations grounds. *See* 2016 WL 4076831, at *4. However, that court went on—in *dicta*—to dismiss the statutory construction arguments made by plaintiffs. *See id.* at *4-10. Notably, like the court below, that court relied heavily on *Chevron. See id.* at *4 (citing *Chevron*, 467 U.S. at 843). *Chevron*'s view of agency deference has since been curtailed, at least through implication, by *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *See id.* at 2416 ("Under *Auer*, **as under Chevron**, the agency's reading must fall 'within the bounds of reasonable interpretation.' … And let there be no mistake: That is a requirement an agency can fail." (emphasis added) (citation omitted)). Such deference to one litigant's view of the law has been criticized as violating both principles of separation of powers and due process for the litigant not receiving such advantage. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1152, 1155 (10th Cir. 2016) (Gorsuch, J., concurring) (separation of powers and due process); *Valent v. Comm'r of Social Sec.*, 918 F.3d 516, 525 (6th Cir. 2019) (Kethledge, J., dissenting) (habitual deference undermines judicial independence); *see* Phillip Hamburger, *Chevron Bias*, 84 Geo. Wash. L. Rev. 1187, 1195 (2016) (due process violation when judges "engage in systematic bias in favor of the government."). Secondly, the *Goethel* court confused "observers," which are explicitly named by statute under 16 U.S.C. § 1853(b)(8), with this new office, ASM, which are nowhere prescribed by the MSA.

In this case, the Final Rule explicitly notes that ASM have different duties than "observers." A244 (noting the types of data and information observers collect is different than the type of data and information ASM collect).

The *Goethel dicta* also traduces the bedrock foundation of administrative law that an agency is without power to act "unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id*. To do that permits an agency to override Congress, which is something the Supreme Court is "both unwilling and unable to do." *Id*. at 374–75. Nothing in the MSA confers this power on any Appellee. "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). The MSA explicitly allows "observers" to be placed on vessels "for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). It does not generally allow the government to charge fishermen for the cost of their own monitors and, when the law does, it says so. This Court may not supply the lack.

Such agency overreach has been rejected. *Gulf Fisheries Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 455 (5th Cir. 2020) (prohibiting NOAA and the Secretary from regulating "aquaculture" when not explicitly authorized by statute). That court noted that the agency's attempt to "create an entire industry the statute does not even mention" was founded on a "slippery" use of the word "harvest." *Id.*

The ASM office is equally unmentioned in the statute and the result should be the same.

The words "necessary and appropriate" could not be conscripted to allow any imposition Appellees desired to impose on a regulated fishery. Congress knew how to regulate aquaculture if it wanted to, and silence was indicative that it did not do so. *Id.* at 465–66 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). So it is here, if the Appellees want the type of powers that have been granted by section 1862(a) to the NPFMC, they can only receive them from Congress, and not by the MSA's silence.

*Loper Bright* is both wrong and distinguishable. The unrebutted fact here that Appellants' vessels are made to carry observers and, likely, ASM at higher rates than other vessels, and that the per trip rather than per day exemptions damage Appellants to no good purpose were not present there. *Loper Bright* contained an issue of extra-record evidence not applicable here. 2021 WL 2440511, at *8–9. It found no ambiguity in the statute which the district court here did not condone. *Id.* at *13. It also misapplied what "necessary and appropriate" means in statutory construction analysis. *Id.* at *13–14. Finally, that court found that the Final Rule did not violate the Anti-Deficiency Act, the Miscellaneous Receipts Statute, or the Independent Offices Appropriations Act. *Id.* But those are not Appellants' argument here. At every turn, Congress has *explicitly* allowed industry funding in the fisheries when it

wanted to and erected barriers like those statutes and the cost limits to protect fishers in the MSA. This Court should not interpret the MSA in such a way that allows the agency to get around these statutory safeguards. The MSA carefully balances protection of fish and fishers but an interpretation by this Court that anything the agency wants to do it can foist on fishers misbalances the statute away from Congress's design.

*Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016), points in the same interpretive direction. Money is fungible. *Sabri v. U.S.*, 541 U.S. 600, 606 (2004). The Appellees assert the Final Rule does not implement a "fee." *See* A248. And the record is clear these are not user fees, which would perhaps be allowable under 31 U.S.C. § 9701(b). *Anglers Conservation Network* contains the government's explication of all the ways Congress has stopped them from burdening the regulated. There plaintiffs sought, *inter alia*, 100% observer coverage funded by industry. *Anglers Conservation Network*, 139 F. Supp. 3d at 115. The government noted this would "have violated federal statutes outside of the MSA framework, in contravention of 16 U.S.C. § 1853(a)(1)(C)'s requirement that provisions of fishery management plans 'shall be consistent with … any other applicable law.'" *Id.* It would also traduce the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), the Miscellaneous Receipts Statute, 31 U.S.C. § 3302(b) and 18 U.S.C. § 209, which prohibits payment of "federal

employees' salaries from non-governmental sources." *Id*. at 116. The court held the record "amply" supported this concern, and noted only the Alaskan fisheries allowed such a program and so held for the government. *Id*.; *see* 16 U.S.C. § 1862(a); *see also Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9.

There is a broader reason the requirement to deal with ASM violates the law. It violates the very structure of the Congressional grants of agency power. The levels at which various government activities shall be funded is quintessentially a nondelegable legislative function. *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 229 (1st Cir. 2003) ("Deciding what funds shall be appropriated from the public fisc and how that money is to be spent is a task that the Constitution places in the congressional domain."). Here, Appellees approved neither the level of observers Congress was willing to fund nor the laws that prevented them from dunning the industry. The scheme creating a new federal office, ASM, followed. *See U.S. v. Cusick,* No. 11cr10066-LTS, 2012 WL 442005, at *3 (D. Mass. Feb. 9. 2012) (ASM was a "representative of the Federal government" and impeding their work, a crime).

The district court rejected Appellants' arguments that the *casus omissus* canon controls, which instructs the courts not to engage in judicial legislation by "add[ing] to what the statutory text states or reasonably implies," because the Defendants-Appellees relied on broad language in the statute not just one section of it. ADD15-18 (citation omitted); *see also Ebert v. Poston*, 266 U.S. 548, 554 (1925); *Iselin v.*

*U.S.*, 270 U.S. 245, 251 (1926) ("To supply omissions transcends the judicial function."); *Loving v.* , 517 U.S. 748, 758 (1996) ("[T]he lawmaking function belongs to Congress … and may not be conveyed to another branch or entity." (citing U.S. Const. art. I, § 1)). The district court erroneously rejected this canon and found ambiguity in the MSA for three reasons. First, because the MSA allows the Appellees to place observers on fishing vessels, ADD16 (citing 16 U.S.C. § 1853(b)(8)). Second, the Secretary may provide such "'conservation and management measures' that are 'necessary and appropriate' to . . . 'promote the . . . stability of the fishery.' *Id.* at ADD9 (quoting 16 U.S.C. § 1853(a)). That combined with a provision that the Secretary may penalize a fisher for failing to pay a contract for an observer (16 U.S.C. § 1858(g)(1)(D)) provided the "ambiguity" that ostensibly allowed the district court to approach *Chevron* step two.

This was error. *Campanale & Sons, Inc.* undermines the district court's decision. 311 F.3d at 109. There, Rhode Island lobstermen brought a declaratory judgment action against the Secretary of Commerce that a lobster trap-per-boat limit the Department implemented violated the APA, the MSA, and the RFA. *Id.* at 115. This Circuit stated "[o]ur general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning." *Id.* (citations omitted). The issue in that case was what the word "consultation" meant. The court found it had as its plain meaning "the

act of asking the advice or opinion of someone." *Id*. at 117 (citations omitted). There the appellees argued that because they had taken comments from some of the "consultants" they had fulfilled their duty. This Court disagreed. "Consultation, within the parameters of the Atlantic Coastal Act, must mean something more than general participation in the public comment process on environmental impact statements, otherwise the consultation requirement would be rendered nugatory." *Id*. at 118; *Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001) (the "primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous").

The Appellees seek to read out of the MSA the exceptions to industry funding, and protections of fishers from it, explicitly put there by Congress for LAPPs, foreign vessels, and the North Pacific fisheries. Under this Circuit's precedent this is forbidden. *See Campanale & Sons, Inc.*, 311 F.3d at 121 (reversing the district court for misconstruing "consultation"). One of the faults of the Secretary of Commerce in that case was that he affirmed the final rule at issue (on lobster traps) before consultation. *Id*. at 117 (Secretary had made his decision before any correspondence deemed "consultation" occurred). Here, the Secretary of Commerce approved the IFM Amendment and Final Rule before the comment period was over, making a mockery of the comment requirement and failing the procedural test laid out in *Campanale & Sons, Inc*. *See* A240; *see also* A269. Such rules are to be

approved only "after a statutorily designated period of public comment." *Lovgren*, 701 F.3d at 13. While the district court's ruling that the timing of the rule and comments was lawful is not challenged on this appeal it does cast doubt on the stated responses.

*Atlantic Fish Spotters Ass'n* provides Appellants further support. 321 F.3d 220. Statutory interpretation "begins—and sometimes ends—with the relevant statutory text … When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not consult other aids to statutory construction." *Id*. at 223–24. There, the Court determined that the words of a yearly appropriation bill, prohibiting spotting tuna from the air. did not support a permanent law against the practice. NOAA could not condition permits on such prohibition, thereafter. *Id*. at 229. Here, Appellees cannot use the three exceptions allowing industry funding to create a general agency prerogative for such funding.

The Supreme Court's most recent interpretations of federal statutes also provide powerful support for the proposition that courts must not countenance the statutory legerdemain attempted here. *See supra* Section I. Interpretation of statutes should not make any part of them superfluous. *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017) ("[T]he Board's interpretation makes the first requirement superfluous, a result we typically try to avoid."). In that case, the Court interpreted the Federal Vacancies Reform Act ("FVRA"). The Court started with the

text of the statute. *Id*. at 938. It found that FVRA made no sense unless it applied to "anyone performing acting service under the FVRA" because any other reading would make much of the statute superfluous. *Id.* at 941. Here, the sections of the MSA allowing "observers" to be paid by industry funding in one fishery, makes no sense if the MSA willy-nilly allows Appellees to avoid every statutory protection for beleaguered fishermen by simply creating a new industry-funded office to do the same thing.

### C. It Is Arbitrary and Capricious in the Extreme to Allow Some Fishers to Harvest More Herring Without ASM While Requiring Appellants to Do So

One of the most glaring problems with the IFM Amendment and Final Rule, is that its exceptions completely bypass Appellants *while allowing other vessels to harvest more herring than Appellants would*. It is undisputed that Appellants cannot take advantage of port-side monitoring or other exceptions that would free them from carrying an ASM. But two aspects of the Final Rule and its exceptions are completely arbitrary and capricious regardless of whether the Court examines the goal of the MSA to protect fish or fishers.

First, if a fishing vessel declares that it will take less than 50 mt of herring on a *trip* it receives a coverage waiver and need not procure an ASM. A243–244. Second, the typical herring vessel in the New England fishery spends on average 2-3 days per trip harvesting herring. A238. Appellants' vessels, partly because they

harvest *fewer* fish per day than other vessels, are out on average 7-14 days. *Id*. The existence of the ACL means that there is a region wide cap on how many total herring can be harvested per *year*. There is nothing less arbitrary or capricious than the iron laws of math. And nothing more arbitrary and capricious than ignoring them. Here vessels other than F/Vs *Relentless* and *Persistence* can go out for two days and take in 49 mt of herring. They can make 7 two-day trips and harvest 343 mt of herring without an ASM present. Or if they can use portside monitoring they can take the same 343 mt (or more) of herring without an ASM. But F/Vs *Relentless* or *Persistence* taking only 55 mt of herring on a typical seven to fourteen day trip would require an ASM that raises its costs 20%!

The only response from Appellees on this was that the per-day monitors allow closer monitoring of fish catch. A252. This is wholly arbitrary and capricious. It also belies any argument that ameliorating Appellants' problems with the Final Rule is not "practicable." The ACL is determined yearly. The ASM are determined per trip and paid per day. The MSA forbids such a blind eye to an economic reality that allows more herring to be taken by other vessels to no gain to the fishery or fishers while burdening one segment of the fishery without cause or explanation.

It is also arbitrary and capricious to impose costs of 20% more on one set of Fishers when Congress, through statutorily authorized LAPPs allowed only 3%, or if the lucrative North Pacific fishery is a benchmark, half the cost of ASM here.

Congress set the amount of costs it is willing to impose in the MSA and for the Appellees to exceed it nearly seven times is arbitrary and capricious.

### D. *Chevron* Does Not Save the Final Rule as the Appellees' Interpretation Is Unreasonable and Aggrandize Their Own Power at the Expense of Congress's

The *Goethel* and *Loper Bright* courts found no ambiguity in the MSA and allowed the regulation. The district court here found ambiguity but that the Appellees' interpretation was reasonable. Appellants adhere to the position that the MSA does not say the Appellees can do this and therefore they should not be able to assume such power absent further congressional action. As a matter of interpretation, the burden is on the Agency to show it has been delegated this power and not on Appellants to demonstrate it has not. The courts should not misinterpret *Chevron* to ascribe more power to federal agencies and require congressional action to stop it. If the question is what power the statute gives to the agency, the court is in a better position, and retains Article III indifference to executive interpretation of law, to understand a statutory scheme than an agency. Nonetheless, even if *Chevron* applies, modern *Chevron* does not go so far as the lower court and Appellees' assert.

Appellees claim that the mere ability to regulate the fisheries, or the fact that industry-paid at-sea observers (rather than ASM) are allowed in some fisheries, allows them in all. This conclusion cannot be supported. Section 1853(b)(8) along with section 1858(g)(1)(D) of the MSA do not provide for this new federal office

paid for by the regulated. Section 1853(b) merely allows that the Secretary may require that observers can be ordered on board a vessel which holds a federal fishing permit. *See* 16 U.S.C. § 1853(b). Congress appropriates money for these observers, and by separate statute, in one fishery, has directed that the Secretary may allow industry funding. In *Atlantic Fish Spotters Ass'n*, this Court noted that what Congress does through its appropriation power does not bind the law forever based on that funding. 321 F.3d at 229. New funding without such a proviso was simply new funding. The Appellees urge the Court to *exceed* the level of funding Congress allowed for observers by creating a new office funded by industry with similar, albeit not identical functions. Under such an interpretation, Congress loses much of the power of the purse. *Chevron* should not lead this Court to aggrandize agency power above and beyond Congress's spending power.

Section 1858(g)(1)(D) of the MSA merely allows the Secretary to ensure at-sea observers are paid by industry vessels in those fisheries where Congress has provided for industry funding of observers. *See* 16 U.S.C. § 1858(g)(1)(D). The MSA does not require industry funding because Congress expressly authorizes appropriated funds in the budgets for the agencies and nowhere authorizes any Appellant to augment those resources by other schemes or contrivances. In gauging whether the Final Rule is "reasonable" even under *Chevron*, the Court should look at what Congress has explicitly done where it has allowed fee shifting.

In the North Pacific Fishery, the fee-shifting provision's granularity and particularity, as opposed to the vast powers without any statutory support the Appellees' claim here is instructive. It first states the North Pacific Council can for any fishery under its jurisdiction (except for salmon) establish a system of fee-based observers. *Id.* § 1862(a).

The statute then provides for the standards that must be used to provide for this industry funding. *See Id.* § 1862(b)(1)(A)–(D), 1862(b)(2)(A)–(J). Those standards include "be fair and equitable to all vessels and processors[.]" *Id.* § 1862(b)(1)(B). Foisting a disproportionate share of the regulatory costs on two vessels out of Rhode Island, to no gain to conservation of herring or other species in this fishery, is not "fair and equitable." These requirements do not apply to the New England fishery—which provides more support for the fact that "fee shifting" does not apply there either.

The words "necessary and appropriate" also do not open up ambiguity and require *Chevron* analysis nor remove unreasonableness. Words like "appropriate and necessary" do not create magical administrative powers. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). There as here, the agency claimed an ability to ignore costs when regulating power plants that was directly contradicted by part of the statute. The Court struck it down using the *Chevron* analysis stating "This is a[n] [ ] effort

to avoid strictures Congress, for good reason, placed on agency power." *Id.* (citations omitted). So too here.

In this case, the Court should not get past *Chevron* step one—whether there is an ambiguity in the statute—because there is no ambiguity when the traditional tools of construction are used. *See Gulf Fisheries,* 968 F.3d at 460 (when all tools of statutory construction used, no ambiguity and NOAA could not charge fees).

This is also the direction of the Supreme Court. *See Kisor*, 139 S. Ct. at 2415 (citing *Chevron*, 467 U.S. 843, n. 9); *see also Gulf Fisheries*, 968 F.3d at 460 ("We will not defer to 'an agency interpretation that is inconsistent with the design and structure of the statute as a whole.'" (citations omitted)). Courts ought not find ambiguity in Congress's silence on whether it granted an agency power or not and require Congressional negation of that power to find no ambiguity. *Gulf Fisheries*, 968 F.3d at 461; *see also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) (*Chevron* deference not created by Congressional silence on an issue). Congress must implicitly or explicitly assign the power. *Ethyl Corp.*, 51 F.3d at 1060 Here it did neither. In fact, the D.C. Circuit's holding in *Ethyl Corp.* also notes that silence does not get an agency to *Chevron* step two. *Id.* (allowing agency power "absent an express withholding of such power" would give agencies "virtually limitless hegemony").

One such tool can be legislative history. That approach favors Appellants. The 1990 MSA amendments added fee-shifting provisions in the North Pacific and placed observers on vessels. *See* 16 U.S.C. §§ 1862(a), 1853(b)(8). It did not "clarify" or "approve" the fee requirements. The Senate comments state that section 1853(b)(8) "would clarify the existing authority in the [MSA] for fishery management plans to require that observers be carried on board domestic fishing vessels for conservation and management purposes." S. Rep. No 101-414 at 20 (Aug. 2, 1990). Nothing in that statement provides support for making those vessels pay for the observers.

As for 16 U.S.C. § 1862(a), Section 118 of Public Law 101-627 in the Committee notes says: "This section adds a new provision to the [MSA] which is specific to the North Pacific Management Council. Nothing in this section should be construed as affecting the rights and responsibilities of other Regional fishery Management Councils or as affecting fisheries other than those within the jurisdiction of the North Pacific Fishery Management Council." H.R. Rep. 101-393 at 31 (Dec. 15, 1989). Congress practically screamed "don't do this in other fisheries." If anything, the legislative history reveals that Congress looked at charging industry observer fees in one fishery, approved it, and prohibited it everywhere else.

Should the Court reach *Chevron* step two, it should reverse the district court. A free-standing power to charge all regulated industries fees for government activities

42

is nowhere described in the Constitution or any statute. The Appellees' interpretation is unreasonable and contrary to law. If this conduct is "permissible," no agency can be constrained by Article I's taxing or spending authority, because without clear authorization they can require industry to pay for their desires by outsourcing the government function to third parties.

The "ASM" charges are not related in any way to a benefit received by the regulated industry. The information gathered does not help the individual fisherman and is seen as an intrusive imposition. It helps the government monitor its own property—fish stocks. Such a scheme is on dangerous ground constitutionally. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) (when a fee scheme was not premised on benefit granted regulated company, it approached being a tax and to avoid a non-delegation issue the Court would remand to allow a fee assessment along these constitutional lines).

IV.  **THE FINAL RULE DOES NOT PROPERLY ASSESS THE NATIONAL STANDARDS**

The record is devoid of adequate support for five standards. National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Here the record reveals: (1) Appellants' vessels have a very low percentage of bycatch, *see* A292 ("Our currently high levels of coverage show that there are extremely low

43

bycatch rates for our vessels and our style of fishing."); (2) Appellants take less Atlantic herring a day than other types of trawlers, *see* A238; and yet, (3) they are threatened with higher ASM costs as they will not be able to use the exemptions because of their style of fishing, and for some reason are assigned more such officers on their vessels.

Placing ASMs on Appellants' vessels does not aim to prevent overfishing while obtaining optimum yield, because the Final Rule's arbitrary exemptions for those vessels taking more Atlantic herring per day get to avoid every burden while taking more Atlantic herring than F/Vs *Relentless* and *Persistence* over the same period. The rule allows hundreds of thousands of metric tons of herring to be harvested by other boats with no monitors and without explanation why this is so.

This case is like *Western Sea Fishing Co.*, where the court struck down a rule on herring that did nothing to comply with National Standard One. 722 F. Supp. 2d 126. The Final Rule does nothing to establish optimum yield. It simply shifts who will harvest the yield.

National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Appellants' fishing is no more harmful to the Atlantic herring stock than any other kind of Atlantic herring fishing. Appellants' fleet is assigned ASMs more often than other members of the fleet without any scientific reason for that

costly imbalance. To burden industry, with no scientific evidence of clear increase in Atlantic herring stocks therefrom, violates National Standard Two (as well as National Standard Seven). *See Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 32 (1st Cir. 1999) (where state-by-state quotas unsupported by the record MSA regulations could be overturned); *Hall v. Evans*, 165 F. Supp. 2d 114, 117–18 (D.R.I. 2001) (overturning final rule under MSA because differing treatment by gear type was arbitrary and capricious).

National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6). The Final Rule takes no notice that Appellants are multi-species fishers. As noted in their comments, F/Vs *Relentless* and *Persistence* have on-board observers for squid, Atlantic herring, and other species. They consistently have lower bycatch rates than other vessels, yet the Final Rule is requiring them to rely on non-Atlantic herring resources to pay for the ASM for Atlantic herring. This cross-subsidy completely upends their style of fishing and puts pressure on the other fishery resources that is not addressed by Appellees. *See* A238–239. It also fails to address the fishing community of North Kingston, R.I. (where F/Vs *Relentless* and *Persistence* are docked) by a rule that singles them out for harsher treatment than other herring fishers.

National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). This National Standard has been completely ignored. As noted, Appellants are bearing a disproportionate amount of ASM for no good reason, and the discrepancy is unexplained by the Final Rule or any response to comments. A per-day herring exemption was dismissed out of hand without adequate reason or scientific basis. *See* A252. The industry contribution to ASM in the beleaguered New England Fishery is about twice the industry contribution per day found in Alaska—where fishing is more lucrative and industry-funded at-sea observers are statutorily authorized. A348.

National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements …, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). This standard has been violated in the same way as National Standard Seven. Appellants are not more damaging than any other vessel to any fishing resource, yet the Final Rule burdens them the most because they fish different

species and freeze the catch. There were many "practicable" ways not to injure the North Kingston, Rhode Island fishing fleet and none were taken.

*Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003), is instructive. In that case plaintiff sued the Secretary of Commerce for his Tilefish Fishery Management Plan. *Id.* at 347–48. The court found that National Standard Two was not complied with because, in one case, the finding was based on political compromise not science and, in another, there was no evidence at all that trawling was hurting the tilefish. *Id.* at 353, 356. There is no evidence Appellants hurt herring stocks more than other, less burdened vessels, and the result should be the same.

## V. THE FINAL RULE FAILS TO COMPLY WITH THE REGULATORY FLEXIBILITY ACT

The RFA, 5 U.S.C. § 601 *et seq.*, requires administrative agencies to consider the effect of their actions on small entities, including small businesses and reduce their impact where possible. *See Hall*, 165 F. Supp. 2d at 144. After the comment period the FRFA accompanies the publication of a final rule. *Id.* If it finds there is a significant impact, it must explore alternatives. *Id.* at 10.

The purpose of the RFA is to enhance agency sensitivity to the economic impact of rulemaking on small entities to ensure that alternative proposals receive serious consideration at the agency level. The RFA provides that, whenever an agency is required by the APA to publish a general notice of proposed rulemaking,

it must prepare and make available for public comment an IRFA, 5 U.S.C. § 10, and subsequently prepare and make public a FRFA, *id.* § 604. An agency must also publish the FRFA or a summary of the FRFA in the Federal Register. *Id.* § 604(b). When an agency takes a final action that is subject to the RFA, including the promulgation of final rules, but does not comply with the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review." *Id.* § 611(a).

Like the MSA, the RFA is reviewed under the APA, and this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that are taken without observance of the procedure required by law. 16 U.S.C. § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(D). The RFA in this case found that of the 66 businesses affected by the Final Rule, 62 were small businesses. *See* A253. Of these, 30 were actively fishing Atlantic herring. A254. NOAA estimates that "each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an ASM for category A or B vessels would be $566,580, with an average cost per vessel of $13,490." *Id.*

Incredibly, Appellees categorize this massive increase, for minimal gain, as a "potential economic impact." *Id.* They say under a heading "Steps the Agency Has Taken to Minimize the Significant Economic Impact on Small Entities" that such steps include: (1) "setting the coverage target at 50 percent rather than 75 or 100

48

percent"; (2) allowing exemptions for 50 mt per trip; and 3) electronic monitoring and port-side sampling for mid-water trawlers. A256.

This Circuit has stated that the RFA "does not command an agency to take specific substantive measures, but, rather, only to give explicit consideration to less onerous options." *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997). It must "describe those it considered and explain its rejection of any which, if adopted, would have been substantially less burdensome on the specified entities." *Id.* (citations omitted).

The agency never considered or included the recommendations to make exemptions available for at-sea processors which can take advantage of none of the measures it did consider. It did not "adequately summarize and respond[]" to the comments it received on this issue from Appellants and others. *See Little Bay Lobster Co. v. Evans*, No. Civ. 00-007-M., 2002 WL 1005105, at *30 (D.N.H. May 16, 2002) (agency should adequately summarize and respond to alternatives to comply with RFA). Appellees did not address the impacts associated with the omnibus alternatives throughout the process including in the IFM Amendment. *See* A248 (stating that "[b]ecause Omnibus Alternatives have no direct economic impacts, they will not be discussed in [the RFA/IFRA] section"). The assertion that a 20% economic cost hit has "no direct economic impacts" is inherently

insupportable.  If "the sky is green" is in an administrative record, the Court need not believe it.

Appellants also rejected, without analysis, the comments and data claiming a great drop in fishermen in the region. A250. Finally, and glaringly, there is nothing in the Final Rule or comments concerning ensuring that ASM are allocated across the fleet fairly.  And the RFA does not explain that.  There is no cap or prohibition on how often each vessel will host these ASM.  This is arbitrary and capricious in itself, but it also violates the RFA.  Each of the alternatives is not listed, including no action, and compared by the Appellees in relation to small businesses.

## VI.    THE FINAL RULE FORCES APPELLANTS INTO A MARKET AGAINST THEIR WILL

In *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court ruled that Congress lacked the power under the Commerce Clause to force individuals into a market they were not already in or "existing commercial activity." *Id.* at 552. The Court declined to allow Congress to require "mandatory purchase[s] to solve almost any problem." *Id.*   The ability to regulate commerce is not the ability to compel it. *Id.* at 555.   The ASM here are "purchased" solely because an administrative agency has (1) created the office without statutory basis; and (2) required Appellants to enter that market to "solve" the "problem" of Congress not appropriating the amount of money NOAA wants for monitoring. The

Final Rule would penalize Appellants if they do not enter this market by barring them from the fisheries.

The Supreme Court further noted the Federal Government did not have this power under the "necessary and proper clause." *Id*. at 561. *NFIB v. Sebelius* famously determined the penalty for failing to enter the market the Federal Government wanted you to enter was a "tax." *Id*. at 574. The taxing power is greater than the power to regulate commerce. *Id*. at 573. Here Congress did not give , NOAA, or any other Appellee the power to tax. They cannot force individuals into a market they do not wish to join. The Appellees admit that the ASM contracting is not a user fee. The response in the comments was that it is simply incidental to Commerce's power to regulate the fisheries. [AR17739]. The district court ruled the applicable market was herring, not ASMs. There has been a herring market on these shores longer than the United States has existed, with no observers or ASM. It is a new thing and not part of the herring market. The Final Rule requires Appellants to enter a market for ASM that previously only the government entered because they paid for observers. The Final Rule has the intended effect of moving the Appellees out of the ASM market and putting the Appellants in it. This is admittedly being done to avoid the constitutional and statutory prohibitions on making industry pay directly for government representatives.

The district court seemed to believe that because Appellants are regulated parties that are exercising the "privilege" of fishing the agency could make them do virtually anything. That is not the law. In *NFIB v. Sebelius*, the statute authorized such a market; here no statute does.

**CONCLUSION**

The Court should reverse the erroneous legal conclusions of the district court and strike the Final Rule. Consequently, the Court should reverse the decision below and remand for further proceedings consistent with the Court's decision.

Respectfully submitted on February 15, 2022, by:

*/s/ John J. Vecchione*

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the 13,000-word limit established by FRAP 32(a)(7) because it contains 12,209 words. This document complies with the typeface and typestyle requirements of FRAP 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, Times New Roman, and set at 14-point or larger.

Dated: May 27, 2022

*/s/ John J. Vecchione*
JOHN J. VECCHIONE

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2022, I electronically filed the foregoing document, along with the Appendix and Addendum, with the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for all parties are registered users of the CM/ECF system. They will be served by the CM/ECF system:

Dina Mishra, Dina.Mishra@usdoj.gov, Counsel for Appellees

Lauren S. Zurier lauren.zurier@usdoj.gov Counsel for Appellees

Dated: May 27, 2022

*/s/ John J. Vecchione*
JOHN J. VECCHIONE

*Counsel for Appellants*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔯𝔰𝔱 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

_____

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs-Appellants*,

*v.*

US DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her official
capacity as Secretary of Commerce; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; RICHARD SPINRAD, in his official
capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES
SERVICE, a/k/a NOAA Fisheries; JANET COIT, in her official capacity as
Assistant Administrator for NOAA Fisheries,
*Defendants-Appellees*.

_____

On Appeal from
the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

---

## APPELLANTS' ADDENDUM

---

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

District Court Opinion and Order (ECF No. 47) ...............................................ADD1

District Court Judgment (ECF No. 48) ........................................................ADD33

U.S. Const. art. I, § 1 ...............................................................................ADD34

U.S. Const. art. I, § 7 ...............................................................................ADD35

U.S. Const. art. I, § 8 ...............................................................................ADD36

5 U.S.C. § 706 .........................................................................................ADD38

16 U.S.C. § 1801 .....................................................................................ADD39

16 U.S.C. § 1851 .....................................................................................ADD40

16 U.S.C. § 1853 .....................................................................................ADD41

16 U.S.C. § 1857 .....................................................................................ADD43

16 U.S.C. § 1858 .....................................................................................ADD48

16 U.S.C. § 1862 .....................................................................................ADD49

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
RELENTLESS INC., et al.,                )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )    C.A. No. 20-108 WES
                                        )
U.S. DEPARTMENT OF COMMERCE,            )
et al.,                                 )
                                        )
          Defendant.                    )
_____)

## OPINION AND ORDER

WILLIAM E. SMITH, District Judge.

A recently promulgated regulation requires commercial herring
fishing vessels in New England to pay the daily salaries of at-
sea monitors. Plaintiffs argue, inter alia, that the Magnuson-
Stevens Act does not permit industry-funded monitoring; the
regulation's outsized impact on certain classes of fishing vessels
violates the National Standards set forth in the Magnuson-Stevens
Act; the process by which the agency adopted the regulation
violated the Regulatory Flexibility Act; and the regulation
violates the Commerce Clause by forcing fishing vessels to pay for
third-party monitors. For the reasons that follow, Plaintiffs'
Motion for Summary Judgment, ECF No. 37, is DENIED, and Defendants'
Cross-Motion for Summary Judgment, ECF No. 38, is GRANTED.[1]

_____

[1] The Court substitutes the Secretary of Commerce, Gina M.
Raimondo, for Wilbur L. Ross; Richard Spinrad, NOAA Administrator,

I.   BACKGROUND

A.   Magnuson-Stevens Act

In "[r]espon[se] to depletion of the nation's fish stocks due to overfishing[,]" Congress passed the 1976 Magnuson-Stevens Fishery Conservation and Management Act ("MSA" or "Act"), 16 U.S.C. §§ 1801-1884.  Goethel v. U.S. Dept. of Com., 854 F.3d 106, 108-09 (1st Cir. 2017) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997)).  Through the MSA, Congress sought to "take immediate action to conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles."  16 U.S.C. § 1801(b)(1), (3).

The MSA's primary mechanism is the promulgation and enforcement of "fishery management plans," each of which regulates a fishery (defined as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management") in a given region.  Id. § 1802(13)(A); see also id. § 1853.  A fishery management plan, which is usually developed by the region's fishery management council, must specify the "conservation and management measures" that are "necessary and appropriate" to "prevent overfishing and rebuild overfished stocks, and to protect,

_____

for Neil Jacobs; and Janet Coit, Assistant Administrator for NOAA Fisheries, for Chris Oliver.  See Fed. R. Civ. P. 25(d).

restore, and promote the long-term health and stability of the fishery." Id. § 1853(a)(1)(A). Similarly, a plan may "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." Id. § 1853(b)(14). In addition to the plan itself, the council must develop regulations that would be "necessary or appropriate" to implement the plan. Id. § 1853(c).

The Secretary is tasked with reviewing the plan for consistency with applicable law and publishing it for a sixty-day period of notice and comment. Id. § 1854(a)(1). After considering all comments, "[t]he Secretary shall approve, disapprove, or partially approve [the] plan." Id. § 1854(a)(3). The implementing regulations must, too, be promulgated through notice and comment, with a publication period of fifteen to sixty days. Id. § 1854(b). The Secretary has delegated these responsibilities to the National Oceanic and Atmospheric Administration, the parent agency of the National Marine Fisheries Service ("NMFS"). See Goethel, 854 F.3d at 109 n.1. The adoption of a plan and its implementing rules are subject to judicial review. See id. § 1855(f).

B. Industry-Funded Monitoring Omnibus Amendment

The current herring fishery management plan was implemented by the New England Fishery Management Council ("Council") in 2000.

AR17104.[2]  Among other provisions, the plan includes an annual catch limit and various restrictions on when and where herring may be caught.  See 50 C.F.R. § 648.200.  Since 2007, the fishery has been subject to the Standardized Bycatch Reporting Methodology ("SBRM") program, through which bycatch is monitored by on-board, government-funded observers.  See AR17293.  The frequency of SBRM coverage varies based on available funding.  See MSA Provisions; Fisheries of the Northeastern U.S.; Industry-Funded Monitoring Omnibus Amendment ("Final Rule"), 85 Fed. Reg. 7425 (Feb. 7, 2020) (to be codified at 50 C.F.R. pt. 648) (AR17742).

In 2017, the Council adopted the Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"), later approved by the National Marine Fisheries Service ("NMFS"), which provided for on-board human monitoring to be funded by the herring industry.  See Final Rule, 85 Fed. Reg. at 7414-19 (AR17731-36).  NMFS pays for administrative costs - such as training and certification of monitors, data processing, and liaison activities with various partners - while the herring industry is required to fund the travel expenses and daily salaries of the monitors.  Id. at 7415-16 (AR17732-33).  Through data collected by the monitors regarding retained and discarded catch, the program is intended to increase the accuracy of catch estimates for herring and incidental catch

_____

[2] The Court cites the Administrative Record, ECF Nos. 21-30, 34, using the Bates numbering system utilized by the parties.

species.  Id. at 7417-18 (AR17734-35).  The program has a coverage
target – including both SBRM and industry-funded monitoring – of
fifty percent.  Id. at 7417 (AR17734).  The two types of monitoring
do not co-occur on any one trip.  Id.  Therefore, industry-funded
monitoring only applies to the delta between the percentage of
trips with SBRM monitoring (which varies based on available
funding) and the fifty-percent target.

For each trip in which a vessel declares that it will catch
herring, NMFS informs the vessel operator whether an at-sea monitor
is required.  However, the monitoring requirement will be waived
if (1) an at-sea monitor is not available, (2) the vessel has
midwater trawl gear and intends to operate as a wing vessel
(meaning that it will not carry any fish), or (3) the vessel
intends to land less than fifty metric tons of herring during the
trip.  Id. at 7418 (AR17735).  Midwater trawl vessels - as opposed
to bottom trawlers like Plaintiffs, see Lapp Decl. ¶ 4, ECF No.
37-4 – can avoid the at-sea monitoring requirement by using
electronic monitoring devices in combination with portside
sampling protocols.  Id. at 7419-420 (AR17736-37).  NMFS estimates
that the cost of an at-sea monitor is $710 per day.  Id. at 7420
(AR17735).

NMFS published the proposed amendment on September 19, 2018,
and the sixty-day comment period ended on November 19, 2018.  Id.
at 7414 (AR17731) (citing 83 Fed. Reg. 47,326).  NMFS received

seven comment letters criticizing the proposal, but nevertheless approved the Omnibus Amendment on December 18, 2018. Id. at 7424 (AR17741). In a process that partially overlapped the Omnibus Amendment approval process, NMFS published the proposed rule implementing the amendment on November 7, 2018, with a forty-seven-day comment period ending on December 24, 2018. Id. at 7414 (AR17731) (citing 83 Fed. Reg. 55,665). Again, notwithstanding twenty comment letters, NMFS adopted and promulgated the rule ("Final Rule"). Id. at 7414, 7422 (AR17731, 17739).

C. Plaintiffs' Regulatory Challenge

Plaintiffs are the operators of two fishing vessels that catch herring and other species. See Letter from Seafreeze to Herring/Observer Committee, June 30, 2015, AR17801. Unlike other fishing vessels, Plaintiffs freeze their catch on-board. Id. Therefore, Plaintiffs' trips are longer, and they have greater flexibility to choose what to harvest during each trip. Id. Seafreeze Ltd., a sister company of Plaintiff Seafreeze Fleet LLC, submitted comments during the regulatory approval process, raising arguments similar to those advanced by Plaintiffs here. See Final Rule, 85 Fed. Reg. at 7422-26 (AR17739-743).

II. LEGAL STANDARD

Challenges to fishery management plans are reviewed pursuant to the Administrative Procedure Act ("APA"). See 16 U.S.C. § 1855(f)(1)(B). "[A] motion for summary judgment is simply a

vehicle to tee up a case for judicial review . . . ." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (citing Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 526 (1st Cir. 1993)). "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow." Associated Fisheries of Me., 127 F.3d at 109 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971)). The Court will set aside the regulation only if it is "'arbitrary, capricious, an abuse of discretion,' or 'without observance of procedure required by law,' or otherwise contrary to law." Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 116 (1st Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)-(D)). The Court defers to the agency's factfinding "unless 'the record evidence would compel a reasonable factfinder to make a contrary determination.'" Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003) (quoting Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999)).

III. DISCUSSION

According to Plaintiffs, the Secretary[3] has, "without Congressional authorization, 'erected' a 'new office[] and sent hither swarms of officers to harass' Plaintiffs 'and eat out their

---

[3] The Court refers to Defendants collectively as the "Secretary."

substance.'" Mem. Supp. Pls.' Mot. Summ. J. ("Pls.' Mot.") 1, ECF No. 37-1 (quoting The Declaration of Independence para. 12 (U.S. 1776)). More specifically, Plaintiffs claim that the Omnibus Amendment and the Final Rule violate the MSA, the APA, the Regulatory Flexibility Act, and the Commerce Clause.

A. Statutory Interpretation of the MSA

Plaintiffs first argue that the MSA does not allow industry-funded monitoring in these circumstances. The First Circuit has framed judicial review of an agency's statutory interpretation as a three-step process:

> First, we assess the statutory text to determine whether Congress has directly spoken to the precise question at issue. If so, courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. Second, if Congress's intent is uncertain, we decide whether and to what extent the agency's interpretation is entitled to deference. Finally, we evaluate the agency's interpretation under the governing standard to determine whether it exceeds the bounds of the permissible.

Lovgren v. Locke, 701 F.3d 5, 21 (1st Cir. 2012) (citations and quotations omitted). As explained below, the Court concludes that Congress has not spoken unambiguously on the subject, and that the Secretary's interpretation satisfies Chevron's deferential review. See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

i.   Whether Congress Has Directly Spoken

     The Secretary argues that the following statutory provisions
of the MSA, when construed in a harmonious fashion, demonstrate
that Congress has unambiguously provided for industry-funded
monitoring under these circumstances.  See Mem. of Law in Supp. of
Defs.' Cross-Motion for Summ. J. and in Opp'n to Pls.' Mot. For
Summ. J. 11-12, ECF No. 38-1.

     First, 16 U.S.C. § 1853(b)(8) states that a fishery management
plan may "require that one or more observers be carried on board
a vessel of the United States engaged in fishing for species that
are subject to the plan, for the purpose of collecting data
necessary for the conservation and management of the fishery."
Therefore, the Secretary is indisputably allowed to require the
presence of monitors.  (Plaintiffs' challenge is directed only at
program's funding mechanism.  See Pls.' Mot. 26; Pls.' Mem. in
Resp. to Defs.' Cross-Mot. for Summ. J. and Reply to Opp'n to Pls.'
Mot. For Summ. J. ("Pls.' Resp.") 4, ECF No. 40.)

     The Secretary's next interpretive hook is 16 U.S.C.
§ 1853(a), which requires each fishery management plan to include
the "conservation and management measures" that are "necessary and
appropriate" to "prevent overfishing and rebuild overfished
stocks, and to protect, restore, and promote the long-term health
and stability of the fishery." Id. § 1853(a)(1)(A), (2); see also
id. § 1853(c) (requiring a fishery management plan to be

                                9

accompanied by proposed regulations that are "necessary or appropriate" to implement the plan). The Secretary contends that, to ensure the accuracy of catch estimates and the integrity of annual catch limits in the New England herring fishery, it is necessary and appropriate to place the financial burden of monitoring on industry.

Finally, 16 U.S.C. § 1858(g)(1)(D) allows the Secretary to sanction any vessel owner who has not made "any payment required for observer services provided to or contracted by an owner or operator." Plaintiffs theorize that this provision applies only to those limited fisheries in which Congress has explicitly provided for observer fees. See Pls.' Resp. 4. However, this argument elides the fact that sanctions may be issued for failure to pay for services "contracted by an owner or operator." 16 U.S.C. § 1858(g)(1)(D) (emphasis added). In the three provisions that explicitly allow the Secretary to charge fees for monitoring, there are no contracts between vessel owners and observers. Rather, the vessel owners pay the fees to NMFS, which hires observers and assigns them to fishing trips. Thus, as explained in the only two cases to address this issue, the statute's mention of contracts "would be unnecessary if the MSA prohibited the very type of industry funding at issue in this case." Loper Bright Enters. v. Raimondo, CV 20-466 (EGS), 2021 WL 2440511, at *11 (D.D.C. June 15, 2021) (quoting Goethel v. Pritzker, 15-CV-497-

JL, 2016 WL 4076831, at *5 (D.N.H. July 29, 2016), aff'd on other grounds sub nom. Goethel v. U.S. Dept. of Com., 854 F.3d 106 (1st Cir. 2017)).[4]  However, the words "or contracted by" are fleeting and unspecific, so it goes too far to say that Congress has directly spoken in the Secretary's favor.

Conversely, Plaintiffs contend that Congress has spoken directly in their favor.  As they point out, there are statutes that expressly authorize the Secretary to collect fees to fund observer programs, and none of them apply here.  Plaintiffs therefore contend that approbation of this regulation would render the three statutes superfluous because, whether or not Congress provided for the collection of observer costs, the Secretary could charge such costs to fishing vessels.  See Pls.' Mot. 23-29.

Three such statutes exist.  First, the agency must "collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any . . . limited access privilege program."[5]  16 U.S.C. § 1854(d)(2)(A).  These

---

[4] The district court in Goethel ruled that the claims were both time-barred and lacked merit.  Goethel v. Pritzker, 15-CV-497-JL, 2016 WL 4076831, at *1 (D.N.H. July 29, 2016).  The First Circuit upheld that decision based on the statute of limitations, without reaching the merits of the claims.  Goethel v. U.S. Dept. of Com., 854 F.3d 106, 108 (1st Cir. 2017).

[5] These programs are complicated regulatory mechanisms through which fishing vessels can receive exclusive rights to harvest portions of a fishery's annual catch limit.  See 16 U.S.C. § 1802(23), (26), (27); see generally id. § 1853a.

fees, which "shall not exceed 3 percent" of the value of the catch, are deposited into a fund earmarked for the administration and implementation of the program. <u>Id.</u> §§ 1854(d)(2)(B-C), 1855(h)(5)(B). Second, the North Pacific Council may establish fishery research plans that require observers to "be stationed on fishing vessels" and that "establish[] a system . . . of fees . . . to pay for the cost of implementing the plan." 16 U.S.C. § 1862. Third, the Secretary may station observers on certain foreign fishing vessels and require the vessels to make payments into the Foreign Fishing Observing Fund, which is used to maintain the program. <u>Id.</u> § 1827(b), (d), (e).

But, because those statutes involve "fee-based program[s,]" they are distinguishable "from the industry-funded observer measures at issue here, in which the fishing vessels contract with and make payments directly to third-party monitoring service providers." <u>Loper</u>, 2021 WL 2440511, at *12. This distinction matters. Absent a statutory mandate to the contrary, the Miscellaneous Receipts Statute requires that fees be deposited in the Treasury without being earmarked for NMFS activities. <u>See</u> 31 U.S.C. § 3302(b). Therefore, were NMFS to collect the fees here, it could not keep the money. The above-mentioned statutory programs, on the other hand, allow NMFS to keep the money, using it to pay for any or all aspects of the observer program, including NMFS's administrative costs. <u>See</u> 16 U.S.C. §§ 1827(e),

1853a(d)(2), 1855(h)(5)(B), 1862(d).  Instead of collecting fees, the instant program requires fishing vessels to pay third-party monitors directly.  Because the payments never enter NMFS's pockets, the Miscellaneous Receipts Statute is not violated.  Importantly, though, this framework is less advantageous than the statutory programs, as NMFS must bear all of its internal costs of administering the program.

Accordingly, there is a meaningful difference between the monitoring program created by the Omnibus Amendment and the statutory observer programs.  The Secretary's interpretation of the MSA does not render the other three statutory provisions superfluous.  See Loper, 2021 WL 2440511, at *12 (holding the same).  With statutory currents flowing in all directions, the Court concludes that Congress's intent regarding industry-funded monitoring is ambiguous, and the inquiry cannot end at step one.[6]

---

[6] Pointing to Anglers Conservation Network v. Pritzker, 139 F. Supp. 3d 102 (D.D.C. 2015), Plaintiffs argue that the Secretary has already anchored herself to the position that industry-funded monitoring is prohibited under the MSA.  See Pls.' Mot. 33-34.  In Anglers, the Mid-Atlantic Fisheries Management Council had proposed a plan in which an observer would be stationed on every small mesh bottom trawl mackerel trip.  NMFS rejected the proposal, and an environmental group sued, seeking to reverse NMFS's decision.  The Secretary argued that the plan would have required NMFS "to augment its budget by accepting fees from the fishing industry[,]" thus violating the Miscellaneous Receipts Statute, 31 U.S.C. § 3302(b).  Anglers, 139 F. Supp. 3d at 116.  That argument is entirely consistent with the Secretary's position in the current litigation:  that the herring monitoring program cannot be funded through fees paid to NMFS, but that it can operate by requiring

ii.  Level of Deference

The next question is "whether and to what extent the agency's interpretation is entitled to deference."  Lovgren, 701 F.3d at 21.  An agency's statutory interpretation warrants Chevron deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  United States v. Mead Corp., 533 U.S. 218, 226–27 (2001); see also Chevron, 467 U.S. at 842-43.  In other words, Chevron applies where Congress gave the agency the "power to engage in adjudication or notice-and-comment rulemaking."  Mead, 533 U.S. at 227.  Conversely, where an agency's interpretation does not have the force of law – such as in an opinion letter – the weaker Skidmore deference usually governs.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

Here, Congress delegated authority to make rules implementing the MSA to the Secretary, who in turn assigned that power to the National Oceanic and Atmospheric Administration and NMFS.  See Goethel, 854 F.3d at 109 n.1.  These rules "have the full force and effect of law."  Hadaja, Inc. v. Evans, 263 F. Supp. 2d 346,

---

industry to pay third-party monitors directly.  Thus, Anglers does not help Plaintiffs' cause.

349 (D.R.I. 2003) (citing 16 U.S.C. §§ 1854, 1855).  Therefore,
Chevron deference applies.

    iii. Reasonableness under Chevron

    Under Chevron, the Court must "accept an agency's reasonable
resolution  of  an  ambiguity  in  a  statute  that  the  agency
administers."  Michigan v. EPA, 576 U.S. 743, 751 (2015) (citing
Chevron, 467 U.S. at 842-43).  In other words, an interpretation
will be upheld if it "represents a reasonable accommodation of
conflicting policies that were committed to the agency's care."
Chevron, 467 U.S. at 845.[7]

    Plaintiffs  argue  that  the  Secretary's  interpretation  is
unreasonable because it confers on the agency a power not provided
by Congress.  See Pls.' Mot. 26-27.   Specifically, Plaintiffs

_____

    [7] Plaintiffs assert that "Chevron's view of agency deference
has . . . been curtailed [since Goethel, 2016 WL 4076831], at least
through implication, by Kisor v. Willkie, 139 S. Ct. 2400 (2019)."
Pls.' Mot. 25.  But Kisor, which dealt solely with deference to
agency interpretations of regulations, has little to say about
agency interpretation of statutes.  See 139 S. Ct. 2408.  To the
extent Plaintiffs assert that Kisor altered Chevron by indicating
that  Chevron  deference  is  not  merely  a  rubber  stamp,  that
proposition has long been clear.  See, e.g., Util. Air Reg. Group
v. EPA, 573 U.S. 302, 321 (2014) (holding agency's interpretation
to be unreasonable, despite Chevron deference); Michigan v. EPA,
576 U.S. 743, 751 (2015) (holding agency's interpretation to be
unreasonable under Chevron deference, without step-one analysis);
AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 397 (1999) (same).
In  a  throwaway  line,  Plaintiffs  also  state  that  Chevron  "is
inconsistent with the Due Process Clause of the Fifth Amendment
and judicial independence and should be abandoned."  Pls.' Resp.
18.  Of course, though, Chevron is binding precedent that cannot
be ignored by district courts, including this one.

point to the casus omissus doctrine, which states that "nothing is to be added to what the text states or reasonably implies." Gorss Motels, Inc. v. Safemark Systems, LP, 931 F.3d 1094, 1102 (11th Cir. 2019) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts § 8, at 93 (2012)).  As Plaintiffs emphasize, 16 U.S.C. § 1853(b)(8) - which states that the Secretary can force fishing vessels to allow monitors on their boats - does not mention an industry-funding model (or any funding mechanism at all).  Indeed, if § 1853(b)(8) were the sole statute relied upon by the Secretary, the casus omissus doctrine might be more helpful.  But instead, the Secretary relies on provisions that empower the Secretary to take a wide range of actions to effectuate the goals of the MSA.

To start, Congress has tasked the Secretary with ensuring that the maximum number of fish can be caught, while simultaneously preventing overfishing.  16 U.S.C. § 1851(a)(1).  The most valuable tool for accomplishing these goals is the imposition of annual catch limits.  See 50 C.F.R. § 600.310(b)(1)(iii).  Of course, the Secretary's ability to accurately track annual catches is crucial to her efforts to enforce those limits.  To this end, Congress recognized that human observers could play an important role in improving the accuracy and reliability of NMFS's tracking, as shown by the express authorization of observer requirements in fishery management plans.  See 16 U.S.C. § 1853(b)(8).  As for the funding

of these observers, the statutory clues provide some support for the idea that the Secretary can impose costs on industry. See id. § 1858(g)(1)(D) (allowing imposition of sanctions for failure to pay for "observer services provided to or contracted by an owner or operator"). Moreover, Congress gave the Secretary the power to take any measures that are "necessary and appropriate" to achieve the MSA's conservation goals. Id. §§ 1853(a)(1)(A). Given the integral nature of catch estimates to the MSA's goals, along with the agency's financial incapacity to fully fund a monitoring program, it was reasonable for the Secretary to conclude that industry-funded monitoring is permitted under the MSA. See Final Rule, 85 Fed. Reg. at 7414 (AR17731) ("This amendment remedies NMFS disapprovals of previous Council proposals for industry-funded monitoring that either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.").

The legislative history reinforces this conclusion. Prior to the passage of § 1853(b)(8), which statutorily authorized at-sea monitoring, the Secretary had operated a North Pacific monitoring program in which vessel operators directly paid third-party monitors. See Loper, 2021 WL 2440511, at *13 (citing Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea & Aleutian Islands Area, 55 Fed. Reg. 4839-02, 4840 (Feb. 12, 1990)).

By enacting § 1853(b)(8), Congress arguably ratified NMFS's usage of industry-funded monitoring programs.  Moreover, in the years since, "[c]ongressional committees have continued to take note of such industry-funded programs."  Loper, 2021 WL 2440511, at *13 (citations omitted).

Thus, in keeping with the statutory text, the only two on-point decisions (Loper and Goethel), and the legislative history, the Court concludes that the Secretary reasonably interpreted the MSA to authorize the Omnibus Amendment.

B.   National Standards

Fishery management plans must comply with ten "National Standards."  16 U.S.C. § 1851(a).  Casting a wide net, Plaintiffs contend that the industry-funded monitoring program violates five of them.

i.   National Standard One

The first standard provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery."  16 U.S.C. § 1851(a)(1).  "The determination of [optimum yield] is a decisional mechanism for resolving the Magnuson-Stevens Act's conservation and management objectives, achieving [a fishery management plan]'s objectives, and balancing the various interests that comprise the greatest overall benefits to the Nation."  50 C.F.R. § 600.310(b)(2)(ii).

Plaintiffs argue that the monitoring exemption for trips landing less than fifty metric tons of herring does not serve these goals. Pls' Mot. 30. They contend that this rule unfairly burdens boats with on-board freezing capacity, which tend to take longer trips, thus leading to larger catches per trip. Id. Instead of a per-trip cutoff, Plaintiffs say, a per-day cutoff should have been used. See id. at 30-32.

However, National Standard One simply states that yield should be as high as it can be while avoiding the risk of overfishing. See 16 U.S.C. § 1851(a)(1). The incongruity between Plaintiffs' argument and this standard is illustrated by Plaintiffs' reliance on Western Sea Fishing Co. v. Locke, 722 F. Supp. 2d 126 (D. Mass. 2010). There, the court held that NMFS's denial of the plaintiff's application for a fishing license was "not rationally related to achieving optimum yield" because there was "simply no evidence or contention of a current danger of overfishing." Id. at 140. Importantly, relying on the fact that the fishery industry had not been reaching the annual catch limit, the court held that the license denial did not help to avoid surpassing the yearly limit. Id. As Plaintiffs note here, Atlantic herring were not overfished at the time the industry-funded monitoring regulations were implemented.[8] However,

---

[8] Just because a fishery is not approaching overfished status does not mean that NMFS cannot institute a fishery management plan.

Plaintiffs make no argument that the industry-funded monitoring rule will change the optimum yield or the industry's ability to reach that yearly level. Their argument simply concerns equity among the various participants in the herring fishery. National Standard One says nothing about those concerns.

    ii.  National Standard Two

Under the second standard, fishery management plans must "be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Noting that herring was not overfished at the time that the regulation was promulgated, Plaintiffs argue there is no scientific data to indicate that more monitoring would help prevent overfishing. Pls.' Mot. 31. The Court disagrees.

First, common sense instructs that additional data collection will lead to more accurate catch estimates. Moreover, National Standard Two "'does not mandate any affirmative obligation on [NMFS'] part' to collect new data." Massachusetts v. Pritzker, 10 F. Supp. 3d 208, 220 (D. Mass. 2014) (quoting Commonwealth of Mass. by Div. of Marine Fisheries v. Daley, 10 F. Supp. 2d 74, 77 (D. Mass. 1998)). In order to successfully challenge a fishery management plan under National Standard Two, a plaintiff must point

_____

See Anglers Conservation Network v. Pritzker, 139 F. Supp. 3d 102, 113 (D.D.C. 2015). And once a fishery management plan is in the works, the Secretary is explicitly tasked with preventing overfishing, not just remediating extant problems. See, e.g., 16 U.S.C. § 1853(a)(1)(A).

to specific scientific data that were ignored by the agency.  See

Massachusetts ex rel. Div. of Marine Fisheries v. Daley, 170 F.3d

23, 30 (1st Cir. 1999) ("If no one proposed anything better, then

what is available is the best.").  Because Plaintiffs do not point

to any information that was ignored, National Standard Two lends

no wind to their sails.[9]

### iii. National Standard Six

The  sixth  standard  provides  that  "[c]onservation  and

management  measures  shall  take  into  account  and  allow  for

variations  among,  and  contingencies  in,  fisheries,  fishery

resources, and catches."  16 U.S.C. § 1851(a)(6).  "There is no

requirement in national standard 6 or anywhere else in the statute

that  defendant  finely  attune  its  regulations  to  each  and  every

fishing vessel in the offshore fishery."  Ace Lobster Co. v. Evans,

---

[9] Plaintiffs  also  make  the  curious  argument  that  observers
have  been  assigned  to  a  higher  percentage  of  Plaintiffs'  fishing
trips  than  those  of  other  boats,  and  that  this  disparity  is
unsupported  by  scientific  reasoning.   See  Pls.'  Mot.  9,  31.
However,  the  monitoring  program  at  issue  had  not  yet  started  when
these  issues  were  briefed,  so  the  higher  observer  rate  cited  by
Plaintiffs  must  be  part  of  a  different  program,  likely  the
government-funded  SBRM  program.   See  Pls.'  Second  Notice  of  Facts
Subsequent  to  Filing  Summ.  J.  1,  ECF  No.  45  (explaining  that
monitoring  requirement  had  not  yet  begun);  AR17805.   The  Omnibus
Amendment seeks to augment the SBRM program such that fifty percent
of  herring  fishing  trips  are  covered  by  one  program  or  the  other.
Final  Rule,  85  Fed.  Reg.  7417  (Feb.  7,  2020)  (to  be  codified  at  50
C.F.R.  pt.  648)  (AR17734).   Thus,  to  the  extent  that  Plaintiffs
are  subject  to  greater  rates  of  a  SBRM  monitoring,  this  disparity
will  lead  to  Plaintiffs  paying  for  fewer  at-sea  monitors  than  they
would have otherwise, not more.

165 F. Supp. 2d 148, 182 (D.R.I. 2001). Rather, the standard merely requires the regulation to "be flexible enough to allow timely response to resource, industry and other national and regional needs." Id. at 181–82 (quoting J.H. Miles and Co. v. Brown, 910 F. Supp. 1138, 1155 (E.D. Va. 1995)).

Plaintiffs do not contend that the rule lacks flexibility to adapt to future developments. Instead, Plaintiffs complain that "[t]he Final Rule takes no notice that Plaintiffs are multi-species fishers." Pls.' Mot. 31. This harkens back to the argument first made under National Standard One. See Pls.' Mot. 30. Plaintiffs' boats, due to their on-board freezing capabilities, are built to remain at sea for much longer trips (7-14 days) than other boats (2-3 days). See AR17710-15. Under the Final Rule, Plaintiffs bear a greater regulatory burden than other boats. To illustrate, assume that Plaintiffs and certain other boats all tended to catch 15 metric tons of herring per day. Plaintiffs, with average trip lengths exceeding 7 days, would be subject to the monitoring requirement because they would catch far more than 50 metric tons per trip. The non-freezer boats, even at the same rate of 15 metric tons per day, would not hit the cutoff on their 2- or 3-day trips. Thus, a per-day threshold would be better for Plaintiffs.

The Final Rule discussed this exact complaint, stating that "the Council explicitly considered measures to address

[Plaintiffs'] concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day." Final Rule, 85 Fed. Reg. at 7426 (AR17743). Nonetheless, the agency decided against those measures because "the potential for a relatively high herring catches per trip aboard [Plaintiffs'] vessels warranted additional monitoring." Id.[10] However, this explanation arguably begs the question: Why should the metric for "high herring catches" be keyed to trips, not days? Especially since the primary goal of monitoring – ensuring optimum yield – is based on a year-long period, not a number of trips.

In Ace Lobster, the Secretary imposed a flat cap on the number of lobster traps that any fishing vessel could utilize. 165 F. Supp. 2d at 153. The plaintiffs pointed out that, prior to the

---

[10] In the midst of their arguments under the National Standards, Plaintiffs also assert that the per-trip waiver is "[o]ne of the unexplained arbitrary and capricious aspects of the Final Rule." Pls.' Mot. 30. Based on NMFS's determination that the increased burden on Plaintiffs was justified by their capacity for high herring catches, the Court concludes that the waiver is not arbitrary and capricious. See Hall v. Evans, 165 F. Supp. 2d 114, 128 (D.R.I. 2001) (noting that, because a decision between alternative fishery conservation measures presents "a classic example of a factual dispute the resolution of which implicates substantial agency expertise[,]" an agency's decision cannot be set aside unless "the administrative record is so devoid of justification . . . that the decision is necessarily arbitrary and capricious" (internal quotation marks and citations omitted)).

regulation's implementation, certain boats used as many as 5,000 traps, while others used as few as 600. Id. at 182. They thus argued that the flat cap unfairly burdened those vessels with historically larger capacities. Id. However, the plaintiffs asked too much of the standards; the agency's failure to "finely attune its regulations to each and every fishing vessel in the offshore fishery" was insufficient to sink the rule. Id. Moreover, "NMFS included adaptive management measures in the Final Rule that w[ould] enable future consideration of state/federal collaboration efforts, including trap reductions based on historical participation[,]" thus indicating compliance with National Standard Six. Id. (internal quotation marks and citation omitted).

Same here. Plaintiffs note that "the record reveals no other vessels . . . in the Atlantic herring fleet" like theirs: boats with freezing capacity that catch multiple species during lengthy trips. Pls.' Mot. 10. Although that fact may engender sympathy for two disproportionately burdened businesses, it ultimately weighs against Plaintiffs' argument. The Secretary is not required to alter regulatory metrics in order to accommodate two vessels. As this Court has stated, the National Standards are not violated where the agency reasonably believes that a regulation "would benefit the overall fishery to the (unfortunate) detriment of certain fishermen." Hadaja, Inc. v. Evans, 263 F. Supp. 2d 346, 355 (D.R.I. 2003) (citing Alliance Against IFQs v. Brown, 84 F.3d

343, 349 (9th Cir. 1996); Hall v. Evans, 165 F. Supp. 2d 114, 146-47 (D.R.I. 2001)). Rather, "[t]he Secretary is allowed . . . to sacrifice the interest of some groups of fishermen for the benefit as the Secretary sees it of the fishery as a whole." Fishermen's Finest, Inc. v. Locke, 593 F.3d 886, 899 (9th Cir. 2010) (citation omitted). The record indicates that the Secretary did exactly that, determining that the per-trip exemption was the best option for the fishery as a whole and that any extra burden on Plaintiffs would not be as large as they claimed. See Final Rule, 85 Fed. Reg. at 7417 (AR17734). Lastly, after two years, NMFS will review the rule and make "a framework adjustment or an amendment to the Herring [fishery management plan], as appropriate[,]" id., thus complying with the requirement for flexibility. National Standard Six is satisfied.

   iv. National Standards Seven and Eight

  The seventh standard requires the Secretary, "where practicable, [to] minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). Relatedly, the eighth standard provides that "[c]onservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information

available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." Id. § 1851(a)(8). Despite the concern for the economic health of fishing communities, Congress "inten[ded] that conservation efforts remain the Secretary's priority, and that a focus on the economic consequences of regulations not subordinate this principal goal of the MSA." N. Carolina Fisheries Ass'n, Inc. v. Gutierrez, 518 F. Supp. 2d 62, 91-92 (D.D.C. 2007) (citing 50 C.F.R. § 600.345(b)(1)).

This inquiry is deferential, and the Secretary's decision to impose costs on fishing communities is protected by a "rule of reason." Little Bay Lobster, 352 F.3d at 470 (citing Daley, 127 F.3d at 110-111). The Court must "ask whether the Secretary has examined the impacts of, and alternatives to, the plan [she] ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable, taking account of [considerations such as] whether information is available and whether the further analysis is likely to be determinative." Id.

Here, the agency estimated the financial impact on fishing vessels and adjusted the monitoring requirements to reduce that impact. For example, it chose a 50 percent total monitoring requirement instead of a goal of 75 or 100 percent. Additionally, government-funded SBRM monitoring was included in that target, thus reducing the burden on industry. The regulation also exempts

any trip that does not plan to catch more than 50 metric tons of herring. Furthermore, though not applicable to the boats owned by Plaintiffs, the Final Rule allowed certain types of boats to utilize electronic monitoring instead of human monitors.

As discussed, Plaintiffs argue that a per-day metric, which would have eased their burden, should have been used to calculate the weight-based monitoring exemption. But the agency considered such options and determined that they would provide insufficient monitoring capabilities, which would jeopardize the achievement of the optimum yield lodestar. See Final Rule, 85 Fed. Reg. at 7417 (AR17734). Under the standards, that decision was the Secretary's prerogative.

In sum, Plaintiffs have not established that the industry-funded program violates the National Standards. See Loper, 2021 WL 2440511, at *16-19 (holding that Omnibus Amendment did not violate standards seven and eight).

C.    Timing of Notice and Comment

In a rather undeveloped argument, Plaintiffs contend that the agency did not follow notice-and-comment requirements. Pls.' Mot. 28. Specifically, Plaintiffs incorrectly state that "the Secretary of Commerce approved the [Omnibus Amendment] before the comment period was over, making a mockery of the comment requirement." Pls.' Mot. 28. But, to be clear, the Secretary did not approve the amendment before its comment period had concluded.

Rather, the Secretary approved the amendment before the separate comment period for the proposed rule had ended.  Plaintiffs point to no authority, and develop no argument, indicating that the comment periods for an amendment and its implementing rule cannot overlap.  Moreover, Plaintiffs suffered no prejudice based on this overlap, as the Final Rule responded to all submissions from both comment periods.  Thus, this timing argument is a belly flop.  See Loper, 2021 WL 2440511, at *30 (rejecting similar argument).

D.  Regulatory Flexibility Act

Lastly, Plaintiffs argue that the promulgation of the industry-funded monitoring program violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612.  The RFA "does not alter the substantive mission of the agencies under their own statutes; rather, the Act creates procedural obligations to assure that the special concerns of small entities are given attention in the comment and analysis process when the agency undertakes rule-makings that affect small entities."  Little Bay Lobster, 352 F.3d at 470.  Where, as here, a regulation would "have a significant economic impact on a substantial number of small entities[,]" the agency must analyze "the effect of the proposed rule on small businesses and discuss[] alternatives that might minimize adverse economic consequences."  N. Carolina Fisheries Ass'n, Inc. v. Gutierrez, 518 F. Supp. 2d 62, 72–73 (D.D.C. 2007) (citation omitted).  If the agency decides to issue the regulation despite

the impact on small businesses, the agency must issue a final regulatory flexibility analysis, including "a description of the steps the agency has taken to minimize the significant economic impact on small entities" and "a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency . . . was rejected." 5 U.S.C. § 604(a)(5). The RFA does not "require that the agency give explicit consideration to certain classes of small businesses that are affected more gravely than other small businesses." Hall v. Evans, 165 F. Supp. 2d 114, 146-47 (D.R.I. 2001).

Here, the agency did issue a final regulatory flexibility analysis, explaining the potential impacts on small businesses, the concessions made to accommodate their economic interests, the alternatives that could have further lessened that impact, and the reasons why the agency did not adopt those alternatives. See Final Rule, 85 Fed. Reg. at 7427-430 (AR17744-47). Nonetheless, Plaintiffs contend that "[t]he Agency never considered or included the recommendations to make exemptions available for at-sea processors which can take advantage of none of the measures it did consider." Pls.' Mot. 38. This assertion is belied by the plain text of the Final Rule. As discussed, "the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels [from the industry-funded

monitoring requirement], including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day." Final Rule, 85 Fed. Reg. at 7426 (AR17743). Despite these considerations, the agency stuck with the 50-metric-ton cutoff because "the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring." Id.

Therefore, the agency satisfied the RFA's (solely procedural) requirements. See Loper, 2021 WL 2440511, at *28 (holding that Omnibus Amendment did not violate RFA); see also Little Bay Lobster, 352 F.3d at 471 (denying RFA challenge, even though "the final statement did little more than acknowledge that 'several commentators' had objected to the change in the boundary line and responded by referring to the 'current consensus' in support of the new regime as a whole").

E. Commerce Clause

Finally, Plaintiffs contend that the monitoring program exceeds Congress's authority to regulate commerce. Pls.' Mot. 34-36. Under the Commerce Clause, Congress may regulate a wide variety of public and private actions, including those activities that "have a substantial effect on interstate commerce." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 549 (2012) (quoting United States v. Darby, 312 U.S. 100, 118-119 (1941)). In Sibelius, the Supreme Court examined a provision of the Affordable

Care Act that imposed a monetary penalty on any individual who failed to maintain health insurance. Id. at 538-39. Chief Justice Roberts, writing alone, noted that the provision "d[id] not regulate existing commercial activity" but "instead compel[ed] individuals to become active in commerce by purchasing a product." Id. at 552. The Chief Justice therefore reasoned that the law could not be justified under the Commerce Clause. Id. at 558; see also id. at 650-660 (joint op. of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (agreeing that the individual mandate exceeded the scope of Congress's authority under the Commerce Clause). But see id. at 606-618 (Ginsburg, J., joined by Sotomayor, Breyer, and Kagan, JJ., dissenting in part) (disagreeing with the Chief Justice's Commerce Clause analysis).

Based on this holding, Plaintiffs contend that the monitoring program unconstitutionally compels them to become active in the market for at-sea monitors. This analogy holds no water. The relevant market is not the monitoring market, but rather the commercial herring fishing market. If Plaintiffs do not want to pay for monitoring, they can decline to fish for herring, limit their herring catches to fifty metric tons per trip, leave the New England region, or purchase fishing vessels that qualify for electronic monitoring. Unlike the involuntary insurance purchasers – who could not, short of leaving the country, avoid the health insurance requirement – Plaintiffs are voluntary market

participants. Therefore, the regulatory scheme does not violate the Commerce Clause. <u>See</u> <u>Goethel</u>, 2016 WL 4076831, at *7 (rejecting Commerce Clause argument and concluding that "the costs of monitors are part of the permissible regulation of [the] plaintiffs' commercial fishing activities").

IV. CONCLUSION

The Secretary reasonably concluded that industry-funded monitoring was necessary and appropriate to effectuate the goals of the Atlantic herring fishery management plan and the MSA. Moreover, the process and rules through which the agency effectuated the monitoring program did not violate the National Standards, the RFA, or the APA. Lastly, the program does not exceed Congressional authority under the Commerce Clause. Plaintiffs' Motion for Summary Judgment, ECF No. 37, is DENIED, and Defendants' Cross-Motion for Summary Judgment, ECF No. 38, is GRANTED.

IT IS SO ORDERED.

_WESmith_

_____
William E. Smith
District Judge
Date: September 20, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


RELENTLESS INC., et al.,

        Plaintiffs,


        v.                          CA No. 20-cv-108-WES-PAS


U.S. DEPARTMENT OF COMMERCE,
et al.,

        Defendants.


## **JUDGMENT**

    This action came to be heard before the Court and a decision has been rendered.  Upon consideration whereof, it is now hereby ordered, adjudged, and decreed as follows:

    Pursuant to this Court's Opinion and Order entered on September 20, 2021, and in accordance with Fed. R. Civ. P. 58., judgment is hereby entered in favor of the Defendants U.S. Department of Commerce, et al., and against Plaintiffs Relentless Inc., et al.


    It is so ordered.


    September 20, 2021                    By the Court:


                                         /s/ Hanorah Tyer-Witek.
                                         Clerk of Court

**U.S. Const. art. I, § 1**

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

**U.S. Const. art. I, § 7**

All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

**U.S. Const. art. I, § 8**

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;-And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

## 5 U.S.C. § 706 – Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

**16 U.S.C. § 1801 – Findings, purposes, and policy**

[…]

(b) Purposes

It is therefore declared to be the purposes of the Congress in this chapter—

(3) to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

(4) to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

(5) to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances (A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and (B) which take into account the social and economic needs of the States;

(6) to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen, including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

(7) to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

[…]

**16 U.S.C. § 1851 – National Standards For Fishery Conservation And Management**

(a) In general

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

**16 U.S.C. § 1853 – Contents of fishery management plans**

(a)Required provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

(1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—

(A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

(B) described in this subsection or subsection (b), or both; and

(C) consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

[…]

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

[…]

(b) Discretionary provisions

[…]

(7) require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

(8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

[…]

(c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of—

(1) implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

(2) making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

## 16 U.S.C. § 1857 – Prohibited Acts

It is unlawful—

(1) for any person—

(A) to violate any provision of this chapter or any regulation or permit issued pursuant to this chapter;

(B) to use any fishing vessel to engage in fishing after the revocation, or during the period of suspension, of an applicable permit issued pursuant to this chapter;

(C) to violate any provision of, or regulation under, an applicable governing international fishery agreement entered into pursuant to section 1821(c) of this title;

(D) to refuse to permit any officer authorized to enforce the provisions of this chapter (as provided for in section 1861 of this title) to board a fishing vessel subject to such person's control for purposes of conducting any search or inspection in connection with the enforcement of this chapter or any regulation, permit, or agreement referred to in subparagraph (A) or (C);

(E) to forcibly assault, resist, oppose, impede, intimidate, or interfere with any such authorized officer in the conduct of any search or inspection described in subparagraph (D);

(F) to resist a lawful arrest for any act prohibited by this section;

(G) to ship, transport, offer for sale, sell, purchase, import, export, or have custody, control, or possession of, any fish taken or retained in violation of this chapter or any regulation, permit, or agreement referred to in subparagraph (A) or (C);

(H) to interfere with, delay, or prevent, by any means, the apprehension or arrest of another person, knowing that such other person has committed any act prohibited by this section;

(I) to knowingly and willfully submit to a Council, the Secretary, or the Governor of a State false information (including, but not limited to, false

information regarding the capacity and extent to which a United States fish processor, on an annual basis, will process a portion of the optimum yield of a fishery that will be harvested by fishing vessels of the United States) regarding any matter that the Council, Secretary, or Governor is considering in the course of carrying out this chapter;

(J) to ship, transport, offer for sale, sell, or purchase, in interstate or foreign commerce, any whole live lobster of the species Homarus americanus, that—

  (i) is smaller than the minimum possession size in effect at the time under the American Lobster Fishery Management Plan, as implemented by regulations published in part 649 of title 50, Code of Federal Regulations, or any successor to that plan implemented under this subchapter, or in the absence of any such plan, is smaller than the minimum possession size in effect at the time under a coastal fishery management plan for American lobster adopted by the Atlantic States Marine Fisheries Commission under the Atlantic Coastal Fisheries Cooperative Management Act (16 U.S.C. 5101 et seq.);

  (ii) is bearing eggs attached to its abdominal appendages; or

  (iii) bears evidence of the forcible removal of extruded eggs from its abdominal appendages;

(K) to to [sic] steal or attempt to steal or to negligently and without authorization remove, damage, or tamper with—

  (i) fishing gear owned by another person, which is located in the exclusive economic zone, or

  (ii) fish contained in such fishing gear;

(L) to forcibly assault, resist, oppose, impede, intimidate, sexually harass, bribe, or interfere with any observer on a vessel under this chapter, or any data collector employed by the National Marine Fisheries Service or under contract to any person to carry out responsibilities under this chapter;

(M) to engage in large-scale driftnet fishing that is subject to the jurisdiction of the United States, including use of a fishing vessel of the United States to engage in such fishing beyond the exclusive economic zone of any nation;

(N) to strip pollock of its roe and discard the flesh of the pollock;

(O) to knowingly and willfully fail to disclose, or to falsely disclose, any financial interest as required under section 1852(j) of this title, or to knowingly vote on a Council decision in violation of section 1852(j)(7)(A) of this title;

(P)

(i) to remove any of the fins of a shark (including the tail) at sea;

(ii) to have custody, control, or possession of any such fin aboard a fishing vessel unless it is naturally attached to the corresponding carcass;

(iii) to transfer any such fin from one vessel to another vessel at sea, or to receive any such fin in such transfer, without the fin naturally attached to the corresponding carcass; or

(iv) to land any such fin that is not naturally attached to the corresponding carcass, or to land any shark carcass without such fins naturally attached;

(Q) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish taken, possessed, transported, or sold in violation of any foreign law or regulation or any treaty or in contravention of any binding conservation measure adopted by an international agreement or organization to which the United States is a party; or

(R) to use any fishing vessel to engage in fishing in Federal or State waters, or on the high seas or in the waters of another country, after the Secretary has made a payment to the owner of that fishing vessel under section 1861a(b)(2) of this title.

For purposes of subparagraph (P), there shall be a rebuttable presumption that if any shark fin (including the tail) is found aboard a vessel, other than a fishing vessel, without being naturally attached to the corresponding carcass, such fin was transferred in violation of subparagraph (P)(iii) or that if, after landing, the total weight of shark fins (including the tail) landed from any vessel exceeds five percent of the total weight of shark carcasses landed, such fins were taken, held, or landed in violation of

subparagraph (P). In such subparagraph, the term "naturally attached", with respect to a shark fin, means attached to the corresponding shark carcass through some portion of uncut skin.

(2) for any vessel other than a vessel of the United States, and for the owner or operator of any vessel other than a vessel of the United States, to engage—

(A) in fishing within the boundaries of any State, except—

(i) recreational fishing permitted under section 1821(i) of this title;

(ii) fish processing permitted under section 1856(c) of this title; or

(iii) transshipment at sea of fish or fish products within the boundaries of any State in accordance with a permit approved under section 1824(d) of this title;

(B) in fishing, except recreational fishing permitted under section 1821(i) of this title, within the exclusive economic zone, or for any anadromous species or Continental Shelf fishery resources beyond such zone, unless such fishing is authorized by, and conducted in accordance with, a valid and applicable permit issued pursuant to section 1824(b), (c), or (d) of this title; or

(C) except as permitted under section 1856(c) of this title, in fish processing (as defined in paragraph (4)(A) of such section) within the internal waters of a State (as defined in paragraph (4)(B) of such section);

(3) for any vessel of the United States, and for the owner or operator of any vessel of the United States, to transfer at sea directly or indirectly, or attempt to so transfer at sea, any United States harvested fish to any foreign fishing vessel, while such foreign vessel is within the exclusive economic zone or within the boundaries of any State except to the extent that the foreign fishing vessel has been permitted under section 1824(d) of this title or section 1856(c) of this title to receive such fish;

(4) for any fishing vessel other than a vessel of the United States to operate, and for the owner or operator of a fishing vessel other than a vessel of the United States to operate such vessel, in the exclusive economic zone or within the boundaries of any State, if—

(A) all fishing gear on the vessel is not stored below deck or in an area where it is not normally used, and not readily available, for fishing; or

(B) all fishing gear on the vessel which is not so stored is not secured and covered so as to render it unusable for fishing;
unless such vessel is authorized to engage in fishing in the area in which the vessel is operating; and

(5) for any vessel of the United States, and for the owner or operator of any vessel of the United States, to engage in fishing in the waters of a foreign nation in a manner that violates an international fishery agreement between that nation and the United States that has been subject to Congressional oversight in the manner described in section 1823 of this title, or any regulations issued to implement such an agreement; except that the binding provisions of such agreement and implementing regulations shall have been published in the Federal Register prior to such violation.

**16 U.S.C. § 1858 – Civil penalties and permit sanctions**

[…]

(g) Permit sanctions

(1) In any case in which (A) a vessel has been used in the commission of an act prohibited under section 1857 of this title, (B) the owner or operator of a vessel or any other person who has been issued or has applied for a permit under this chapter has acted in violation of section 1857 of this title, (C) any amount in settlement of a civil forfeiture imposed on a vessel or other property, or any civil penalty or criminal fine imposed on a vessel or owner or operator of a vessel or any other person who has been issued or has applied for a permit under any marine resource law enforced by the Secretary has not been paid and is overdue, or (D) any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law administered by the Secretary has not been paid and is overdue, the Secretary may—

    (i) revoke any permit issued with respect to such vessel or person, with or without prejudice to the issuance of subsequent permits;

    (ii) suspend such permit for a period of time considered by the Secretary to be appropriate;

    (iii) deny such permit; or

    (iv) impose additional conditions and restrictions on any permit issued to or applied for by such vessel or person under this chapter and, with respect to foreign fishing vessels, on the approved application of the foreign nation involved and on any permit issued under that application.

[…]

**16 U.S.C. § 1862 – North Pacific fisheries conservation**

(a) In general

The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—

(1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and

(2) establishes a system, or system,[1] of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

(b) Standards

(1) Any plan or plan amendment prepared under this section shall be reasonably calculated to—

(A) gather reliable data, by stationing observers on all or a statistically reliable sample of the fishing vessels and United States fish processors included in the plan, necessary for the conservation, management, and scientific understanding of the fisheries covered by the plan;

(B) be fair and equitable to all vessels and processors;

(C) be consistent with applicable provisions of law; and

(D) take into consideration the operating requirements of the fisheries and the safety of observers and fishermen.

[…]