# United States Court of Appeals
# for the First Circuit

———————————————

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs-Appellants*,

*v.*

US DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; RICHARD SPINRAD, in his official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; JANET COIT, in her official capacity as Assistant Administrator for NOAA Fisheries,
*Defendants-Appellees*.

———————————————

On Appeal from
the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

---

## APPELLANTS' REPLY BRIEF

---

JOHN J. VECCHIONE (1177417)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... i

SUMMARY OF THE REPLY ...............................................................1

ARGUMENT .......................................................................................2

   I.    Neither "as a Whole" nor in Parts Does the MSA Allow Industry Funded Observers or At-Sea Monitors ................................................2

      A.    The Text of the MSA Does Not Say Any Defendant Has This Power ...3

      B.    "Necessary and Appropriate" Does Not Help the Government ............10

   II.   Whether Deemed a Fee, a Cost or a Forced Entry into a Market the Final Rule's Shifting Costs of ASMs or "Observers" Is Unlawful .......................................................................................13

      A.    Forcing Fishers to Pay Government Servants Is Unlawful. ..................13

      B.    Appellees Do Not Explain How Their Budget Would Be Controlled by Congress If They Are Allowed the Privilege of Dunning Permit Holders .......................................................................................15

   III.  The Government Has Never Explained Why Appellants' Boats are Being Treated More Harshly than Other Boats that Take More of the Regulated Resource ....................................................18

   IV.  Legislative History Is Not in the Government's Favor .................20

   V.   Chevron is of No Use to the Government ...........................................21

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE.......................................................24

CERTIFICATE OF SERVICE ..............................................................25

# TABLE OF AUTHORITIES

## Cases

*Alabama Power Co. v. OSHA.,*
  89 F.3d 740 (11th Cir. 1996)...............................................................12
*Anglers Conservation Network v. Pritzker,*
  39 F.Supp.3d 102 (D.D.C. 2015) .........................................................14
*Fishing Co. of Alaska, Inc. v. Gutierrez,*
  510 F.3d 328 (D.C.Cir. 2007) ................................................................6
*Food & Drug Admin. v. Brown & Williamson Tobacco,*
  529 U.S. 120 (2000)..............................................................................21
*Gulf Fishermans' Ass'n v. Nat'l Marine Fisheries Serv.,*
  958 F.3d 454 (5th Cir. 2020)................................................................11
*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.,*
  281 F. Supp. 2d 1 (D.D.C. 2003) .........................................................11
*In re MCP No. 165, OSHA Admin Rule on Covid-19 Vaccination and Testing 86 Fed Reg. 61402,*
  21 F.4th 357 (6th Cir. 2021) ..................................................................6
*Michigan v. EPA,*
  576 U.S. 743 (2015)..............................................................................12
*Nat'l Grain & Feed Ass'n v. OSHA,*
  866 F.2d 717 (5th Cir. 1988)................................................................12
*Ocean Conservancy v. Gutierrez,*
  394 F. Supp. 2d 147 (D.D.C. 2005) .....................................................12

## Statutes

16 U.S.C. § 1821 ........................................................... 6, 7, 10, 16
16 U.S.C. § 1827 ................................................................. 5, 10, 16
16 U.S.C. § 1851 ................................................................ 13, 19, 20
16 U.S.C. § 1853 ...................................................................... passim
16 U.S.C. § 1854 .............................................................................7, 10
16 U.S.C. § 1857 ................................................................... 3, 5, 17
16 U.S.C. § 1862 ................................................................... 7, 8, 10

## Rules

50 C.F.R. § 648.11 .........................................................................7
50 C.F.R. § 648.14 .....................................................................3, 17

**Other Authorities**

*Coda* (Apple TV+ 2021) ........................................................................................16

*Fee,* Black's Law Dictionary (9th ed. 2009) ...........................................................14

Reauthorization of the Magnuson Fishery Conservation and Management Act of
    1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine
    & Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't, 101st
    cong. 86 (1989) ...................................................................................................20

# SUMMARY OF THE REPLY

The Government failed in its response to explain why Congress, in the Magnuson-Stevens Act ("MSA") or anywhere else never said "The Department of Commerce ("Commerce"), the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS")(collectively "agencies" or the "Government") can place at-sea-monitors ("ASM") on commercial fishing vessels and force those vessels to pay for the salaries of these federal officers regardless of cost." Instead, the agencies attempt to wave away the fact that Congress also erected many barriers both inside and outside the MSA to prevent what is attempted here—making a beleaguered industry pay the cost of having government officers on their vessels—by claiming Appellants waived the argument even though it was made multiple times below and in the moving brief. The Government's claim that the MSA "as a whole" magically grants the agencies the powers claimed here although it never actually says so are unavailing. Neither the law, structure, purpose, nature of the Act, nor the "necessary and appropriate" language, which cabins rather than expands agency power, saves this unlawful action.

The Government seeks to avoid math and fails to provide a coherent answer as to why vessels that take fewer herring from the mandatory quota than other vessels are treated worse. The nonsensical response "they might take more per trip" fails both the arbitrary and capricious standard of the Administrative Procedure Act ("APA") and the laugh test. Appellees also err in saying that the costs of observers are "compliance costs" under any reasonable definition, and that the industry-funded

monitors are anything other than agents of the Government serving the Government's interests and not those of the Appellants. To allow Appellees this new source of funding for its activities without clear Congressional authorization is unconstitutional and untethers the agencies from normal Congressional control through the power of the purse. Costs are vital to properly assess a regulation, particularly under the MSA's ten National Standards. The huge excess costs of this regulation over those Congress have actually authorized for this fishery supply another reason to declare it arbitrary and capricious. Finally, forcing Appellants into a market to avoid congressional restrictions on agency size and impact on the industry is no more licit than forcing them into it under the Commerce Clause.

## ARGUMENT

### I. NEITHER "AS A WHOLE" NOR IN PARTS DOES THE MSA ALLOW INDUSTRY FUNDED OBSERVERS OR AT-SEA MONITORS

The Government, flummoxed in its attempt to find the necessary language in the statute, repeatedly states that if read "as a whole" it would yield up the necessary words. Appellees' Br. at 25, 31, 41. But nowhere does the MSA say that nor does the structure, other statutes binding these agencies,[1] the legislative history or an airy reference to "broad" grants of power fix Appellees' problem.

---

[1] Appellees' inexplicably claim waiver of these other statutes restricting their ability to charge the industry costs, fees, and impositions at whim. Not only were these statutes argued below, but they were explicitly argued in the moving brief. *See* Appellant's Br. at 21, 22, 31, 32 (Anti-Deficiency Act ("ADA"), Miscellaneous Receipts Statute ("MRS"), Independent Appropriation Act. ("IAA"). The MSA explicitly states all FMP's must comply with all other laws. These other laws provide interpretive guidance to the Court on whether Congress carelessly handed

**A. The Text of the MSA Does Not Say Any Defendant Has This Power**

Even though the Final Rule itself says that this new office, at-sea monitor ("ASM"), has different functions than observers, the Appellees now claim they are "observers" as designated by statue. *See* Final Rule A244 ("[I]n contrast to observers, ASM would not collect whole specimens, photos or biological samples…"). Assuming *only* for purposes of this Reply that the ASM are not a new office but are "observers" as defined by statute, they are federal officers. And they are performing a task that benefits the Government and not F/V *Relentless*, F/V *Persistence* or Seafreeze by, for instance, fishing. *See* 16 U.S.C. § 1857; 50 C.F.R. § 648.14(e) (penalties for impeding a federal officer including "observers"). The Government announced that it was making the industry fund these offices for the benefits it imparted to them but not for the administrative measures that benefitted the Government. Appellees' Br. at 13-14. Nothing the ASM do is for the benefit of the fishing vessels or the fishers. They collect scientific, management, and regulatory compliance as well as economic data. *At-Sea Monitoring in the Northeast*, NOAA Fisheries (Feb. 3, 2021), https://bit.ly/3LWBbzQ. That is a government function for which Congress appropriates funds.

---

over the power to the agencies to charge fishers when it has both in the MSA and elsewhere so clearly limited these agencies' power to burden the regulated industry in this way.

The MSA says that observers may be placed on commercial vessels. 16 U.S.C. § 1853 (b)(8). But that statute explicitly excludes observers from vessels with inadequate berths or adequate places to carry out observer functions. *Id.* So, the very statute relied on by Appellees contemplates the regulatory cost to the vessel being the berths and the place to perform observer functions. It does not contemplate the *salary* of the observer. Nor does it say the commercial vessels can be forced to pay for them whether by designating such payment a "fee", a "cost", a "tax" or anything else. So where do Appellees locate their attempt to seize Congress's Article I §§ 1,7, and 8 powers to lay and collect taxes, appropriate, and spend? Appellees claim that section 1858(g)(1)(D), which says that "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law administered by the Secretary has not been paid and is overdue[,]" means that all observers can be charged directly to the industry otherwise this section would be superfluous. This is false. The MSA in certain sections clearly allows industry-funded observers to be provided to a vessel and then paid for by the vessel or requiring the vessel to contract with such observers directly.

The MSA does allow observer services to be "provided to or contracted by an owner or operator[.]" and that section of the MSA applies to those provisions. It is not a general ukase to require or allow charges for "observer services." This is in

distinct contrast to where observers are "provided to or contracted by" the fishers. Section 1827 is explicit in setting up an "observer program." *Id.* at 1827(b). That section, stating that foreign vessels that may incidentally take billfish (fish such as marlin and sword fish), says that "[t]he Secretary may acquire observers for such program through contract with qualified private person." *Id.* It also says that "[t]he Secretary shall establish a program under which a United States observer will be stationed aboard each foreign fishing vessel…" *Id.* The foreign observer program states the functions of the observers. 16 U.S.C. § 1827(c) gives the Secretary the power to "carry out such scientific and other functions as the Secretary deems *necessary or appropriate* to carry out this section." *Id.* (emphasis added); *and see* 16 U.S.C. § 1827(g) ("The Secretary shall issue such regulations as are necessary or appropriate to carry out this section."). Section 1827 also sets out fees for these observers and a fund to pay them up to amounts appropriated by Congress. 16 U.S.C. § 1827(d)(e). This section places "necessary or appropriate" in the disjunctive rather than requiring they be both "necessary and appropriate" as section 1853(a)(1)(A) requires all Fishery Management Plans ("FMPs") to be. *See* 1853(b)(3) (also limitations that are "necessary and appropriate").[2] Requiring something to be "necessary" rather than just "appropriate" limits agency power, it

---

[2] Only after the FMP's have found limitations as "necessary and appropriate" may the Councils propose regulations to the Secretary it deems "necessary or appropriate." 1853(c).

does not expand it. *See In re MCP No. 165, OSHA Admin Rule on Covid-19 Vaccination and Testing 86 Fed Reg. 61402*, 21 F.4th 357, 391-397 (6th Cir. 2021) (Larsen, dissenting) (distinguishing "necessary" from "necessary or appropriate"); *see Fishing Co. of Alaska, Inc. v. Gutierrez*, 510 F.3d 328, 333-334 (D.C.Cir. 2007) (striking rule because the Council failed to certify the regulation as "necessary or appropriate.").

According to the Appellees, all Congress had to do to give them this claimed power was to state observers generally, not ASMs specifically, could be placed on vessels and then state the regulation was "necessary and appropriate" (or at least "necessary or appropriate"). Under the Government's view, the structure of the entire MSA then provided the power. If that was how Congress devolved core powers to the agencies all of the MSA related to foreign vessels makes little or no sense. Not only does section 1827 become inexplicable so does section 1821 entitled "Foreign Fishing". Foreign vessels are required to directly contract with observers if Congress fails to appropriate the funds in the Fund set up for observers for foreign vessels. 16 U.S.C. § 1821(h)(6). Whenever Congress fails to appropriate the funds for observers the monies are still paid into the Fund set up for that purpose, but the Secretary also had to implement a "supplementary observer program" for times when there were no appropriated monies. That program requires the Secretary to "establish a reasonable schedule of fees that certified observers, or their agents shall

be paid by the owners and operators of foreign fishing vessels for observer services[.]" 16 U.S.C. § 1821(h)(6)(C). Congress did not explicitly lay out such a plan for paying foreign vessels' observers and then put in the same provision *sub silentio* for American vessels.

The Limited Access Privilege Programs ("LAPPs") are to the same effect. Congress explicitly stated how the data collection and management was to be paid for. 16 U.S.C. § 1853(e) ("cost recovery"). The Secretary is given the explicit power to charge fees for the collection of data such as that provided by observers. 16 U.S.C. § 1854(d) (establishment of fees). It then details how such fees are to be collected and paid and limits them to "3 percent of the ex-vessel value of fish harvested" under the LAPP. *Id.*[3] The LAPP provision of section 1853(e)(1) is nearly identical to the language about observers in section 1853(b)(8), upon which the Government relies here, but the LAPP statute follows the observer language with section 1853(a)(e)(2) explicitly stating "a program of fees" will be set up to pay for it. Yet the Appellees argue that Congress *sub silentio* empowered them to raise costs by twenty percent under the former statute!

The same problem exists when section 1862(a) is examined. That section entitled "North Pacific fisheries conservation" states:

**A) In General**

---

[3] Any assertion the LAPPs don't include "observers" is belied by 50 C.F.R. § 648.11(k) (Atlantic sea scallop observer program).

The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—

**(1)** requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and

**(2)** establishes a system, or system, of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

It goes on to require that the observers be placed on "all or a statistically reliable sample of fishing vessels." 16 U.S.C. § 1862(b)(1)(A). It requires that such an observer plan be "fair and equitable" to all vessels. 16 U.S.C. § 1862(b)(1)(B). Finally, it limits the fees charged to not exceed the cost of the observers and not be used for the administrative costs of the agency outside of administering the program or a percentage "not to exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish" under the Council's jurisdiction. 16 U.S.C. § 1862(b)(2)(E). It also requires all boats to be charged even when they are not assigned observers to make the costs fairer and more reasonable. 16 U.S.C. § 1862(b)(2)(F). But the statutory provisions regulating the North Pacific fisheries that are most damaging to the Appellees' arguments here involve fees at 16 U.S.C. § 1862(b)(2)(I). That subsection states:

8

**(I)**     provide that fees collected will be credited against any fee for stationing observers or electronic monitoring systems on board fishing vessels and United States fish processors and the actual cost of inputting collected data to which a fishing vessel or fish processor is subject under section 1854(d) of this title;

*Id.*

What is section 1854(d)?  It is the section, as discussed above, providing for the payment of observers when LAPPs are created entitled "establishment of fees"!  Why are those fees to be credited through this fee system?  Because the MSA does not contemplate observer fees or contracts absent the other sections explicitly requiring those payments.  Otherwise, this section would have credited those as well.

All of these sections allow observers to be "provided to or contracted by" a permit holder.  The foreign vessels may be required to contract with a private party when no funds have been appropriated and the other sections allow observers to be provided and fees charged.  That is what section 1858(g)(1)(D) refers to.  Because of the myriad ways the MSA allows observers to be paid in the proper fishery the penalties statute allows penalties when "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law administered by the Secretary has not been paid and is overdue…" *Id.*  If the permit holder has not paid for an observer by fees, or direct contracting under one of these sections he can be penalized.  It does not empower Appellees to charge an industry for ASM (or

observers).  It only allows penalizing permit holders for failure to pay such fees or contracts where allowed elsewhere in the MSA.  Again, a review of the foreign vessel provisions, the LAPPs, and the North Pacific fishery sections of the MSA demonstrate Congress knew how to shift the costs of observers to industry participants when it wanted to, and it did not do so in the haphazard fashion Appellees suggest.

### B. "Necessary and Appropriate" Does Not Help the Government

As noted, section 1853 requires all fishery management plans to contain "conservation and management measures…" that are "necessary and appropriate" "for the conservation and management of the fishery."  They must also be consistent with the National Standards, "the other provisions of this chapter", and "any other applicable law."  16 U.S.C. § 1853(a)(1)(A)-(C).  As argued above, Appellees interpretation of the FMP for the Final Rule is wholly inconsistent with the other provisions of the chapter, including but not limited to sections 1862, 1854(d), 1821and 1827

The Appellees also rely on the "necessary and appropriate" language as providing a "get-out-of-judicial-review-free" card, but it does not.  Those are words that have meaning and do not derogate the other portions of the MSA.  The MSA delineates FMPs and states they shall "contain the conservation and management measures, … which are necessary and appropriate for the conservation and

10

management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery[.]" 16 U.S.C. § 1853(a)(1).

But Courts have held that that language does not allow the Appellees to do whatever they want at-sea. *Gulf Fishermans' Ass'n v. Nat'l Marine Fisheries Serv.*, 958 F.3d 454, 468 (5th Cir. 2020)("necessary and appropriate" language did not grant NMFS with authority over aquaculture). That precedent also notes that the agencies cannot point to the absence of authority and then say *Chevron* deference allows them to assert authority because the failure of language makes the statute "vague." *Id.* 958 F.3d at 461, nn.12-13. The Appellees are attempting the same subterfuge here that was rejected in that case. The attempt to use "broad" and nonspecific language to grant authority should be rejected. Not only because Congress did not delegate the power with vague words but "necessary and appropriate" does not expand the agencies' power.

Other cases have rejected Appellees' expansive reading of "necessary and appropriate" under the MSA. *Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 3 (D.D.C. 2003)(rule struck as Commerce did not properly determine whether reg was "necessary and appropriate." That the rule was "consistent with other applicable law[.]" did not save it), *id.* at 37 ("To reach a contrary holding would be to allow Defendants to flout the procedural rights of

Plaintiff, circumvent judicial review, and ignore some of the most basic tenets of administrative law."). Even where the agency has agreed an FMP is lawful, they have noted that the "necessary and appropriate" language is substantive and "temper[s]" broad discretion rather than embodies it. *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 156 (D.D.C. 2005) ("This broad discretion is tempered by substantive elements of the [MSA] that require all regulations to be 'necessary and appropriate for the conservation and management of the fishery,' and consistent with the ten National Standards defined by statute.").

In *Michigan v. EPA*, 576 U.S. 743 (2015), the Supreme Court held that a requirement under the Clean Air Act for regulations to be "appropriate" required the agency to ensure a reasonable relationship between costs imposed on the industry as against air quality benefits before promulgating such a regulation. *Id.* at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose [exorbitant] economic costs in return for [marginal] health or environmental benefits."). Courts likewise have concluded that "necessary or appropriate" language "encompasses a specie of cost-benefit justification[.]" *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); s*ee also Alabama Power Co. v. OSHA.*, 89 F.3d 740, 746 (11th Cir. 1996) (interpreting "necessary or appropriate" language). *Nat'l Grain* and *Alabama Power* had language that allowed regulation to be "necessary or appropriate" that is either of those two alternatives. The MSA

requires that all FMP's be both. The MSA's "necessary and appropriate" language thus also places a cost-benefit balancing requirement on NMFS's ability to, without statutory authorization, shift the costs of ASMs to industry. Indeed, the grounds for requiring cost-benefit balancing when "necessary" and "appropriate" are used to constrain regulations are even stronger in this case than in *Michigan* or *Nat'l Grain*, because the MSA's National Standards explicitly require conservation measures to be cost-justified. In particular, Standard Seven states that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication[,]" while Standard Eight says "[c]onservation and management measures shall … to the extent practicable, minimize adverse economic impacts on [fishing] communities." 16 U.S.C. § 1851(a)(7), (a)(8). The "necessary and appropriate" language thus cabins rather than expands the Appellees' power.

II. **WHETHER DEEMED A FEE, A COST OR A FORCED ENTRY INTO A MARKET THE FINAL RULE'S SHIFTING COSTS OF ASMS OR "OBSERVERS" IS UNLAWFUL**

### A. Forcing Fishers to Pay Government Servants Is Unlawful.

The Appellees argue that forcing permit holders to contract with ASMs directly is not a fee, cost, or tax. It is simply a regulatory burden of a valid regulation. Appellants have already explained how the language of the MSA grants the agencies no such power. But such an interpretation also ignores Congress' every action with regard to the fishing community and the MSA. Not only did Congress explicitly

state when costs could be shifted within the MSA and when contracts with observers could be required, as already explained, Congress also created roadblocks to prevent this sort of cost-shifting through the ADA, the MSA, and the IAA and the Commerce department has relied on those same statutes to tell courts it did not have power to impose costs on industry as plaintiffs requested. *See generally Anglers Conservation Network v. Pritzker,* 39 F.Supp.3d 102 (D.D.C. 2015) (relating other laws violated by Plaintiffs' proposals if implemented by Commerce).  Appellees do not deny the entire scheme of the Final Rule was because the agencies wanted more monitoring than Congress would fund and to get around the strictures of LAPPS and the other constraining statutes. A173 (Pub. Hearing Summaries); A191(Oliver Memorandum on previous denials of industry funding).  The agencies do not deny they wanted more observers than Congress would fund.  They wanted to spend more than Congress and were looking for ways to do it.  The Appellees are unapologetic about this usurpation of core Congressional spending powers.  They simply argue that they did get around it and the Court should place its imprimatur on the audacious theft.

The Government uses its own regulatory definition to separate fees paid directly to the government from direct payments to contracted observers. Appellees' Br. at 42-43.  But that is unavailing.  A "fee" is, "[a] charge for labor or services, esp. professional services," Black's Law Dictionary (9th ed. 2009).  The Government cannot define the problem away.  Congress gave the agencies many

ways to charge the industry for observers. However, consistent with the MSA's many provisions to protect fishers (, *e.g.*, National Standards 7 and 8), it otherwise prohibited the agencies from imposing ruinous costs-whether designated as costs, fees, or contracts upon the permit holders. The Appellees here attempt to have the Court bless a distinction without a difference. These are government agents doing government work—an argument Appellees did not refute. Congress did not want them paid by permit holders or else it would have said so. It did not and put in many provisions that demonstrated when it wanted to so charge permit holders and those explicit grants of such power demonstrate Congress knew how to tell the Secretary of Commerce when he had such power. It did not grant it when Congress did not say so in the statutory section.

## B. Appellees Do Not Explain How Their Budget Would Be Controlled by Congress If They Are Allowed the Privilege of Dunning Permit Holders

Unaddressed by Appellees is the clear evidence that an agency charging the regulated for government service is a core power of Congress. That is why Congress puts such powers in statutes and clearly marks them as it has with the many fee provisions in the MSA for instance. Commerce, NOAA, and NMFS claim the power to extract anything they like from the regulated to the extent they do not agree to the amounts Congress has appropriated for them. But as we have seen in the foreign vessel regulations Congress explicitly allows Commerce to only use those funds in

the Foreign Fishing Fund when Congress has appropriated them or allowed direct industry contracting when funds are not appropriated. *See, e.g.*, 16 U.S.C. §§ 1827(d), (e), 1821(h)(6). If a provision authorizing a government agent to inspect one's premises is also deemed a right to have the regulated pay for that inspecting government agent directly, agencies will have been handed a weapon of awesome power.

The Government makes the strange assertion that Appellants are asking the Court to add the words "government-funded" to the statute on observers. *See* Appellees' Br. at 28. This is ridiculous. ASMs are government agents. Despite the ludicrous suggestion that they serve some purpose for the permit-holding vessels they do not. Appellees' Br. at 13-14. They are a nuisance as far as most fishermen are concerned and that is why Congress had to make explicit that permit holders had to allow them on the vessel.[4] Government agents serving government functions are presumed to be paid by the Government. They are funded by the government unless Congress says otherwise. It would be strange indeed if you paid the highway

---

[4] Since filing their opening brief, the movie *Coda* (Apple TV+ 2021) won the Best Picture Oscar at the Academy Awards. The movie highlights the fraught relationship between ASMs and the regulated. In *Coda*, the fishermen opposed and explicitly state the ruinous financial effects that will occur from having to pay for ASMs "at $800 dollars a day" to come aboard. The movie is a perfect distillation of the relationship of these government agents and the regulated.

patrolman every time you passed him, and he checked your speed. A statute would have to be far clearer than the statute asserted here for such a bizarre result to obtain.

Finally, the Government claims the salaries or fees or contracts of these ASM's are simply a compliance cost of regulation. As already explained Section 1853(b)(8) identifies its compliance costs as the berth and the space to perform the monitoring function. If a vessel does not have those observers cannot be placed. Note, the vessel does not have to remake the entire boat if it does not have these things. Here what the Government calls a "compliance cost" is the payment of the fee of the observer. Not a piece of equipment as contemplated by the MSA—and identified as equipment in the statute. But a person. Performing a government function. With whose duties it is a crime to interfere. *See* 16 U.S.C. § 1857; 50 C.F.R. § 648.14(e). That is not a compliance cost; that is a new office created by the agency without congressional authorization and paid for by the regulated with no benefit to the regulated. A requirement to enter a contract is not a compliance cost. It is a legerdemain to get around limits imposed by Congress's appropriation, taxing, and spending powers and all the statutes implemented both in the MSA and elsewhere to prevent bureaucrats from "eating out the substance" of the populace with new offices. *See* The Declaration of Independence para. 12 (U.S. 1776).

### III. THE GOVERNMENT HAS NEVER EXPLAINED WHY APPELLANTS' BOATS ARE BEING TREATED MORE HARSHLY THAN OTHER BOATS THAT TAKE MORE OF THE REGULATED RESOURCE

The Government in a breathtaking act of jujitsu asserts that F/V *Relentless* and F/V *Persistence* are seeking special treatment but all they have sought is to be treated as similarly situated vessels are treated. The Government states in its brief that it responded to comments adequately. Appellees' Br. at 58. This is nonsense. Appellants explained that there is a fishery wide quota on herring and Commerce and NOAA know this already because they create it every year! Appellants' Br. at 7. Appellants' boats take no more fish per day than boats that are exempt from observers if they take less than 50mt per trip. Observers are paid per day. As laid out in the moving brief and completely unrefuted by the Government, boats that take less than 50mt per trip can take in hundreds of thousands of tons of herring with no observer in the same two-week period that Appellants' fishing vessels take and yet they pay for no observer while Appellants have paid for two weeks! The response is that "relatively high herring catches per trip aboard those vessels warranted additional monitoring." *Id.* This is lunacy. There is a herring quota. When the quota is reached nobody can take herring. The unrebutted record is that Appellants do no more damage and probably less than other types of fishing to the fishery but get observers far more often. They are not asking to be treated better by the regulator but certainly not worse.

The Governments' response to F/Vs *Relentless* and *Persistence*'s comments and to this Court is akin to a person when asked what two plus two is and responding "blue." That is not a response this Court should countenance. The MSA tasks the Government with preserving the fishery, the fishers, *and* their communities. They cannot blithely say these Rhode Island fishers—who are the only fishers in their town of Rhode Island-- can be disregarded when by the simple application of math, they are doing no more harm to the herring fishery than anyone else—and likely less but are paying more for these observers that do nothing to support the vessel but are just government agents. Under the National Standards and the cost-benefit analysis required by the MSA itself, the Government cannot hurt specific modes of fishing and impose any cost it likes on vessels that are not more harmful to the fishery than vessels it allows to take *more* herring unobserved! Not only is it arbitrary and capricious, but it also violates National Standard Two as the "best scientific information available" includes basic math. 16 U.S.C. § 1851(a)(2). It violates National Standard Six which requires all conservation measures to "take into account and allow variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6). It simply ignores entirely National Standard 7 which requires where practicable the regulator to "minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). When your government agents are paid per day, and you make your regulations that impose that cost

contingent on "per trip" metrics you are simply ignoring this National Standard. Finally, as noted F/Vs *Persistence* and *Relentless* are the only fishing vessels in their fishing community of Rhode Island. The agencies cavalier statement that they are allowed, for no good conservation purpose, to burden these vessels and this community ignores National Standard 8, which requires the use of economic and social data (like math for instance) "in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

IV. **LEGISLATIVE HISTORY IS NOT IN THE GOVERNMENT'S FAVOR**

The Government relies on the 1990 amendment to the MSA that added section 1853(b)(8) to bolster its argument. Appellees' Br. at 35-36. But not one of the cited statements is from any Congressman stating that Commerce could charge the industry for the observers, while the agency was placing observers in the North Pacific (and apparently charging for them). But notice the authority to do so was in doubt and in fact denied by some if not most. *See* Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine & Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't, 101st cong. 86 (1989) (Serial No. 101-37) at 431 (written testimony of Henry Mitchell, Exec. Dir., Bering Sea Fishermen's Ass'n ("Currently, councils appear to be unable to charge fees to cover such costs and

appear merely to be left now to mandating their existence."). Also notice that Congress is able to amend this statue to augment agencies' authority if it so desires.

Congress put in section 1853(b)(8) to make clear that observers were required and allowed, and it permitted industry-funded observers only in the Northern Pacific just as Appellants have argued. Nothing in that recitation is anything but Congress making what it approved of statutorily explicit and not making what it did not approve of—cost shifting of observers—in other fisheries unless they were foreign vessels or approved LAPPs. Moreover, none of the Congressional comments cited by the Government endorse the practice of shifting such costs. And in any event, if Congress approves, they say so in statutes not colloquies. The MSA has been reauthorized three times since 1989, and each time Congress has rejected the authority asserted here to the agencies. When an agency asserts broad power courts "are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the [agency] this power." *Food & Drug Admin. v. Brown & Williamson Tobacco,* 529 U.S. 120, 160 (2000).

## V.    *CHEVRON* IS OF NO USE TO THE GOVERNMENT

One senses in the Government's brief a nervousness about *Chevron* deference. As Appellants pointed out in their moving brief, deference has been reduced in recent years. Neither Appellant nor Appellee believes the statute is ambiguous as the trial court found. The MSA does not say this type of forced contracting is

allowed for domestic vessels in the New England fishery.  That ends the matter.  It unambiguously does not exist in the text and cannot be created *ex nihilio* by the agencies wishing it so.  The agencies say the statute is clear—but the Court can read the fee-shifting sections of the MSA that are clear and unambiguous and see that Appellees' reading cannot prevail.  One look at sections 1827, 1821, 1862, or 1854 demonstrates unambiguous shifting of observer costs and no mention of ASMs.  The Court should declare the MSA unambiguously does not provide this power to the agencies.

But if it the Court reaches *Chevron*'s second step, which the district court did, this Court should not rescue the IFM Amendment and the Final Rule.  They are unreasonable under APA analysis.  They do not take costs to small businesses seriously and the analysis is perfunctory.  It is not reasonable to impose such large costs on industry when Congress applied 3% caps on analogous costs where it explicitly allowed industry funded monitors.  Requiring ASMs on Appellants' vessels if they take, from a fixed overall fishery quota, 60mt of herring in a 14-day trip, while allowing other vessels to take 200mt of herring over the same period *unmonitored* (because they make more trips during that time) is as crystalline example of unreasonableness as can be imagined.  At $750 a day Appellants would have paid $10,500 to the ASM to take less than a third of the herring taken by their

unmonitored peer vessel. Nothing argued by the Government makes that anything but unreasonable and arbitrary and capricious.

It is unreasonable to allow an agency to aggrandize its power by manufactured ambiguity and then to bless such unjust and arbitrary regulation.

## CONCLUSION

The Court should reverse the erroneous legal conclusions of the district court and set aside the IMF Amendment and the Final Rule. Consequently, the Court should reverse the decision below and remand for further proceedings consistent with the Court's decision.

Respectfully submitted on May 27, 2022, by:

*/s/ John J. Vecchione*

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the 6,500-word limit established by FRAP 32(a)(7) because it contains 5,655h words. This document complies with the typeface and typestyle requirements of FRAP 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, Times New Roman, and set at 14-point or larger.

Dated: May 27, 2022                      */s/ John J. Vecchione*
                                            JOHN J. VECCHIONE

                                       *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2022, I electronically filed the foregoing document, along with the Appendix, with the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for all parties are registered users of the CM/ECF system. They will be served by the CM/ECF system:

Dina Mishra, Dina.Mishra@usdoj.gov, Counsel for Appellees

Lauren S. Zurier lauren.zurier@usdoj.gov Counsel for Appellees

Dated: May 27, 2022

*/s/ John J. Vecchione*
JOHN J. VECCHIONE

*Counsel for Plantiffs-Appellants*