No. 21-1886

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,

*Plaintiffs - Appellants*,

v.

US DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her official
capacity as Secretary of Commerce; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; RICHARD SPINRAD, in his official
capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES
SERVICE, a/k/a NOAA Fisheries; JANET COIT, in her official capacity as
Assistant Administrator for NOAA Fisheries,

*Defendants - Appellees*.

On Appeal from the United States District Court for the District of Rhode Island
No. 20-cv-108-WES (Hon. William E. Smith)

**FINAL BRIEF FOR APPELLEES**

TODD KIM
 *Assistant Attorney General*
ALISON C. FINNEGAN
DANIEL HALAINEN
DINA B. MISHRA
 *Attorneys*
Of Counsel:     Environment and Natural Resources Division

MITCH MACDONALD   U.S. Department of Justice
 *Attorney*      Post Office Box 7415
Office of the General Counsel  Washington, D.C. 20044
National Oceanic & Atmospheric (202) 353-9022
Administration     dina.mishra@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE...............................................................4

      A.     Statutory and Regulatory Background ..................................4

      B.     Facts...................................................................................9

           1.     The Omnibus Amendment and the Regulation .......10

           2.     Omnibus Measures...................................................13

           3.     Atlantic Herring Measures.......................................15

      C.     Procedural History............................................................19

SUMMARY OF ARGUMENT ............................................................21

STANDARD OF REVIEW .................................................................23

ARGUMENT ....................................................................................24

I.     The Magnuson-Stevens Act Authorizes the Regulation's
Industry-Funded Monitoring. ........................................................24

      A.     The Magnuson-Stevens Act's text, structure, and history
unambiguously demonstrate authority for the regulation's
industry-funded monitoring.................................................26

           1.     Section 1853(b)(8) authorizes the Service to
require vessels to carry observers—including at-
sea monitors—at the vessels' own expense............26

2. Industry-funded monitoring is authorized as a "necessary and appropriate measure" for fishery conservation and management. .................................29

3. Other provisions confirm that the Act authorizes industry-funded monitoring. ...................................32

4. History confirms that the Act authorizes industry-funded monitoring. ...................................................34

B. Relentless's contrary reading of the statute fails. ...............................37

1. Fee-based provisions do not undercut statutory authority for industry-funded monitoring. ................37

2. At-sea monitors qualify as "observers" under the Magnuson-Stevens Act. ..........................................44

C. Although this Court need not reach the issue, the Service's interpretation deserves deference. ........................................45

II. The Regulation Satisfies the National Standards and the Regulatory Flexibility Act. ...................................................................47

A. The National Standards Support the Regulation. ................................47

B. The Service Complied with the Regulatory Flexibility Act. ...................................................................................54

C. Relentless's Remaining Criticisms Fail. ............................................56

III. Regulation of Relentless's Commercial Fishing is Constitutional. ...............................................................................57

CONCLUSION ......................................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Ace Lobster Co. v. Evans*,
    165 F. Supp. 2d 148 (D.R.I. 2001) ................................................. 50

*Ali v. Fed. Bur. of Prisons*,
    552 U.S. 214 (2008) ........................................................................ 27

*Associated Fisheries of Me. v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ............................ 23, 24, 47, 51, 54, 55, 56

*Atlantic Fish Spotters Ass'n v. Evans*,
    321 F.3d 220 (1st Cir. 2003) .......................................................... 44

*Auer v. Robbins*,
    519 U.S. 452 (1997) ........................................................................ 47

*Bessette v. IKO Indus.*, 30 F.4th 75 (1st Cir. 2022) .......................... 46, 58

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016) ............................................................ 24

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ........................................................................ 32

*Chapman v. United States*,
    500 U.S. 453 (1991) ........................................................................ 43

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .......................................... 20, 22, 25, 26, 46

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020) ............................................................ 34

*Clifton v. Fed. Elec. Comm'n*,
    114 F.3d 1309 (1st Cir. 1997) ........................................................ 43

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ........................................................................ 28

*Conservation Law Found. v. Evans*,
    360 F.3d 21 (1st Cir. 2004)....................................................................56, 57

*Conservation Law Found. of New Eng. v. Franklin*,
    989 F.2d 54 (1st Cir. 1993)...........................................................................30

*Consumer Data Indus. Ass'n v. Frey*,
    26 F.4th 1 (1st Cir. 2022) .............................................................................42

*Coventry Health Care of Miss., Inc. v. Nevils*,
    137 S. Ct. 1190 (2017)..................................................................................25

*Douglas v. Seacoast Prods.*,
    431 U.S. 265 (1977).......................................................................................58

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009).......................................................................................45

*Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores*,
    575 U.S. 768 (2015).......................................................................................28

*Fishermen's Finest, Inc. v. Locke*,
    593 F.3d 886 (9th Cir. 2010) .........................................................................50

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ..........................................................................58

*Goethel v. Pritzker*, No. 15-cv-497,
    2016 WL 4076831 (D.N.H. July 29, 2016)..................... 11, 25, 37, 39, 44, 60

*Goethel v. U.S. Dep't of Commerce*,
    854 F.3d 106 (1st Cir. 2017)..........................................................4, 9, 11, 54

*Gonzales v. Raich*,
    545 U.S. 1 (2012)...........................................................................................59

*Int'l Jr. College of Bus. & Tech. v. Duncan*,
    802 F.3d 99 (1st Cir. 2015)...........................................................................25

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)..................................................................................46

*Little Bay Lobster Co. v. Evans*,
  352 F.3d 462 (1st Cir. 2003)......................................................51, 53, 54, 55

*Loper Bright Enters. v. Raimondo*,
  No. 1:20-cv-466 (D.D.C.)..............................................................................19

*Loper Bright Enters. v. Raimondo*,
  No. 21-5166 (D.C. Cir.)................................................................................20

*Loper Bright Enters. v. Raimondo*,
  544 F. Supp. 3d 82 (D.D.C. 2021).......................................20, 25, 37, 40, 42

*Loughrin v. United States*,
  573 U.S. 351 (2014).......................................................................................34

*Lovgren v. Locke*,
  701 F.3d 5 (1st Cir. 2012)........................................................25, 46, 48, 54

*Mass. ex rel. Div. of Marine Fisheries v. Daley*,
  170 F.3d 23 (1st Cir. 1999)....................................................................50, 53

*McGirt v. Okla.*,
  40 S. Ct. 2452 (2020).....................................................................................32

*Me. Pooled Disability Tr. v. Hamilton*,
  927 F.3d 52 (1st Cir. 2019)...........................................................................41

*Michigan v. Env't Prot. Agency*,
  576 U.S. 743 (2015)..................................................................................43, 44

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)..........................................................................................40

*Miss. Comm'n on Envt'l Quality v. Env't Prot. Agency*,
  790 F.3d 138 (D.C. Cir. 2015)......................................................................59

*Mourning v. Family Pubs. Serv.*,
  411 U.S. 356 (1973)........................................................................................43

*Nat'l Fed'n of Independent Bus. v. Sebelius ("NFIB")*, 567 U.S. 519
  (2012)..............................................................................................................59

*N.H. Lottery Comm'n v. Rosen*,
    986 F.3d 38 (1st Cir. 2021)............................................................31

*Nat'l Labor Relations Bd. v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937)..........................................................................59

*Oceana, Inc. v. Ross*,
    920 F.3d 855 (D.C. Cir. 2019)........................................................8

*Pepperell Assocs. v. Env't Prot. Agency*,
    246 F.3d 15 (1st Cir. 2001)............................................................24

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)......................................................................34

*Russello v. United States*,
    464 U.S. 16 (1983)........................................................................42

*Silva v. Garland*,
    27 F.4th 95 (1st Cir. 2022) ....................................................29, 34

*United States v. Burdulis*,
    753 F.3d 255 (1st Cir. 2014)..........................................................59

*United States v. De La Cruz*,
    998 F.3d 508 (1st Cir. 2021)..........................................................34

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)......................................................................45

*United States v. Lewko*,
    269 F.3d 64 (1st Cir. 2001)............................................................58

*United States v. Roszkowksi*,
    700 F.3d 50 (1st Cir. 2012)............................................................59

*Wickard v. Filburn*,
    317 U.S. 111 (1942)......................................................................59

## Constitution

U.S. Const. art. I, § 8, cl. 3 .............................................. 1, 4, 21, 23, 39, 58, 60, 61

U.S. Const. art. I, § 8, cl. 8 ................................................................................58

## Statutes and Court Rules

Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ............. 1, 2, 3, 21, 22, 47, 54, 56

Administrative Procedure Act
   5 U.S.C. § 706 .........................................................................................56
   5 U.S.C. § 706(2)(A) ...........................................................................9, 24
   5 U.S.C. § 706(2)(B) ...........................................................................9, 24
   5 U.S.C. § 706(2)(C) ...........................................................................9, 24
   5 U.S.C. § 706(2)(D) ...........................................................................9, 24
   5 U.S.C. § 706(2)(E) ................................................................................9
   5 U.S.C. § 706(2)(F) ................................................................................9

Magnuson-Stevens Fishery Conservation & Management Act ............. 1-10, 20-37
                                                             39-52, 54,
                                                             59
   16 U.S.C. § 1801(a)(1) .......................................................................4, 58
   16 U.S.C. § 1801(a)(2) ............................................................................4
   16 U.S.C. § 1801(a)(3) ...................................................................4, 45, 58
   16 U.S.C. § 1801(a)(4) ............................................................................4
   16 U.S.C. § 1801(a)(5) ............................................................................4
   16 U.S.C. § 1801(a)(6) ............................................................................4
   16 U.S.C. § 1801(a)(8) .................................................................6, 31, 48, 58
   16 U.S.C. § 1801(a)(13) ........................................................................58
   16 U.S.C. § 1801(b)(1) ............................................................................4
   16 U.S.C. § 1801(b)(3) ............................................................................4
   16 U.S.C. § 1801(c)(3) .........................................................4, 6, 31, 48, 50
   16 U.S.C. § 1802(2) ..............................................................................11
   16 U.S.C. § 1802(5) ..............................................................................30
   16 U.S.C. § 1802(19) ............................................................................39
   16 U.S.C. § 1802(20) ............................................................................39
   16 U.S.C. § 1802(22) ............................................................................39
   16 U.S.C. § 1802(23) ............................................................................39
   16 U.S.C. § 1802(24) ............................................................................39

16 U.S.C. § 1802(26)......................................................................39

16 U.S.C. § 1802(27)......................................................................39

16 U.S.C. § 1802(31).....................................................7, 27, 33, 45

16 U.S.C. § 1802(32).........................................................7, 27, 31

16 U.S.C. § 1802(33)......................................................................47

16 U.S.C. § 1802(36)................................................................7, 27

16 U.S.C. § 1802(43)......................................................................39

16 U.S.C. § 1802(48)......................................................................39

16 U.S.C. § 1802(49)......................................................................39

16 U.S.C. § 1802(50)......................................................................39

16 U.S.C. § 1824(b)(10)(A)...........................................................39

16 U.S.C. § 1827..................................................................... 8, 37

16 U.S.C. § 1827(b)..........................................................8, 9, 39, 40

16 U.S.C. § 1827(b)(1)(B)..............................................................39

16 U.S.C. § 1827(d).....................................................8, 9, 37, 39

16 U.S.C. § 1827(e).....................................................8, 9, 37, 39

16 U.S.C. § 1851(a)..........................................................................6

16 U.S.C. § 1851(a)(1)....................................................5, 47, 49, 51

16 U.S.C. § 1851(a)(2)................................ 5, 6, 31, 47, 48, 51, 52

16 U.S.C. § 1851(a)(3)......................................................................5

16 U.S.C. § 1851(a)(4)......................................................................5

16 U.S.C. § 1851(a)(5)......................................................................5

16 U.S.C. § 1851(a)(6)........................................................5, 47, 50

16 U.S.C. § 1851(a)(7)....................... 5, 7, 30, 40, 43, 47, 49, 52

16 U.S.C. § 1851(a)(8)................... 5, 7, 30, 40, 47, 49, 52, 54

16 U.S.C. § 1851(a)(9)......................................................................5

16 U.S.C. § 1851(a)(10)....................................................................5

16 U.S.C. § 1852..............................................................................5

16 U.S.C. § 1852(a)..........................................................................5

16 U.S.C. § 1852(a)(1)(A).................................................................9

16 U.S.C. § 1852(b)(1)......................................................................5

16 U.S.C. § 1852(h)(1)......................................................................5

16 U.S.C. § 1852(b)(2)(A).................................................................5

16 U.S.C. § 1853..........................................39, 40, 42, 43, 47

16 U.S.C. § 1853(a)..........................................................................6

16 U.S.C. § 1853(a)(1)(A)......................................6, 29, 30, 46, 54

16 U.S.C. § 1853(a)(5)........................................................6, 31, 48

16 U.S.C. § 1853(a)(11)..................................................................11

16 U.S.C. § 1853(b)..........................................................................6

16 U.S.C. § 1853(b)(1)......................................................6, 29, 33, 39

16 U.S.C. § 1853(b)(4) ................................................28
16 U.S.C. § 1853(b)(8) .................................. 6, 7, 26, 27, 28, 29, 30, 31,
                                                        32, 35, 36, 44, 45, 46, 48
16 U.S.C. § 1853(b)(14) ...........................................6, 29, 30, 46
16 U.S.C. § 1853(c) ..................................................5
16 U.S.C. § 1853a .................................................8, 37
16 U.S.C. § 1853a(b) ................................................39
16 U.S.C. § 1853a(c)(3) .............................................39
16 U.S.C. § 1853a(c)(4) .............................................39
16 U.S.C. § 1853a(c)(5)(C) ..........................................39
16 U.S.C. § 1853a(e) ............................................8, 37, 40
16 U.S.C. § 1854 ....................................................4
16 U.S.C. § 1854(a) .................................................46
16 U.S.C. § 1854(a)(1) ...............................................5
16 U.S.C. § 1854(a)(1)(A) ...........................................54
16 U.S.C. § 1854(a)(3) ...............................................5
16 U.S.C. § 1854(b) ...............................................6, 46
16 U.S.C. § 1854(c) .................................................46
16 U.S.C. § 1854(d)(2) ...............................................8
16 U.S.C. § 1854(d)(2)(B) .........................................41, 43
16 U.S.C. § 1854(d)(2)(C)(i) .........................................39
16 U.S.C. § 1855(d) ..................................................5
16 U.S.C. § 1855(f) ..................................................3
16 U.S.C. § 1855(f)(1) ...........................................9, 24, 54
16 U.S.C. § 1855(f)(1)(B) .............................................9
16 U.S.C. § 1857(1)(D) ...............................................8
16 U.S.C. § 1857(1)(E) ...............................................8
16 U.S.C. § 1857(1)(F) ...............................................8
16 U.S.C. § 1857(1)(L) ....................................7, 8, 32, 33, 40, 48
16 U.S.C. § 1858(g)(1)(D) ..................... 7, 32, 33, 34, 36, 40, 48
16 U.S.C. § 1862 ...............................................9, 37, 42
16 U.S.C. § 1862(a) ...............................................37, 39
16 U.S.C. § 1862(a)(1) .............................................9, 40
16 U.S.C. § 1862(a)(2) ...........................................8, 9, 38
16 U.S.C. § 1862(b)(2) ...............................................40
16 U.S.C. § 1862(b)(1)(B) ............................................41
16 U.S.C. § 1862(b)(2)(B) ............................................41
16 U.S.C. § 1862(b)(2)(E) ..........................................8, 38
16 U.S.C. § 1862(b)(2)(F) ............................................38
16 U.S.C. § 1862(b)(2)(G) .........................................8, 38, 39

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 2107(b) .............................................................................3

31 U.S.C. § 1341 ................................................................................38

31 U.S.C. § 3302 ...........................................................................38, 39

31 U.S.C. § 9701 ................................................................................38

46 U.S.C. § 4502 ................................................................................29

Fishery Conservation and Management Act of 1976,
     Pub L. No. 94-265, 90 Stat. 331 ................................................4

Sustainable Fisheries Act,
     Pub. L. No. 104-297, 110 Stat. 3559 (1996) .............................36

Fishery Conservation Amendments of 1990,
     Pub. L. No. 101-627, 104 Stat. 4436 .........................................35

## Regulations

46 C.F.R. §§ 28.100-28.165..................................................................29
50 C.F.R. § 600.105(a).........................................................................9
50 C.F.R. § 600.305.............................................................................5
50 C.F.R. § 600.305(a)(1).....................................................................5
50 C.F.R. § 600.305(a)(3).....................................................................5
50 C.F.R. § 600.310(g)(2)...................................................................49
50 C.F.R. § 600.315(a)(1)...................................................................48
50 C.F.R. § 600.340(c)........................................................................43
50 C.F.R. § 600.345(b)(1)...................................................................48
50 C.F.R. § 635.7(a)...........................................................................8
50 C.F.R. § 648.2 ........................................................7, 17, 27, 31, 45
50 C.F.R. § 648.4(a)(10)(i).................................................................60
50 C.F.R. § 648.4(a)(10)(iv)(A)...........................................................60
50 C.F.R. § 648.11(a) .........................................................................8
50 C.F.R. § 648.11(g) ........................................................13, 27, 36, 60

50 C.F.R. § 648.11(g)(1)..................................................................13, 15
50 C.F.R. § 648.11(g)(2)..................................................................13, 15
50 C.F.R. § 648.11(g)(3)........................................................................13
50 C.F.R. § 648.11(g)(3)(i).....................................................................13
50 C.F.R. § 648.11(g)(3)(ii)....................................................................13
50 C.F.R. § 648.11(g)(3)(iii)...................................................................13
50 C.F.R. § 648.11(g)(3)(iv)...................................................................13
50 C.F.R. § 648.11(g)(3)(v)....................................................................13
50 C.F.R. § 648.11(g)(3)(vi)...................................................................13
50 C.F.R. § 648.11(g)(3)(vii)..................................................................14
50 C.F.R. § 648.11(g)(4)..................................................................13, 14
50 C.F.R. § 648.11(g)(4)(i).....................................................................14
50 C.F.R. § 648.11(g)(4)(ii)....................................................................14
50 C.F.R. § 648.11(g)(4)(iii)...................................................................14
50 C.F.R. § 648.11(g)(4)(iv)...................................................................14
50 C.F.R. § 648.11(g)(4)(v)....................................................................14
50 C.F.R. § 648.11(g)(5)..................................................................13, 14
50 C.F.R. § 648.11(g)(6)..................................................................13, 14
50 C.F.R. § 648.11(h)............................................................................14
50 C.F.R. § 648.11(i).............................................................................14
50 C.F.R. § 648.11(k)(4)..........................................................7, 10, 25, 36
50 C.F.R. § 648.11(m)......................................................................13, 27
50 C.F.R. § 648.11(m)(1)(i)....................................................................60
50 C.F.R. § 648.11(m)(1)(i)(B)......................................................16, 27, 32
50 C.F.R. § 648.11(m)(1)(ii)..............................................................49, 60
50 C.F.R. § 648.11(m)(1)(ii)(A)...............................................................52
50 C.F.R. § 648.11(m)(1)(ii)(B)................................................................16
50 C.F.R. § 648.11(m)(1)(ii)(D)......................................................18, 49, 52
50 C.F.R. § 648.11(m)(1)(ii)(E)......................................................18, 49, 52
50 C.F.R. § 648.11(m)(1)(ii)(F).........................................................18, 52
50 C.F.R. § 648.11(m)(1)(iii)........................................................49, 52, 60
50 C.F.R. § 648.11(m)(1)(iv)...................................................................60
50 C.F.R. § 648.11(m)(3)..................................................................17, 61
50 C.F.R. § 648.11(m)(4)........................................................................17
50 C.F.R. § 648.11(m)(4)(ii)...................................................................60
50 C.F.R. § 648.18...............................................................................11
50 C.F.R. § 648.87(b)(1)(v)(B)..................................................7, 10, 25, 36
50 C.F.R. § 648.87(b)(4)(ii)(F)(4)..............................................7, 10, 25, 36
50 C.F.R. § 660.16.................................................................................8
50 C.F.R. § 660.16(a)..............................................................7, 10, 25, 36

50 C.F.R. § 679.51 ...................................................................8

50 C.F.R. § 679.51(d)(1)(i) .................................7, 10, 25, 36

55 Fed. Reg. 4839 (Feb. 12, 1990) .....................7, 10, 24, 34

65 Fed. Reg. 11,956 (Mar. 7, 2000) .................................15

65 Fed. Reg. 77,450 (Dec. 11, 2000) ...............................15

83 Fed. Reg. 47,326 (Sept. 19, 2018) ..........................11, 12

83 Fed. Reg. 55,665 (Nov. 7, 2018)...............................11

85 Fed. Reg. 7414 (Feb. 7, 2020) .............. 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 29, 30, 31, 38, 39, 42, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 58

86 Fed. Reg. 17,081 (Apr. 1, 2021) ...........................15, 16

## Legislative History

H.R. Rep. No. 101-393 (1989)........................................35, 42

H.R. Rep. No. 114-605 (2016).........................................36

S. Rep. No. 101-414 (1990) ..........................................35

S. Rep. No. 114-66 (2015) ...........................................36

S. Rep. No. 114-239 (2016) ..........................................36

S. Rep. No. 115-139 (2017) ..........................................36

S. Rep. No. 115-275 (2018) ..........................................36

S. Rep. No. 116-127 (2019) ..........................................36

Oversight of Marine Fisheries Management: Hearings Before the National Ocean Policy Study of the Comm. on Commerce, Science, & Transp., U.S. Senate, 101st Cong. 464 (1989)...........................35

Magnuson Fishery Conservation and Management Act of 1976,
        Reauth.—Part II, Hearing Before the Subcomm. on Fisheries &
        Wildlife Conservation & the Env't of the Comm. on Merchant
        Marine & Fisheries, U.S. House of Representatives, 101st
        Cong. 33 (1989) ............................................................................................35

**Other Authorities**

Fed. R. App. P. 4(a)(1)(B) ......................................................................3

National Oceanic & Atmospheric Administration Fisheries, *Fishery
        Observers*, https://www.fisheries.noaa.gov/topic/fishery-
        observers (last accessed Apr. 22, 2022) .........................................8

National Oceanic & Atmospheric Administration Fisheries, *Atlantic
        Herring* (Mar. 24, 2022), https://www.fisheries.noaa.gov/
        species/atlantic-herring...................................................................15

National Oceanic & Atmospheric Administration Fisheries, *Fishing
        Gear: Bottom Trawls* (June 1, 2021),
        https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-
        bottom-trawls..................................................................................10

New England Fishery Management Council, *Management Plans*
        (2021), https://www.nefmc.org/management-plans.........................9

# INTRODUCTION

The Magnuson-Stevens Fishery Conservation and Management Act broadly authorizes the National Marine Fisheries Service to require fishing vessels operating in regulated fisheries to comply with regulatory conservation and management measures. The Act more specifically authorizes the Service to require industry vessels to have on board observers who collect data necessary for the fishery's conservation and management. In 2020, the Service adopted the regulation challenged here. The regulation establishes a process for determining how and when to implement, in New England fisheries, programs of industry-vessel monitoring in which industry vessels directly procure and cover some costs of observer services to comply with requirements under the Act, which the regulation calls "industry-funded monitoring." The regulation also provides for industry-funded monitoring in the Atlantic herring fishery.

Appellants (collectively, "Relentless") are Massachusetts and Rhode Island companies that operate commercial fishing vessels that bottom-trawl for large quantities of Atlantic herring off the New England coast. Relentless claims the statute does not authorize leaving its vessels to bear their own costs to comply with the undisputedly lawful observer requirement. It also challenges the regulation's consistency with some of the Magnuson-Stevens Act's National Standards, the Regulatory Flexibility Act, and the Commerce Clause.

The district court correctly rejected these challenges. The Magnuson-Stevens Act's plain language authorizes the Service to require industry vessels to carry observers at their own expense. This conclusion is consistent with—indeed, compelled by—the statute's context and structure, which make clear that such data collection is essential to fisheries' effective conservation and management and that the statute authorizes industry-funded monitoring. The statute's history reinforces this conclusion. Relentless's contrary argument ignores the Act's definition of "observer," which encompasses the at-sea monitoring at issue. Relentless's argument also rests on the flawed premise that specific statutory authorization of separate fee-collection programs precludes other statutory authority for vessels to procure and pay for their own observers on some trips when they elect to participate in a regulated fishery. In light of the statute's clear meaning, the Court need not decide whether deference to the agency is warranted. The government's interpretation is more than reasonable in any event.

Relentless's other arguments are similarly mistaken. To the extent preserved, these arguments overlook that the challenged regulation was well justified under the National Standards and the Regulatory Flexibility Act, and well supported by the U.S. Constitution. The regulation is properly directed toward the Standards' conservation and management focus, while mitigating costs to the extent practicable (including costs for smaller entities) as the Standards envision.

In particular, the regulation exempts vessel trips that burden the fishery less, such as by taking less fish. And the Service explained why Relentless's desired alternative—which seeks, in effect, special treatment for its two fishing vessels alone—would be inappropriate: Relentless chooses to operate vessels in the Atlantic herring fishery in a manner that warrants monitoring to address risks to the the sustainability of the fishery and to interstate commerce in the fish. The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

The district court had limited subject-matter jurisdiction over Relentless's challenge to the regulation pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1855(f). Appendix ("A__") A12, A33-A37. That court entered final judgment on September 20, 2021. Opening Brief Addendum ("ADD__") ADD33. The notice of appeal was timely filed on October 28, 2021. A164; 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the Magnuson-Stevens Act authorizes a regulation whereby fishing vessels procure and pay for their own observer services as needed to comply with requirements pursuant to that Act.

2. Whether the regulation satisfied that Act's National Standards and the Regulatory Flexibility Act.

3. Whether the regulation, which applies only to permitted vessels choosing to participate in the Atlantic herring fishery off the coasts of the several New England states, is authorized consistent with the Commerce Clause.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "the Act") was adopted in 1976 under another name in response to depletion of the nation's fish stocks due to overfishing. *See* Fishery Conservation and Management Act of 1976, Pub L. No. 94-265, 90 Stat. 331; 16 U.S.C. § 1801(a)(1)-(4); *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106, 108 (1st Cir. 2017). Congress sought through the Magnuson-Stevens Act "to take immediate action to conserve and manage the fishery resources found off the coasts" and to promote commercial and recreational fishing under "sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3); *see id.* § 1801(a)(5)-(6), (c)(3).

To accomplish these goals, the Act authorizes the Secretary of Commerce to implement a comprehensive national fishery management program, in order "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(6); *see id.* § 1854,

1855(d).  The Secretary has delegated authority to administer the statute to the National Marine Fisheries Service ("the Service"), a division of the National Oceanic and Atmospheric Administration.

To assist in fishery management, the Act establishes eight Regional Fishery Management Councils to develop measures consistent with these policies.  16 U.S.C. § 1852.  Each council includes federal and state (including territorial) fishery management officials, and individuals appointed by the Secretary who are "knowledgeable" about fishery resources within the council's geographic area.  *Id.* § 1852(a), (b)(1), (2)(A).  The regional councils submit to the Service fishery management plans for each fishery under their authority that requires conservation and management and, from time to time, any amendments that are "necessary," as well as proposed regulations that the council "deems necessary or appropriate" to implement the plan.  *Id*. §§ 1852(h)(1), 1853(c).  Plans and amendments are implemented consistent with ten statutory National Standards for fishery conservation and management.  *Id.* § 1851(a)(1)-(10); 50 C.F.R. §§ 600.305 *et seq.* (advisory guidelines for the National Standards).

When a council transmits a fishery management plan or amendment to the Service, the Service conducts a notice-and-comment process to determine whether to approve, disapprove, or partially approve it.  16 U.S.C. § 1854(a)(1), (3).  The

Service also conducts a notice-and-comment rulemaking process for regulations to implement plans and amendments.  *Id.* § 1854(b).

The Act sets forth a number of measures that "shall" be included, and measures that "may" be included, in fishery management plans.  *Id.* §§ 1853(a), (b).  For example, the Act authorizes requiring domestic fishing vessels to obtain permits to participate in a particular fishery.  *Id.* § 1853(b)(1).

Among such authorized measures, the plans shall contain measures "necessary and appropriate" for "the [fishery's] conservation and management" or its "long-term health and stability," such as by "prevent[ing] overfishing and rebuild[ing] overfished stocks."  *Id.* § 1853(a)(1)(A).  Similarly, the Service may generally prescribe measures that it determines to be "necessary and appropriate for the [fishery's] conservation and management."  *Id.* § 1853(b)(14).  The Act finds "[t]he collection of reliable data" to be "essential" to "effective conservation [and] management."  *Id.* § 1801(a)(8); *see id.* §§ 1801(c)(3), 1851(a)(2), 1853(a)(5), (b)(8).

More specifically, the Act authorizes plans to require domestic industry vessels to carry observers "for the purpose of collecting data necessary for the conservation and management of the fishery."  *Id.* § 1853(b)(8).  And the Act contemplates that costs of complying with such provisions, and responsibility to procure such observer services, may rest upon those vessels' owners or operators.

*See, e.g.*, *id.* § 1858(g)(1)(D) (authorizing permit sanctions against vessels where "any payment required for observer services provided to or contracted by [the vessel's] owner or operator … has not been paid or is overdue"); *id.* § 1857(1)(L) (protecting observers and "any data collector[s] … under contract to any person to carry out responsibilities" under the Act); *id.* § 1851(a)(7)-(8) (indicating that plan measures permissibly entail "costs" and "economic impacts" on members of "fishing communities").

Pursuant to such authority, various fishery management plans and their implementing regulations have long utilized observers on industry vessels to collect data related to fishery conservation and management, including observers procured by the vessels at their expense. *See, e.g.*, 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990) (providing that the "vessel operator … is responsible for obtaining" the observer and "will pay the cost of the observer directly to the contractor"); A338-A340; 50 C.F.R. §§ 648.11(k)(4), 648.87(b)(1)(v)(B), (4)(ii)(F)(4), 660.16(a), 679.51(d)(1)(i).

Under the Act, "observers" may include "any person"—whether individual, corporate, or governmental—carried on a vessel for such fishery-conservation-and-management purposes. 16 U.S.C. § 1802(31)-(32), (36). Such observers include "at-sea monitors" who collect information about regulated fisheries and monitor fishing practices on industry vessels. *See* 50 C.F.R. § 648.2 ("[a]t-sea monitor[s]"

are among those who collect such data "through direct observation"); NOAA

Fisheries, *Fishery Observers*, https://www.fisheries.noaa.gov/topic/fishery-

observers (last accessed Apr. 22, 2022). Observers are "professionally trained

biological technicians gathering first-hand data on what's caught and discarded by

U.S. commercial fishing vessels." *Id.*; *see, e.g.*, *Oceana, Inc. v. Ross*, 920 F.3d

855, 860 (D.C. Cir. 2019) (describing observers as "biologists trained to collect

information onboard fishing vessels"). The Magnuson-Stevens Act expressly

distinguishes observers, as data collectors, from "officer[s]" performing a law

"enforce[ment]" role. *Compare* 16 U.S.C. § 1857(1)(L), *with id.* § 1857(1)(D)-(F).

Observers are used in fisheries throughout the waters off the U.S. coasts. *See, e.g.*,

50 C.F.R. §§ 635.7(a), 648.11(a), 660.16, 679.51.

In addition to delegating broad authority to the Service, Congress has

devised comprehensive schemes for regulating particular issues—for example, in

the context of foreign vessels, limited-access-privilege programs, and the North

Pacific fisheries research plan. 16 U.S.C. §§ 1827, 1853a, 1862. In establishing

these particular programs, Congress decided to adopt specific *fee-based* funding

mechanisms, whereby funding is paid by vessels to the government for an

earmarked Fund pursuant to a specified schedule or rate of fees. *See, e.g.*, *id.*

§§ 1827(b), (d)-(e), 1853a(e), 1854(d)(2), 1862(a)(2), (b)(2)(E), (G). Observers,

where mentioned by these programs, are authorized to be funded through those

statutorily specified fee-based funding mechanisms (*id.* §§ 1827(b), (d)-(e), 1862(a)(1)-(2)), as distinct from industry funding for observer services procured and paid directly by industry vessels.

The Magnuson-Stevens Act provides for limited judicial review of challenges to regulations promulgated under it. *Id.* § 1855(f)(1). For example, it precludes courts from setting aside regulations for lack of factual basis under the Administrative Procedure Act ("APA"). *Id.* § 1855(f)(1)(B) (court may do so only on legal APA grounds specified in 5 U.S.C. § 706(2)(A)-(D), not factual grounds specified in 5 U.S.C. § 706(2)(E)-(F)); *see Goethel*, 854 F.3d at 111 n.3.

## B.  Facts

The New England Fishery Management Council ("the New England Council") has authority over fisheries in the Atlantic Ocean seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. 16 U.S.C. § 1852(a)(1)(A); *see* 50 C.F.R. § 600.105(a) (describing boundaries). The New England Council has nine fishery management plans for twenty-nine species, including Atlantic herring. *See generally* New England Fishery Management Council, *Management Plans* (2022), https://www.nefmc.org/management-plans.

Appellants (collectively, "Relentless") are three companies—two Rhode Island operational corporations and one Massachusetts limited liability holding company—that conduct "commercial fishing" for Atlantic herring off the coasts of

the several states in the New England and Mid-Atlantic regions. A13-A14, A25.

Unlike many Atlantic herring fishing vessels (A462), Relentless's vessels operate

by "bottom trawling" the ocean—essentially, dragging weighted nets along the

ocean floor—to catch Atlantic herring in planned excess of 50 metric tons per trip.

*See* ADD5 (citing A162 ¶4); Opening Brief ("Br.") 8-9, 13, 37. Such practices,

particularly where unobserved, can burden the Atlantic herring fishery and aquatic

life. *See, e.g.*, A251-A252, A256, 85 Fed. Reg. 7414, 7425-7426, 7430 (Feb. 7,

2020); A402 ("higher discard rates"); A449-A456; A189; A190; NOAA Fisheries,

*Fishing Gear: Bottom Trawls* (June 1, 2021),

https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls.

### 1. The Omnibus Amendment and the Regulation

For decades, including in New England, specific fishery management plans

have established observer programs whereby fishing industry vessels bear their

own costs to comply with a requirement to carry observers pursuant to the

Magnuson-Stevens Act. *E.g.*, 50 C.F.R. §§ 648.11(k)(4), 648.87(b)(1)(v)(B),

(4)(ii)(F)(4), 660.16(a), 679.51(d)(1)(i); 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990);

*see* A338-A340. A federal court rejected a challenge, on many of the grounds

raised here, to the groundfish plan amendment providing for such industry

responsibility, and this Court affirmed that judgment on timeliness grounds.

*Goethel v. Pritzker*, No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 29, 2016),

*aff'd, Goethel*, 854 F.3d at 108, 117, *cert. denied*, 138 S. Ct. 221 (2017).

In 2013, the New England Council began a process to provide for the potential use of what it called "industry-funded monitoring"—that is, monitoring for which industry entities would directly procure and fund their vessels' observer services—in all the region's fishery management plans. *See* A221, 83 Fed. Reg. 47,326, 47,326 (Sept. 19, 2018). The Council was interested in "increas[ing] monitoring in certain fisheries to assess the amount and type of catch and reduce uncertainty around catch estimates." A198, 83 Fed. Reg. 55,665, 55,665 (Nov. 7, 2018); *see* A335. While the Service may itself pay to provide observers for these purposes in some particular circumstances under particular programs, that coverage is limited. For example, the Service currently funds at-sea observers in most fisheries to gather data on bycatch, but that coverage is determined by a specific methodology in plan amendments on bycatch reporting. A598; *see* 50 C.F.R. § 648.18 (on the Standardized Bycatch Reporting Methodology ("SBRM") program).[1] The Service may allocate additional funding to support monitoring programs, when available, but cannot be obligated to spend money that Congress has not appropriated. *See, e.g.*, A199, 83 Fed. Reg. at 55,666; A335-A336.

---

[1] "Bycatch" refers to fish harvested in a fishery that are essentially wasted—not sold or kept for personal use. 16 U.S.C. § 1802(2). Fishery plans must establish a "standardized reporting methodology" to assess bycatch. *Id.* § 1853(a)(11).

The New England Council thus initiated, and in late 2018 adopted, an amendment to its fishery management plans to provide a framework for developing and administering industry-funded monitoring programs. *See* A221-A222, 83 Fed. Reg. at 47,326-47,327; AR17000-AR17637 (excerpts at A307-A783), *available at* https://www.nefmc.org/committees/observer-policy-committee (December 2018 omnibus document). That Industry-Funded Monitoring Omnibus Amendment ("omnibus amendment" or "the amendment") standardized industry-funded monitoring in the New England Council's fishery management plans generally and provided for industry-funded monitoring in the Atlantic herring fishery specifically. A240-A245, 85 Fed. Reg. at 7414-7420. The Service published a *Federal Register* notice of the amendment's availability in September 2018 and solicited public comment. A221, 83 Fed. Reg. at 47,326. After considering comments, the Service approved the amendment and informed the Council. *See* A240, 85 Fed. Reg. at 7414; A269-A271.

The Service published a proposed rule to implement the omnibus amendment in early November 2018 and solicited public comment. A198-A220, 83 Fed. Reg. at 55,665-55,687. In February 2020, after considering public comments, the Service published the final rule. A240-A268, 85 Fed. Reg. at 7414-7442. The regulation's main omnibus measures are codified at 50 C.F.R.

§ 648.11(g), and its Atlantic herring monitoring coverage requirements are codified at 50 C.F.R. § 648.11(m).

## 2. Omnibus Measures

The regulation's omnibus measures "standardize[] the development and administration of future industry-funded monitoring programs" in New England Council fishery management plans. A240, 85 Fed. Reg. at 7414; *see* 50 C.F.R. § 648.11(g)(1). These measures are "administrative"; they specify a process for implementing industry-funded monitoring without "directly affect[ing] fishing effort or amounts of fish harvested." A241, 85 Fed. Reg. at 7415. That process is intended to reduce administrative burden and yield greater consistency in collected information to better manage biological resources. *Id.*

The omnibus measures contain five key provisions. A241-A243, 85 Fed. Reg. at 7415-7417; 50 C.F.R. § 648.11(g)(2)-(6). *First*, they standardize the process to implement and revise industry-funded monitoring programs. *Id.* § 648.11(g)(2). *Second*, they delineate cost responsibilities for such monitoring for the fishing industry and the Service. *Id.* § 648.11(g)(3). The Service covers program costs "for which the benefit of the expenditure accrues to the government" (A241, 85 Fed. Reg. at 7415)—specifically, administrative expenses such as the costs of training observers and monitoring observer performance. 50 C.F.R. § 648.11(g)(3)(i)-(vi). Industry covers the costs of using observer services

on their vessels, such as "travel and salary" for monitoring deployments and overhead costs incurred by observer service providers. A241-A242, 85 Fed. Reg. at 7415-7416; *see* 50 C.F.R. § 648.11(g)(3)(vii).

*Third*, the omnibus measures establish a process, led by the New England Council, for prioritizing monitoring programs if funding for government administrative costs is limited. *Id.* § 648.11(g)(4). Because the Service must cover administrative costs, these observer programs proceed only when sufficient federal funds are available to cover those costs, even when industry vessels pay the costs for their observer services. *Id.* § 648.11(g)(4)(i). If no federal funding is available for a particular program under the prioritization process, then that program would not be administered that year (such that industry would not need to pay observer service costs). *Id.* § 648.11(g)(4)(i)-(v).

*Fourth*, the omnibus measures include standards for industry-funded observers and observer service providers, such as by requiring training and limiting conflicts of interest with observed vessels. *Id.* § 648.11(g)(5), (h)-(i). And *fifth*, they standardize the process for developing future monitoring "set-aside" programs, which would use a portion of the fishery's annual catch limit to help limit any monitoring costs to industry. *Id.* § 648.11(g)(6).

These omnibus measures do not themselves implement industry-funded monitoring in any particular fisheries. To do so, the New England Council must

develop the particular fishery's program into the relevant fishery management plan consistent with the omnibus measures' standardized process; and the Service must approve that plan (or plan amendment) and implementing regulation. A240-A241, 85 Fed. Reg. at 7414-7415; 50 C.F.R. § 648.11(g)(1)-(2).

### 3.     Atlantic Herring Measures

In conjunction with the omnibus measures, the regulation provides an industry-funded monitoring program for the Atlantic herring fishery. A273-A274.

Atlantic herring are found in the Atlantic Ocean and serve as a forage species for other fish, marine mammals, and seabirds. NOAA Fisheries, *Atlantic Herring* (Mar. 24, 2022), https://www.fisheries.noaa.gov/species/atlantic-herring. In 1999, the New England Council responded to concerns about overfishing of Atlantic herring by submitting the operative fishery management plan for that fishery, which the Service implemented by regulation the next year. 65 Fed. Reg. 77,450, 77,450 (Dec. 11, 2000); *see* 65 Fed. Reg. 11,956, 11,956-11,957 (Mar. 7, 2000). In 2018, the Service determined—based on declines in Atlantic herring spawning stock—that the Atlantic herring was "approaching an overfished condition." 86 Fed. Reg. 17,081, 17,082 (Apr. 1, 2021). Accordingly, the Service instructed the New England Council to develop measures to rebuild Atlantic herring stock, consistent with the Magnuson-Stevens Act. *Id.*

The New England Council adopted the Atlantic herring industry-funded monitoring program to improve accuracy in estimates of catch and provide affordable monitoring for the fishery, to sustain Atlantic herring stock under the Act. A243, A249, 85 Fed. Reg. at 7417, 7423; *see* A519-A520. Industry-funded monitors will collect data on, among other things, fishing gear, tow, and catch— including the species, weight, disposition, and length of catch. A244, 85 Fed. Reg. at 7418; *see* 50 C.F.R. § 648.11(m)(1)(i)(B).

The Service, in consultation with New England Council staff, sets coverage targets that determine how much monitoring will be industry-funded. 50 C.F.R. § 648.11(m)(1)(ii)(B). The regulation establishes a 50-percent coverage target— that is, at-sea monitoring on 50 percent of vessel trips—for vessels that are issued Category A or Category B limited-access herring permits. *See* A243-A244, 85 Fed. Reg. at 7417. The coverage target would be achieved through a combination of Service observers under its SBRM program and industry-funded at-sea monitoring at whatever level is needed to meet the overall 50-percent coverage target. *Id.*

Because federally funded SBRM monitoring supplements industry-funded monitoring, the level of industry-funded monitoring in a given year will vary based on federal funding. *Id.* Service observer coverage through the *federally* funded SBRM program could—based on available federal funding—be estimated to cover

some or all of the 50-percent monitoring coverage target, leaving the industry-funded monitoring program to cover only the remainder and thus resulting in less or no funding obligation for industry. *Id.* The industry-funded monitoring program would also be subject to the omnibus measures' prioritization process. *Id.* If the Service lacks funding to support a program's administrative costs (or prioritizes a different fishery's program), there might be no industry-funded monitoring requirements that year, even if federally funded observer coverage does not meet the 50-percent target. *Id.* Thus, the 50-percent coverage target is essentially a ceiling, not a mandate. *Id.*

If industry-funded monitoring is required in a given year, the Service will select declared herring trips by permitted vessels to carry an industry-funded at-sea monitor to "observ[e]" the trip. *Id.*; 50 C.F.R. § 648.2; *see id.* § 648.11(m)(3). Vessel owners are then responsible for procuring, and paying costs of, the at-sea monitor's services to them for those trips. A244, 85 Fed. Reg. at 7418; *see* 50 C.F.R. § 648.11(m)(4). Coverage requirements may be waived on particular trips, including those planning to land smaller quantities of herring. A244, A256, A250-A251, 85 Fed. Reg. at 7418, 7430, 7424-7425; *see* 50 C.F.R. § 648.11(m)(1)(ii)(D)-(E). The Service will exempt certain vessels from human observer coverage if they use electronic monitoring. A245-A246, 85 Fed. Reg. at 7419-7420. The regulation requires the New England Council to revisit the

industry-funded monitoring coverage targets after two years to consider results of increased coverage (if any) and determine whether adjustments are warranted. A243, A246, A251, A256, 85 Fed. Reg. at 7417, 7420, 7425, 7430; *see* 50 C.F.R. § 648.11(m)(1)(ii)(F).

The Service acknowledged that industry-funded monitoring would have "direct economic impacts" on permitted herring vessels. A244, A253, 85 Fed. Reg. at 7418, 7427. It estimated maximum and total cost-to-vessels figures and explained that those figures would likely be substantially lower for particular types of vessels, including small-mesh bottom-trawling vessels. *See, e.g.*, A256, A254, A244, 85 Fed. Reg. at 7430, 7428, 7418 (potential reduction of only "less than 5 percent" in owner's annual returns for those vessels). The Service also assessed potential costs and impacts on smaller entities, explaining how the regulation's accommodations would help reduce such costs. A253-A256, 85 Fed. Reg. at 7427-7430; *see, e.g.*, A244, A251, A256, 85 Fed. Reg. at 7418, 7425, 7430 (noting that waiving monitoring coverage for trips landing smaller amounts of herring, or certain trips by mere "wing vessels" "carrying no fish," would help address cost concerns); A246, A256, 85 Fed. Reg. at 7418, 7430 (noting that electronic monitoring may provide a "more cost effective" substitute for observer coverage in various circumstances).

The Service responded to comments in publishing the regulation. A248-A253, 85 Fed. Reg. at 7427. Several comments supported the regulation as proposed; some urged greater monitoring stringency, including for small-mesh bottom-trawling vessels. *See, e.g.*, A251, 85 Fed. Reg. at 7425. The Service also explained, in responding to comments seeking lesser stringency, why the need for increased monitoring and more accurate catch estimates outweighed potential costs, particularly as mitigated by the regulation's exemptions and adjustments. *See, e.g.*, A248-A249, A252, 85 Fed. Reg. at 7422-7423, 7426. For example, the Service explained that an alternative metric proposed by Relentless's sister company (Seafreeze Ltd)—which sought exemption based on herring catch *per day*—would not meet statutory conservation purposes, because "the potential for … relatively high herring catches *per trip* aboard [Relentless's] vessels warrant[s] additional monitoring." A252, 85 Fed. Reg. at 7426 (emphasis added).

## C. Procedural History

In March 2020, Relentless filed suit in the Rhode Island federal district court, challenging the omnibus amendment and the regulation, and seeking declaratory and injunctive relief. A11, A33-A38.

By that time, a similar challenge by other plaintiffs was pending in *Loper Bright Enters. v. Raimondo*, No. 1:20-cv-466 (D.D.C.). In August 2020, this district court declined to transfer this case to the D.C. district court. A158-A161.

The *Loper* district court ruled for the government in June 2021, concluding that the Magnuson-Stevens Act authorizes the regulation's industry-funded monitoring. *Loper Bright Enters. v. Raimondo*, 544 F. Supp. 3d 82, 103-107 (D.D.C. 2021). An appeal in that case was orally argued in February 2022 and remains pending. *Loper Bright Enters. v. Raimondo*, No. 21-5166 (D.C. Cir.).

In January 2021, Relentless and the government cross-moved for summary judgment. District Court Docket Entry ("DE") 37; DE38. In September 2021, the district court denied Relentless's motion and granted the government's motion, entering judgment for the government. ADD1-ADD32; ADD33. The court concluded that the Service reasonably interpreted the Magnuson-Stevens Act to authorize industry funding of at-sea monitors as observers. ADD8-ADD18. Accordingly, the court deferred to the Service's interpretation of that statute under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). ADD14-ADD18. The court similarly concluded that the regulation was authorized under the Commerce Clause, as Relentless voluntarily participates in the herring market and fishery to which its observer compliance obligations and costs attach. ADD30-ADD32. The court decided that the regulation satisfied the five National Standards under the Act that Relentless had invoked, and the Regulatory Flexibility Act. ADD18-ADD30. The regulation's preamble "belied" Relentless's contrary claims, the court reasoned, because the Service there addressed any

prescribed considerations by taking account of costs, including to smaller entities; adopting accommodations to minimize them; and considering and explaining why other alternatives were not adopted. ADD29-ADD30. This appeal followed.

## SUMMARY OF ARGUMENT

1. The district court correctly rejected Relentless's challenge to the Magnuson-Stevens Act's statutory authority for the regulation. The statute governs the highly regulated use of a public resource to afford overall national benefit. It expressly permits fishery management plans to include observer requirements and any necessary and appropriate measures for the fishery's conservation and management. Under its plain text, industry participants in New England fisheries may be required to bear their own costs of compliance with a monitoring coverage requirement, just as they bear other compliance cost responsibility that Relentless did not dispute. Other provisions of the statute expressly contemplate that private vessels may be required to procure and pay for required observers. The monitoring measures are consistent with the Magnuson-Stevens Act's overall structure and purpose by advancing the interest in collecting data "essential" to fisheries' conservation and management. If the statute's plain language, context, and structure were not enough, its history confirms that Congress intended to authorize industry-funded monitoring.

Relentless's argument—that the Service alone must bear all costs of meeting vessels' observer requirements—lacks footing in the statute's text or purpose. Relentless's reliance on statutory provisions authorizing fee-based monitoring programs—whereby the government funds a comprehensive program and recovers some costs through fees—is misplaced. These programs cannot be understood to deprive the Service of its authority to require industry vessels to carry observers at their own expense. Similarly, Relentless cannot obviate the statute's application to at-sea monitors that observe data for fishery conservation and management purposes, when the statute defines the "observers" to which it applies in such terms. Because the agency's reading is correct, this Court need not decide whether *Chevron* deference should apply. In any event, this Court should sustain the agency's more than reasonable construction of the statute.

2. The district court also correctly ruled that the regulation complies with the Magnuson-Stevens Act's National Standards and the Regulatory Flexibility Act. Review on such claims is deferential to the agency, but regardless, the regulation expressly addresses and accommodates all that those authorities require. The regulation is designed to meet the Standards' bedrock principle of preventing overfishing while achieving optimum yield, consistent with the best scientific information available and allowance for the Standards' contemplated variations and contingencies. The Service considered costs and economic impacts on

industry, including smaller entities, as well as fishing communities.  It adopted

accommodations that mitigate such impacts, considered and explained its decision

regarding alternatives, and tailored the regulation to promote the fishery's

conservation consistent with statutory goals.  Relentless's contrary challenge rests

on claiming that its vessels and operational decisions should get special treatment

regardless of the extent to which they burden the herring fishery.

3.     Finally, the district court correctly rejected Relentless's only

preserved constitutional challenge, which was predicated on the Commerce Clause.

Relentless undisputedly commercially harvests fish, from vessels it sends beyond

state waters into the Atlantic Ocean, for sale in and substantially affecting

interstate commerce and the national economy.  The regulation reaches only such

voluntary economic and commercial activity, for which monitoring to sustain the

fishery resources (including for future commercial use) is necessary.  Relentless's

challenge defies longstanding precedent establishing that regulation of this type is

constitutionally permissible.

Accordingly, the district court's judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews a district court's entry of summary judgment de novo,

applying directly the APA's deferential standard to review the challenged

regulation.  *See Associated Fisheries of Me. v. Daley*, 127 F.3d 104, 109 (1st Cir.

1997); 16 U.S.C. § 1855(f)(1) (citing 5 U.S.C. § 706(2)(A)-(D)).  Under the APA,

courts set aside an agency action only if it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A);

*Associated Fisheries*, 127 F.3d at 109.  "[T]he APA standard affords great

deference to agency decisionmaking" and an agency's "action is presumed valid,"

so "judicial review … is narrow."  *Id.*  Deference afforded to agency judgments "is

particularly strong where the agency's expertise comes into play."  *Pepperell*

*Assocs. v. Env't Prot. Agency*, 246 F.3d 15, 22 (1st Cir. 2001).  The reviewing

court "cannot substitute its judgment" for the agency's.  *Bos. Redevelopment Auth.*

*v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (internal quotation marks

omitted).  An agency's decision should be upheld if its explanation "includ[es] a

rational connection between the facts found and the choice made."  *Int'l Jr.*

*College of Bus. & Tech. v. Duncan*, 802 F.3d 99, 106-107 (1st Cir. 2015).

## ARGUMENT

## I.  The Magnuson-Stevens Act Authorizes the Regulation's Industry-Funded Monitoring.

Contrary to Relentless's argument (Br.20-43), the Magnuson-Stevens Act

authorizes industry-funded monitoring, including the measures in the challenged

regulation.  Industry-funded monitoring is well-established in domestic fisheries

and has been upheld against similar legal challenges.  *See* 50 C.F.R.

§§ 648.11(k)(4), 648.87(b)(1)(v)(B), (4)(ii)(F)(4), 660.16(a), 679.51(d)(1)(i); 55

Fed. Reg. 4839, 4840 (Feb. 12, 1990); *Goethel*, 2016 WL 4076831, at *4-6; *Loper*, 544 F. Supp. 3d at 103-107.  As the Service explained, this regulation's industry-funded monitoring measures fall well within applicable statutory authority—in particular, authority to require vessels to have observers.  A248, 85 Fed. Reg. at 7422 (citing 16 U.S.C. § 1853(b)(8)).

The agency's interpretation of the Magnuson-Stevens Act is unambiguously correct, so this Court need not decide whether *Chevron* deference is warranted. *See Coventry Health Care of Miss., Inc. v. Nevils*, 137 S. Ct. 1190, 1198 n.3 (2017).  The relevant provisions' plain text, read in the Act's context and structure as a whole, authorize industry-funded monitoring of the type challenged here.  The statute's history reinforces this conclusion.  Relentless's misplaced focus on fee-collection programs (Br.26-27, 30, 32, 40-43), and on whether at-sea monitors that directly observe data for fishery conservation and management purposes are statutory "observers" (Br.1, 19-20, 22, 25, 29-30, 33, 39), cannot override the statutory text's ordinary meaning.  Even if the Court were to reach *Chevron*'s second step, the Service's interpretation of the Magnuson-Stevens Act—a statute it is charged with administering—is more than reasonable.  *See Lovgren v. Locke*, 701 F.3d 5, 31 (1st Cir. 2012).

**A.** **The Magnuson-Stevens Act's text, structure, and history unambiguously demonstrate authority for the regulation's industry-funded monitoring.**

**1.** **Section 1853(b)(8) authorizes the Service to require vessels to carry observers—including at-sea monitors—at the vessels' own expense.**

The Magnuson-Stevens Act expressly authorizes the Service to provide for industry-funded monitoring. Among other authority, Section 1853(b)(8) authorizes fishery management plans to "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan." 16 U.S.C. § 1853(b)(8). By that provision, plans may require vessels to ensure that they have observers on board. The only relevant qualification to this authority describes the purpose of the observer requirement: "collecting data necessary for the conservation and management of the fishery." *Id.* The Service exercised this statutory authority in approving the omnibus amendment and its implementing regulation. *See* 50 C.F.R. § 648.11(g), (m).

Relentless concedes that Section 1853(b)(8) explicitly authorizes requiring vessels to have observers aboard. Br.28-29, 22. Its argument depends on misunderstanding the meaning of "observer" in Section 1853(b)(8). Relentless misconstrues that provision to restrict observer coverage requirements to apply only to observers funded by the government, and not to apply to "at-sea monitors" that observe data pertaining to fishery conservation and management as Section

26

1853(b)(8) describes.  Br.22, 29-30, 39-40.  Neither purported limitation is supported by the statute's text or the plain meaning of "observer."

"Observer" is defined by the Magnuson-Stevens Act to mean, simply, "*any* person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under [the Act]."  16 U.S.C. § 1802(31) (emphasis added).  "Person" is similarly defined broadly to include "*any* individual" or "*any*" of a list of business or government entities.  *Id.* § 1802(36) (emphases added); *contra* Br.32, 19.  And the Act's broad definition of "observer information"—which covers "*any* information collected, observed, retrieved, or created" under an agency-authorized observer or electronic-monitoring-system program, among other things—encompasses the data that at-sea monitors observe and collect.  *Id.* § 1802(32) (emphasis added) (listing examples of "observer information" that include "fish sampling or weighing data" and "location … observations"); 50 C.F.R. § 648.2 ("[a]t-sea monitors" are expressly included in definition of "observer or monitor" as "*any* person certified by NMFS to collect operational fishing data, biological data, or economic data through[, for example,] direct observation" (emphasis added)); *id.* § 648.11(m)(1)(i)(B) (listing specific types of such data that at-sea monitors collect).  The term "any"—which appears in these definitions—has "an expansive meaning" that ordinarily lacks limitation.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-221 (2008).  Industry-

funded at-sea monitors, as addressed by the regulation, meet the statute's definition and are clearly "observers" within the statute's meaning.

Relentless in effect asks the Court to write "government-funded" into Section 1853(b)(8) before "observers." Br.29, 22. Thus, it impermissibly "asks [the Court] to add words to the law" to produce Relentless's desired result. *Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores*, 575 U.S. 768, 774 (2015). Relentless cannot interpolate such a specific restriction into the statute. "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

The statute's plain language authorizes the Service to require that industry vessels meet a substantive observer coverage requirement, regardless of who funds the observers. 16 U.S.C. § 1853(b)(8). This clear statutory authority necessarily allows leaving regulated vessels to bear their own costs of compliance with the observer requirement. *See* A248, 85 Fed. Reg. at 7422. Indeed, a similar provision of the statute authorizes requiring vessels to "use … specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels," such as for safety and environmental conservation reasons. 16 U.S.C. § 1853(b)(4). The statute need not expressly disclaim the public's responsibility for buying private vessels' fishing nets and life preservers to prevent those vessels from evading the

28

statute's expressly authorized requirement. It is far from unusual for a statute to authorize regulations that entail compliance costs borne by the regulated entities—particularly where, as here, they are subject to permitting requirements (16 U.S.C. § 1853(b)(1)). *See, e.g.*, 46 U.S.C. § 4502 (directing Coast Guard to prescribe regulations requiring equipment on vessels); 46 C.F.R. §§ 28.100-28.165 (requiring such equipment); *see infra* p.59.

If there were any doubt on this point, the statute elsewhere clearly contemplates that conservation and management measures impose compliance costs that industry must bear. Two of its National Standards for such measures address such costs or economic impacts, directing that they be "minimize[d]" only to the degree "practicable," but not eliminated. 16 U.S.C. § 1851(a)(7)-(8). These provisions would be superfluous if the Service lacked authority to adopt measures entailing compliance costs for industry vessels. *See Silva v. Garland*, 27 F.4th 95, 103 (1st Cir. 2022) (statutes should be construed to give effect to every word).

> ## 2. Industry-funded monitoring is authorized as a "necessary and appropriate measure" for fishery conservation and management.

The Service also has authority to require industry-funded monitoring under Magnuson-Stevens Act provisions that authorize plan measures "necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(1)(A); *id.* § 1853(b)(14). This authority, by its terms, is broad.

*Conservation Law Found. of New Eng. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993) (describing "broad discretion" under 16 U.S.C. § 1853(b)(14) as previously numbered).  Although broad, the Service's authority under these provisions is not all-purpose.  The statute defines "conservation and management" in a manner addressed to particular sustainability functions.  16 U.S.C. § 1802(5).

These provisions work in tandem with Section 1853(b)(8), authorizing the Service to adopt regulations necessary and appropriate to ensure that observer requirements fulfill their purpose of "collecting data necessary for the conservation and management of the fishery."  *Id.* § 1853(b)(8).  Providing for industry-funded monitoring falls within the ambit of this authority to meet a fishery's conservation and management needs, as the Service discussed in publishing the regulation.  *See, e.g.*, A248-A249, 85 Fed. Reg. at 7422-7423 (explaining that industry-funded monitoring facilitates accurate estimates of catch and discards to determine if the fishery retains sustainable levels of stock, including for future fishing community needs).  Thus, even if Section 1853(b)(8)'s authority alone were not enough to authorize the regulation's adopted measures, the authority under Section 1853(a)(1)(A) and (b)(14) to adopt appropriate measures suffices.

Indeed, the Magnuson-Stevens Act, read as a whole, makes clear that the regulation properly exercises the Service's authority to prescribe necessary and appropriate measures to ensure data collection necessary for conservation and

management.  *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (statutory meaning is determined from "the whole statute, not … isolated sentences," by reading the statute's words "in their context" and based on "the overall statutory scheme").  The statute expressly declares that "collection of reliable data is *essential* to the effective conservation [and] management" of fishery resources.  16 U.S.C. § 1801(a)(8) (emphasis added).  Other provisions of the Act—including one Relentless invokes (Br.23, 44)—reinforce the importance of having the "best scientific information available" regarding fishery resources, such as data to improve the accuracy of catch estimates.  *Id.* §§ 1851(a)(2), 1801(c)(3) (policy of using "best scientific information available," including to consider "the effects of fishing on immature fish" and to "minimize bycatch and avoid unnecessary waste of fish").

To that end, the Act requires plans to specify "pertinent data" to be submitted to the Service, including on "the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof," and "areas in which fishing was engaged in."  16 U.S.C. § 1853(a)(5).  Observer programs are an important and statutorily recognized means of collecting this data.  *Id.* § 1853(b)(8); *see id.* § 1802(32) (describing "fish sampling or weighing data" as "observer information" collected by agency-authorized monitoring programs).  These are the types of data that at-sea monitors collect (50 C.F.R. § 648.2), which are specified under the

regulation's Atlantic herring measures (*id.* § 648.11(m)(1)(i)(B)). The regulation's industry-funded monitoring thus furthers the Magnuson-Stevens Act's conservation and management purposes, by providing for data collection that the statute describes as necessary for those purposes.

### 3. Other provisions confirm that the Act authorizes industry-funded monitoring.

The Magnuson-Stevens Act includes two more provisions—Sections 1858(g)(1)(D) and 1857(1)(L)—that expressly contemplate industry-funded monitoring and vessels' contracting of monitors in fisheries. These provisions reinforce the Service's authority to provide for industry-funded monitoring here. *See, e.g.*, *McGirt v. Okla.*, 140 S. Ct. 2452, 2464 (2020) (express contemplation of authority supports its existence); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979) (provision's language that "explicitly presumes the availability" of a remedy confirms its availability).

The relevant provisions provide adverse legal consequences for various conduct hindering observers that are contracted for and paid by industry, rather than by the Service. *First*, the Service may impose permit sanctions on vessels for failure to make "any payment required for observer services provided to *or contracted by* an owner or operator who has been issued a permit." 16 U.S.C. § 1858(g)(1)(D) (emphasis added). This language expressly contemplates that there is authority for industry-contracted monitoring for which vessels bear

payment responsibility—that is, the regulation's industry-funded monitoring. Because this provision applies to vessel owners or operators permitted "under any marine resource law administered by the Secretary," *id.* (emphasis added), it applies to domestic vessels permitted under 16 U.S.C. § 1853(b)(1). Thus, Section 1858(g)(1)(D) expressly encompasses vessels subject to fishery management plans—the same vessels to which Section 1853(b)(8)'s observer requirement provision applies.

*Second*, the Magnuson-Stevens Act prohibits various forms of adverse conduct (such as "forcibl[e] assault") toward "any observer on a vessel under [the Act], or any data collector employed by the [Service] or *under contract to any person* to carry out responsibilities under [the Act]." *Id.* § 1857(1)(L) (emphasis added). "Observer," as used in this provision, is defined to mean "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits." *Id.* § 1802(31). Thus, Section 1857(1)(L), like Section 1858(g)(1)(D), applies to domestic vessels permitted under fishery management plans that require observers.

These provisions necessarily presuppose that the Service may require industry-funded monitoring. There would be no need for the statute to condition vessels' permits on "any payment required for observer services … contracted by [the vessel's] owner or operator" if those vessels could not be required to contract

for and fund monitoring under the statute.  *Id.* § 1858(g)(1)(D).  Nor would the

statute need to protect observers "under contract to *any person*" if observers were

only under contract to the Service.  *Id.* § 1857(1)(L) (emphasis added).

Understanding the statute to authorize industry-funded monitoring therefore best

"give[s] effect … to every clause and word of [the] statute."  *Silva*, 27 F.4th at 103

(quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)).

> **4.    History confirms that the Act authorizes industry-
> funded monitoring.**

This Court need not go beyond the statutory text to conclude that the

Magnuson-Stevens Act authorizes industry-funded monitoring.  *See, e.g.*, *Ratzlaf v.*

*United States*, 510 U.S. 135, 147-148 (1994); *City of Providence v. Barr*, 954 F.3d

23, 31-32 (1st Cir. 2020).  But the Act's history further supports this conclusion in

any event.  *See United States v. De La Cruz*, 998 F.3d 508, 516 (1st Cir. 2021).

Relentless is mistaken in contending otherwise.  Br.42-43.

After the Magnuson-Stevens Act was enacted in 1976, the Service began

exercising its statutory authority to require industry vessels to carry observers and

pay their own costs.  In 1989, for example, an industry-funded observer program

was adopted in the North Pacific fishery.  *See* 55 Fed. Reg. 4839, 4839-4840 (Feb.

12, 1990) (providing that the "vessel operator … is responsible for obtaining" the

observer and "will pay the cost of the observer directly to the contractor").  During

hearings on the statute that year, witnesses discussed these existing industry-

funded observers in the North Pacific fishery and testified to the observer requirements, where "[i]n all cases" industry "pays the cost of the observer." *Oversight of Marine Fisheries Management: Hearings Before the National Ocean Policy Study of the Comm. on Commerce, Science, & Transp.*, U.S. Senate, 101st Cong. 464 (1989) (written testimony of Chris Blackburn); *see Magnuson Fishery Conservation and Management Act of 1976, Reauth.—Part II, Hearing Before the Subcomm. on Fisheries & Wildlife Conservation & the Env't of the Comm. on Merchant Marine & Fisheries*, U.S. House of Representatives, 101st Cong. 33 (1989) (testimony of John Peterson).

Congress confirmed this authority in the 1990 amendments to the Magnuson-Stevens Act, which added Section 1853(b)(8)'s observer provision. Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448. An accompanying committee report explained that this provision "allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes," noting that "the Councils already have—and have used—such authority." H.R. Rep. No. 101-393, at 28 (1989). Enactment of the observer provision simply "makes the authority explicit." *Id.* Another committee report similarly confirmed that the amendment "clarif[ies] the existing authority in the Magnuson Act." S. Rep. No. 101-414, at 20 (1990). The existing observer practices that Congress sought to expressly authorize included industry-funded

monitoring. Moreover, Congress's later addition of 16 U.S.C. § 1858(g)(1)(D)—

the permit-sanctions provision that references payments for observer services

"contracted by [a vessel's] owner or operator"—confirms Congress's continued

contemplation that industry-funded monitoring was statutorily authorized. *See*

Sustainable Fisheries Act, Pub. L. No. 104-297, § 114(c), 110 Stat. 3559, 3599

(1996).

Consistent with this history, the Service has interpreted its authority,

including under Section 1853(b)(8), to permit the adoption of industry-funded

monitoring programs. During the intervening three decades, the agency

promulgated regulations implementing industry-funded monitoring programs in

several fisheries. *E.g.*, 50 C.F.R. §§ 648.11(g), (k)(4), 648.87(b)(i)(v)(B),

(4)(ii)(F)(4), 660.16(a), 679.51(d)(1)(i). And Congress is aware that such industry-

funded monitoring has been proceeding under the Act. Its committees in recent

years have several times encouraged the Service to look into policies that would be

cost-effective for industry participants. *See, e.g.*, S. Rep. No. 116-127, at 42

(2019); S. Rep. No. 115-275, at 36 (2018); S. Rep. No. 115-139, at 34 (2017); H.R.

Rep. No. 114-605, at 17 (2016); S. Rep. No. 114-239, at 31-32 (2016); S. Rep. No.

114-66, at 31-32 (2015). In sum, Congress's actions regarding this statute

reinforce its understanding that the statute provides authority for industry-funded

monitoring. *See* ADD17-ADD18.

**B.    Relentless's contrary reading of the statute fails.**

**1.    Fee-based provisions do not undercut statutory authority for industry-funded monitoring.**

Relentless's principal argument that the Magnuson-Stevens Act does *not* authorize industry-funded monitoring—despite the foregoing statutory text, context, and history—rests on conflating such monitoring with detailed *fee-based* programs.  Br.26-27, 35-36, 42-43.  Beyond the authority conferred in Section 1853, Congress specifically devised comprehensive schemes for regulating particular issues—foreign vessels (*id.* § 1827), limited-access-privilege programs (*id.* § 1853a), and the North Pacific fisheries research plan (*id.* § 1862).  In these programs, Congress established fee-based funding mechanisms tailored to the particular contexts.  *See id.* §§ 1827(d)-(e), 1853a(e), 1862(a).  But such provisions do not undercut the Service's authority to require industry-funded monitoring.

Fee-based programs are distinct from the industry-funded monitoring measures at issue here, by which the fishing vessels contract with and make payments directly to third-party monitoring service providers.  *See* Br.51 (admitting such distinction).  Courts recognize this distinction's importance.  ADD12-ADD13 (citing *Loper*, 544 F. Supp. 3d at 106); *Goethel*, 2016 WL 4076831, at *5-6.  A "fee" is "where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency."  A248, 85 Fed. Reg. at

7422.  Fees, unlike compliance costs, are not paid to third parties for services rendered, and they may be required of industry participants who do not even use the funded service.  *See, e.g.*, 16 U.S.C. § 1862(a)(2), (b)(2)(F)-(G).  Fees also generally entail specification of how their amount will be determined, as—unlike compliance costs—they ordinarily are not set by market forces.  Fees are thus meaningfully distinct from compliance costs, both in operation and by law.  *See, e.g.*, ADD12-ADD13 (listing distinctions).  Accordingly, the challenged regulation's industry-funded monitoring program does not "charge … fees" (Br.42, 26-27) that are paid to the government and is not comparable to a fee-collection program.

Relentless's basic error pervades and undermines its statutory analysis. Much of its cited law concerns fees, not industry payment of its own costs.  *See, e.g.*, Br.17, 21, 26-27, 31-32, 42.[2]  And Relentless incorrectly claims that fee-based statutory provisions would be superfluous if industry-funded monitoring were authorized.  Br.34-36.

To the contrary, Congress accomplished different goals in Section 1853—a broad delegation of authority to the Service on domestic vessels—and in

---

[2] To the extent that Relentless references (*e.g.*, Br. 39, 42-43) constitutional provisions beyond the Commerce Clause (*see infra* Argument, Section III), its points are forfeited.  It has also waived argument under various other statutes (*e.g.*, 31 U.S.C. §§ 1341, 3302, 9701).  Br.30.

Relentless's cited fee-collection provisions.  Congress had reason to spell out complicated details of these fee-based programs in light of the particular contexts they address.  For example, the foreign vessels context implicates treaties, international jurisdiction, and maintaining foreign relations—for which Congress might deem specific instruction particularly appropriate.  *See, e.g.*, 16 U.S.C. §§ 1827(b)(1)(B), 1824(b)(10)(A), 1802(19)-(20), (22), (24), (43), (48)-(50).  The limited-access-privilege program entails an elaborate and complex system of quota shares and set-asides with implications for inter-community relations that Congress saw fit to address.  16 U.S.C. § 1853a(b), (c)(3)-(4), (5)(C), 1802(23), (26)-(27); *see* ADD11 n.5.  And all three contexts invoked by Relentless implicate questions of how fees should be set and paid to the government—questions that Congress need not answer when industry is left with flexibility to contract for and pay their own observers pursuant to Section 1853.

The fee-based provisions that Relentless cites therefore specify fee mechanisms, which differ from what other fee provisions envision in their absence.  Relentless's cited provisions provide for fees to be deposited into specifically named Funds earmarked for particular agency uses, rather than the general U.S. Treasury.  *Compare* 16 U.S.C. §§ 1827(d)-(e), 1853a(e), 1854(d)(2)(C)(i), 1862(a), (b)(2)(G) (designating earmarked Funds), *with* 31 U.S.C. § 3302 (outlining a general fee mechanism); *see* ADD11-ADD14; A342; *Goethel*, 2016 WL 4076831,

at *7; *Loper*, 544 F. Supp. 3d at 108. Where Relentless's cited provisions even mention observers, they provide for the government to station the observers and pay their costs from such government Funds. 16 U.S.C. §§ 1827(b), (e), 1862(a)(1), (b)(2).

Accordingly, the fee-based provisions have clear effect and are not surplusage under the Service's correct statutory reading.

Instead, it is *Relentless's* interpretation that would create surplusage. Relentless provides no explanation for the language in the permit-sanctions and observer-protection provisions that concerns non-payment by vessel owners and operators to observers with which they directly contract pursuant to permits. 16 U.S.C. §§ 1858(g)(1)(D), 1857(1)(L); *see supra* pp.6-7, 32-34, 36. Reading the statute not to authorize industry contracting and payment of observers would deprive that statutory language of application. Similarly, the National Standards that direct only "minimiz[ing]" costs if "practicable," instead of requiring the Service to eliminate them, would be read out of the statute if—as Relentless suggests—the Service lacked authority to adopt measures entailing compliance costs for industry vessels. 16 U.S.C. § 1851(a)(7)-(8); *see supra* pp.7, 29. Thus, any canon against superfluity cannot assist Relentless. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 105 (2011) ("[T]he canon against superfluity assists only where a competing interpretation gives effect 'to every clause and word of a

statute.'"); *Me. Pooled Disability Tr. v. Hamilton*, 927 F.3d 52, 59 (1st Cir. 2019) (rejecting an "alternative reading [that] would itself treat as surplusage" parts of the statute).

Relentless's cited fee-based provisions also fail to support its negative inference about statutory authority for industry-funded at-sea monitoring. Br.30-31, 34-35. As described, the Act's text broadly and specifically authorizes the regulation's challenged measures, as the statutory scheme as a whole in its full context and history confirm. The fee-based provisions concern distinct matters, and reveal no gap or omission in the statute's authority for industry funding of its own compliance costs that would support Relentless. *See* ADD12-ADD18.

If anything, omissions in the statute's text undercut Relentless's reading. As noted, the statute does *not* include the phrase "government-funded" or so limit the broad class of "observers" that Section 1853 authorizes requiring vessels to have. In addition, the very statutory limitations that Relentless invokes (Br.31, 17, 27, 37, 40) are expressly cabined to "fees" or to particular geographic contexts by their own express terms. *See* 16 U.S.C. § 1854(d)(2)(B) (capping certain "fee[s]"); A248, 85 Fed. Reg. at 7422 (industry-funded monitoring program does not concern items subject to Section 1854(d)(2)(B)'s cap); *id.* § 1862(b)(2)(B) (imposing standards only on certain "fees" under a particular regional council's jurisdiction); *id.* § 1862(b)(1)(B) (same as to plan amendments under that regional council's

jurisdiction).  Accordingly, they should be read as limited to those contexts.

Relentless's own cited legislative history (Br.42) reinforces this understanding.

H.R. Rep. 101-393, at 31 (1989) ("Nothing in [16 U.S.C. § 1862] should be

construed as affecting the rights … of other [regional councils] or as affecting

fisheries other than those within [that particular council's] jurisdiction.").  Along

similar lines, the "statutory safeguards" that Relentless references (Br.31) are

directly cabined to the context of fees paid to, and payments received from, the

government.  *See* ADD12-ADD13; *Loper*, 544 F. Supp. 3d at 107-109.

By contrast, as explained, Section 1853 and other provisions of the statute

that authorize and contemplate industry-funded monitoring omit such restrictions.

If Congress had meant to restrict authority to have industry vessels cover the costs

of their own compliance through direct payment, Congress knew how to say so and

"could have easily so stated," as it did in statutory provisions delineating such

restrictions for those other, fee-based contexts.  *Consumer Data Indus. Ass'n v.*

*Frey*, 26 F.4th 1, 8 (1st Cir. 2022) (citing *Russello v. United States*, 464 U.S. 16, 23

(1983)).  Yet Congress did not, instead conferring express, clear, and broad

authority in Section 1853, reinforced by the rest of the statute and its context and

history, as discussed.  Relentless effectively asks the court to read limitations into

Section 1853's plain language based on unexpressed congressional intent.

Relentless's own logic (Br.29-30) counsels for rejecting that request.

In any event, no canon of construction may muddy the statute's clear, broad conferral of authority. *See Clifton v. Fed. Elec. Comm'n*, 114 F.3d 1309, 1312 (1st Cir. 1997) (citing *Mourning v. Family Pubs. Serv.*, 411 U.S. 356, 372-373 (1973)). Such canons do not provide "a license for the judiciary to rewrite language enacted by the legislature." *Chapman v. United States*, 500 U.S. 453, 464 (1991).

For similar reasons, Relentless's contention that industry-funded monitoring programs are not authorized under Section 1853's provisions for "necessary and appropriate" measures must fail. Br.40-41. Relentless invokes *Michigan v. Environmental Protection Agency*, 576 U.S. 743 (2015), but it is inapposite. In that case, the Court held that the agency could not rely on its authority to adopt "appropriate and necessary" regulations to prohibit consideration of costs where the statutory scheme otherwise expressly required it. *Id.* at 751-752. Here, it is *Relentless* who seeks to read cost-consideration provisions out of the statute, by seeking to treat industry's bearing its own costs as prohibited when such provisions expressly contemplate it. *E.g.*, 16 U.S.C. § 1851(a)(7); *see* 50 C.F.R. § 600.340(c) (contemplating "costs to the industry of compliance"); *supra* pp.7, 29. The agency here not only interpreted the statute consistently with such provisions; it complied with them when considering costs in publishing the regulation. *See, e.g.*, A251, 85 Fed. Reg. at 7425; *infra* Argument, Section II.A.

Relentless misunderstands *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220 (1st Cir. 2003), in an unpreserved point (Br.32; *see supra* n.2). By Relentless's own quotation (Br.32), the decision concerns only "what funds shall be appropriated *from the public fisc*" for *the government* to spend, not costs that industry entities pay to ensure their own compliance to participate in the fishery. 321 F.3d at 229 (emphasis added). If anything, the decision undercuts Relentless, who in effect complains that its participation in taking resources from the commons of a regulated fishery should be *more greatly* subsidized from the public's coffers.

### 2.  At-sea monitors qualify as "observers" under the Magnuson-Stevens Act.

As explained, at-sea monitors meet the statutory definition of the "observers" that Section 1853(b)(8) authorizes requiring vessels to have at their own expense. *See supra* pp.27-28. Even Relentless calls such observers or monitors "analogous." Br.26, 22. Thus, industry-funded at-sea monitors occupy no "new office" (Br.28, 39, 2). *See Goethel*, 2016 WL 4076831, at *1, *4.

To contend otherwise, Relentless distorts the Service's analysis accompanying the regulation. Br.19, 29. In fact, the Service explained that it interprets Section 1853(b)(8) to "expressly authorize[] onboard human monitors" to be carried as "observers" for the provision's stated purposes, and interprets that provision's authorization of observer requirements to "include[] compliance costs

on industry participants." A248, 85 Fed. Reg. at 7422. And the regulation defines the terms "observer" and "monitor" identically and broadly, expressly including "at-sea monitors." 50 C.F.R. § 648.2 ("*any* person certified by [the Service] to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels" under the Service's program for northeast fisheries). Thus, contrary to Relentless's artificial distinction (Br.19, 29), the Service did not "contrast" at-sea monitors to other observers (calling those "observers" as a regulatory shorthand) in any sense relevant to the *statute*'s meaning. The Service distinguished only the *form* of data to be collected by different subcategories of what the statute defines as "observers" based on their data collection's "conservation and management" purposes. 16 U.S.C. §§ 1853(b)(8), 1802(31); *see id.* § 1801(a)(3); A244, A253, 85 Fed. Reg. at 7418, 7427.

## C. Although this Court need not reach the issue, the Service's interpretation deserves deference.

As noted, the statute unambiguously demonstrates that the Service may require industry-funded at-sea monitoring. Even if it did not, that agency's "interpretation governs" under these circumstances. *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). At *Chevron*'s second step, any reasonable interpretation, rather than the most reasonable or only possible interpretation, will suffice. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).

The Magnuson-Stevens Act "expressly delegate[s]" such interpretive authority to the Service. *Lovgren*, 701 F.3d at 30 (citing 16 U.S.C. § 1854(a)-(c)). The regulation was issued pursuant to this authority and subject to extensive notice-and-comment rulemaking, which "creates a strong presumption" favoring *Chevron* deference. *Id.* And the regulation's preamble shows the Service "listened to the public comments … and stated the reasons for its views," reinforcing the basis for deference here. *Id.* at 31; *see* A248-A253, 85 Fed. Reg. at 7422-7427; *supra* pp.12-13, 19; *infra* Argument, Sections II.A-II.B.

Here, the Service more than reasonably construed Section 1853 to authorize industry-funded monitoring, as discussed above. A248-A249, 85 Fed. Reg. at 7422-7433; *see, e.g.*, 16 U.S.C. §§ 1853(b)(8), (a)(1)(A), (b)(14); *see supra* Argument, Sections I.A-I.B. Relentless's arguments against deference are ill-founded. *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), ruled only on *Auer* deference to an agency's interpretation of its own regulation, not *Chevron* deference to its interpretation of a statute. Relentless's quotation from *Kisor* (Br.28) only confirms that reasonable agency interpretations receive deference. Relentless's offhand suggestion that deference to a well-reasoned interpretation violates "separation of powers and due process" (Br.28) is forfeited. *See* ADD15 n.7 (this was a mere "throwaway line"); *Bessette v. IKO Indus.*, 30 F.4th 75, 84 (1st Cir. 2022) (an argument is "waived for lack of development"). It is also wrong, as a matter of

both precedent and principle.  Such deference is an exercise of deliberative judicial decisionmaking, not some controlling intervention by another branch of government.

## II.     The Regulation Satisfies the National Standards and the Regulatory Flexibility Act.

### A.     The National Standards Support the Regulation.

Relentless claims the Service's rule violates five National Standards for fishery management plans.  Br.43-47.  But Relentless misunderstands the standards and how they support the regulation and its supporting analysis.

Standard One provides the "bedrock principle," *Associated Fisheries*, 127 F.3d at 110, that conservation and management measures should "prevent overfishing while achieving … optimum yield" (16 U.S.C. § 1851(a)(1))—that is, managing fishing to generally produce the fishery's "maximum sustainable yield," including by rebuilding overfished fisheries, which "will provide the greatest overall benefit to the Nation."  *Id.* § 1802(33).  Standards Two and Six instruct, respectively, that such measures be based upon the best scientific information available, and allow for variations and contingencies in fisheries, fishery resources, and catches.  *Id.* § 1851(a)(2), (6).  Standards Seven and Eight provide for such measures to take account of costs (for Standard Eight, adverse economic impacts on fishing communities), and minimize them only where "practicable."  *Id.* § 1851(a)(7)-(8).  Such "obligations are subordinate to the [Act's] overarching

conservation goals." *Lovgren*, 701 F.3d at 36; *see Associated Fisheries*, 127 F.3d at 110; 16 U.S.C. § 1851(a)(8) (prioritizing the Act's "conservation requirements"); 50 C.F.R. § 600.345(b)(1).

The regulation complies with these five standards. As its preamble explains, these standards' sustainability goals are well served by "[i]mproving [the Service's] ability to track catch against catch limits" through vessels' funding of increased monitoring. A251, 85 Fed. Reg. at 7425. By better understanding how much herring has been caught, the Service can better assess whether herring stock in the sea remains at sustainable levels and better calibrate regulatory measures, consistent with Standard One's bedrock principle. *See, e.g.*, A243, A252, 85 Fed. Reg. at 7417, 7426; A519-A520; A616-A617. Thus, the regulation well implements the Magnuson-Stevens Act's, including Standard Two's, goal of using high-quality scientific information, such as on amount of catch. 16 U.S.C. §§ 1801(a)(8), (c)(3), 1851(a)(2), 1853(a)(5); *see* 50 C.F.R. § 600.315(a)(1); ADD20. And the regulation makes exemptions available, consistent with considerations under Standards Seven and Eight, when they "are not expected to reduce the benefits of additional monitoring," such as where "trips have minimal to no catch." A251, 85 Fed. Reg. at 7425. The regulation thereby tailored its exemptions to risks to the fishery's sustainability, consistent with statutory conservation goals, and even expressly provided for future review and potential

recalibration that could further reduce costs. A243-A244, A250-A251, A256, 85 Fed. Reg. at 7417-7418, 7424-7425, 7430; 50 C.F.R. § 648.11(m)(1)(ii)-(iii); *see supra* pp.17-19.

Relentless overlooks most of this analysis. Relentless generally complains—based on unsupported self-serving assertions—that due to its own operational decisions, other fishing vessels may face less monitoring even when their rate of herring take per day is more time-efficient. Br.44-45. But Relentless admits that it actively keeps its vessels out for longer trips and uses practices— including bottom trawling—that catch herring above the regulation's exempted weight threshold. *See* Br.37, 14-15 (citing A288; A238). The Service explained that Relentless's long trips may produce "relatively high herring catches per trip," and so "warrant[] additional monitoring." A252, 85 Fed. Reg. at 7426. And Relentless admits that the Service determines "per trip" whether a vessel is monitored. Br.37. By potentially catching more herring on each unmonitored long trip than smaller vessels do on shorter trips, Relentless's vessels pose risk of "hurt[ing] herring stocks more than other … vessels" (Br.47) that are exempted because they fish below the weight threshold or "carry[] no fish." A256, 85 Fed. Reg. at 7430; *see* A244, 85 Fed. Reg. at 7418; 50 C.F.R. § 648.11(m)(1)(ii)(D)- (E); *see also* 50 C.F.R. § 600.310(g)(2) ("accountability measures" to keep catch below limits could include "*trip size* or bag limits" (emphasis added)). The

regulation's application of monitoring requirements to vessels with high herring take per trip is designed to prevent them from unduly burdening the fishery's sustainability, contrary to the Standards.

Regardless, Relentless's demand for special treatment as compared to its competitors, beyond the exemptions already provided, is unwarranted. Standard One's sustainability principle, whose conservation focus takes precedence, is not concerned with such comparisons. *See* ADD20; Br.44 (admitting that relative comparisons are not Standard One's focus). Nor does Standard Six's prescribed tailoring to differences among "fisheries, fishery resources, and catches" (16 U.S.C. § 1851(a)(6)) extend to differences among individual fishing vessels and their preferred practices and operations, contrary to Relentless's claim (Br.12-14, 45, 50). *See* ADD21-ADD22; *Ace Lobster Co. v. Evans*, 165 F. Supp. 2d 148, 182 (D.R.I. 2001) (regulations are not required, "in national standard 6 or anywhere else in the statute," to be "finely attune[d] to each and every fishing vessel"). Moreover, the Magnuson-Stevens Act contemplates that the Secretary may prioritize "the fishery as a whole" over "the interest of some groups of fishermen," *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 899 (9th Cir. 2010), such that even "some discrimination or inequity" between fishermen is permissible given the Act's "overriding purpose … that the fishery be preserved," *Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999). Accordingly, "the

Secretary is not required to alter regulatory metrics" to provide Relentless's desired exemption to accommodate only its two vessels. ADD24; *see* A250, 85 Fed. Reg. at 7424.

Relentless's other Standard-specific arguments are similarly mistaken. Having failed to identify any scientific information that the regulation overlooks, Relentless cannot prevail under Standard Two. ADD20-ADD21; *Mass.*, 170 F.3d at 30 (where a plaintiff has not "proposed anything better, then what is available is the best" under Standard Two); *see also* A617-A618 (further explaining the regulation's consistency with Standard Two). And Relentless's cost-based challenge under Standards Seven and Eight fares no better. Relentless failed to meet its burden to show that the agency's analysis is "clearly unreasonable" as to a particular omission for which "further analysis is likely to be determinative" in Relentless's favor. *Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 469-470 (1st Cir. 2003); *see Associated Fisheries*, 127 F.3d at 110-111.

To the contrary, the agency carefully accounted for the regulation's economic impact on fishing vessels and calibrated monitoring requirements to reduce it, as the district court observed (ADD25-ADD27) and Relentless effectively admits (Br.48-49). For example, the agency chose 50 percent, rather than 75 or 100 percent, as the total monitoring requirement; and it permitted the separate SBRM program's government-funded monitoring to assist in meeting that

target, which further reduces any burden on industry. A256, A250-A251, 85 Fed. Reg. at 7430, 7424-7425; A651; A620-A621. The regulation provides exemption for vessel trips that do not plan to catch more than 50 metric tons of herring, and for certain paired trawl trips that carry no fish, which entail less conservation risk. A256, A250-A251, 85 Fed. Reg. at 7430, 7424-7425; 50 C.F.R. § 648.11(m)(1)(ii)(D)-(E); *see* A620-A621. The Service observed that "[t]rips that land less than 50 [metric tons] are common for small-mesh bottom trawl" vessels, so that exemption may "result in a less than 5% reduction in annual [owner's returns] associated with at-sea monitoring for those vessels." A256, 85 Fed. Reg. at 7430; *see* A316, A620, A495 (estimating only "up to 3%" reduction in owner's returns for small-mesh bottom-trawl vessels). Allowing vessels to utilize electronic monitoring, instead of human monitors, when they choose to use certain gear types affords flexibility to select the monitoring method that entails lower cost, the Service noted. A251, A256, 85 Fed. Reg. at 7425, 7430; *see* 50 C.F.R. § 648.11(m)(1)(iii); A621. And the regulation expressly provides for potential future adjustment to further mitigate any cost concerns. A251, A246, A243, A256, 85 Fed. Reg. at 7425, 7420, 7417, 7430; *see* 50 C.F.R. § 648.11(m)(1)(ii)(A), (F).

Despite these well-explained accommodations, Relentless insists on a per-day metric for the weight-based monitoring exemption. Br.13, 15, 19, 30, 36-37, 44-46. But the agency need not separately assess each plan element or each

competing company's desired alternative; it may simply "discuss[] various alternative conservation measures and the impacts on local communities." *Little Bay Lobster Co.*, 352 F.3d at 469-470. Regardless, the agency did consider, and explain why it rejected, such an alternative metric. A252, 85 Fed. Reg. at 7426 (explaining rejection of alternative exemption for vessel trips landing "less than 20-percent herring or less than 50 [metric tons] of herring *per day*"). The agency observed that the likelihood of "relatively high herring catches per trip aboard [Relentless's] vessels warranted additional monitoring." *Id.* In essence, it found that insufficient monitoring under that alternative would jeopardize the Act's required conservation and sustainability. *See* A243, A251-A252, 85 Fed. Reg. at 7417, 7425-7426 (citing considerations under Standards One and Eight). The National Standards, and the Act generally, leave such balancing to the agency's discretion, especially given its expertise. *See, e.g.*, 16 U.S.C. § 1854(a)(1)(A); *see Little Bay Lobster Co.*, 352 F.3d at 470; *Lovgren*, 701 F.3d at 36; *Associated Fisheries*, 127 F.3d at 110-111 (agency decisionmaking on costs should be upheld so long as it is "rational" and "reflect[s] an understanding of analytical factors").

Relentless's remaining quibbles concern specific facts on costs. Br.16, 48-50. But the Act precludes questioning the Service's factual basis on these points.

*See* 16 U.S.C. 1855(f)(1); *Goethel*, 854 F.3d at 111 n.3; *supra* p.9. In any event,

the Service fully explained why Relentless's assertions are inaccurate.[3]

### B. The Service Complied with the Regulatory Flexibility Act.

Relentless's Regulatory Flexibility Act challenge is similarly mistaken.

Br.48-50. That statute does not govern the agency's substantive decisions or "limit

regulations having adverse economic impacts on small entities," but instead only

"creates procedural obligations" to "give[] attention" to certain types of small-

entity concerns when undertaking rulemakings affecting such entities. *Little Bay*

*Lobster Co.*, 352 F.3d at 470; *Associated Fisheries*, 127 F.3d at 114, 116; *see*

Br.49. The agency's analysis suffices where, as here, it makes a "reasonable,

good-faith effort" to consider "major options," acknowledge their probable

economic impacts on small entities, and explain why the agency did not adopt any

---

[3] The Service explained the following: Given exemptions, small-mesh bottom-trawl vessels may face "a less than 5 percent reduction in annual [returns-to-owner]," not "20% cost hikes" (Br.27, 37, 49), and are expected to face industry-funded monitoring on less than one in five of their trips. A250-A251, 85 Fed. Reg. at 7424-7425; *see* A316, A495, A566 (median of only 2.5% reduction). Relentless's $710 cost figure (Br.17-18, 48) is a "*maximum*" daily cost estimate. A254, 85 Fed. Reg. at 7428. Relentless over-reported its monitoring costs on trips that do not land herring (*see* Br.12, 16 (citing A302)) by misciting a *total* cost estimate for "*all* small-mesh bottom trawl vessels" in the fishery as if it were a per-vessel cost for its two vessels (Br.16). A252, 85 Fed. Reg. at 7426 (emphasis added); *see* A554. The regulation would not undercut "small-scale fishing" or general affordability (Br.14, 50), including because its industry-funded-monitoring requirements would likely affect only two bottom-trawl vessels (and only if they decline to take less herring per trip). A250, 85 Fed. Reg. at 7424.

identified "significant" alternative that would be "substantially less burdensome" on them. *Associated Fisheries*, 127 F.3d at 114-117.

The district court correctly concluded that the Service's analysis accompanying the regulation met this standard. ADD29-ADD30. As discussed above, the Service extensively analyzed potential impacts on small businesses, described the regulation's accommodations mitigating such impact, and examined alternatives and explained their rejection. *See, e.g.*, A253-A256, 85 Fed. Reg. at 7427-7430; *supra* pp.18-19, 48-54. In particular, the Service explained how the fish-catch-weight exemption would mitigate costs for smaller businesses. *See, e.g.*, A256, 85 Fed. Reg. at 7430; *see Associated Fisheries*, 127 F.3d at 116 (approving analysis explaining how a regulation "adopted some salutary measures" to ease burden on small fishing entities). And it explained why small entities' participation in the fishery was unlikely to be deterred. A250, 85 Fed. Reg. at 7424.

Although analysis of effects on a particular company is not required (*see Little Bay Lobster Co.*, 352 F.3d at 469-471), the Service even "explicitly considered measures to address Seafreeze's concern" regarding potentially higher "impacts on *its* vessels" from the regulation. A252, 85 Fed. Reg. at 7426 (emphasis added); *contra* Br.49. As noted, the Service explained that it did not adopt an alternative per-day metric for exemption because the likelihood of

"relatively high herring catches per trip aboard those vessels warranted additional monitoring." *Id.*; *see supra* pp.19, 49-50, 53. Accordingly, Relentless "point[s] to no … alternative," let alone a "*significant*" one, that "escaped the [agency's] notice," so its challenge fails. *Associated Fisheries*, 127 F.3d at 116-117.

## C. Relentless's Remaining Criticisms Fail.

Relentless's suggested allocation concerns regarding assignment of observers to vessels (Br.50)—based only on its own assertions from a self-selected and narrow time period—was correctly rejected. *See* ADD21 n.9. Among other things, as the district court explained, even if Relentless's vessels *had* faced a higher rate of assignment, it was attributable to a different program—likely the *government-funded* SBRM program—not the challenged industry-funded observer program. *Id.* Accordingly, such objection would not properly challenge *this* regulation. And because this regulation permits observers for that government-funded program to satisfy the total coverage target, in lieu of industry-funded observers, any differentially high rate of observer assignment under that program would only *reduce* Relentless's expected costs under this regulation's industry-funded-observer component. *Id.*[4] Thus, Relentless cannot claim prejudice as required. *See, e.g.*, *Conservation Law Found. v. Evans*, 360 F.3d 21, 29 (1st Cir.

---

[4] Moreover, a higher rate of observer coverage under the government-funded program would fit the record's showing of "higher discard rates" by vessels, like Relentless's, that use bottom-trawling gear. A402.

2004); 5 U.S.C. § 706.  Nor could Relentless show such a differentially higher rate of coverage to be problematic given "higher discard rates" by bottom-trawling vessels.  A402.

Relentless has waived any challenge based on the comment period's timing. Br.20, 35; *see* ADD27 (challenge was "rather undeveloped"); *Bessette*, 30 F.4th at 84.  There was neither error nor prejudice in any event.  *See* ADD27-ADD28.  The regulation was approved in 2020, well after its comment period ended in late 2018; and the Service then responded to comments submitted during the comment periods both for the regulation and for the omnibus amendment, ensuring that all comments were considered.  A240, A250, A248-A253, 85 Fed. Reg. at 7414, 7424, 7422-7427; *see Conservation Law Found.*, 360 F.3d at 29 (sustaining entire "omission of a formal public comment period" absent plaintiffs showing prejudice).

## III.   Regulation of Relentless's Commercial Fishing is Constitutional.

By Relentless's own description, its companies—organized under different states' laws—engage in voluntary economic and commercial activity harvesting fish off the coasts of the several New England and mid-Atlantic states for sale in interstate commerce.  A13-A14, A17, A21, A25; Br.9-11.  Relentless's only preserved constitutional challenge to the regulation does not dispute that Relentless's vessels may be required to have observers on board.  Br.50-51, 29.

Instead, Relentless disputes only whether the Commerce Clause permits leaving its vessels to bear any compliance costs for such requirement, even though that is undisputedly essential to conserve fishery resources for future use, including interstate commercial use. *Id.*; *see supra* n.2. The objection cannot succeed.

The regulation is supported by constitutional authority, including authority to regulate interstate commerce and to adopt measures necessary and proper to such ends. *See, e.g.*, U.S. Const. art. I, § 8, cls. 3, 8; *United States v. Lewko*, 269 F.3d 64, 67 (1st Cir. 2001) (listing the Supreme Court's "broad categories" of permissible commerce-power regulation); *Douglas v. Seacoast Prods.*, 431 U.S. 265, 275-276, 281-282 (1977) (Constitution authorizes federal regulation of "the taking of fish" even in state waters "where there is some effect on interstate commerce"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190-194, 196-197, 204, 215-216 (1824) (describing broad constitutional power to regulate vessels). Congress's findings, codified in the Magnuson-Stevens Act, reinforce that such regulation concerns interstate commerce and substantially affects it. *See* 16 U.S.C. § 1801(a)(1), (3), (8), (13) (commercial and recreational fishing for "fish off the coasts of the United States" constitute major employment sources and "contribute[] significantly" to the national economy; many coastal areas' "economies have been badly damaged" by "overfishing"; and data collection is "essential" to sustaining fishery resources).

Relentless misunderstands its only opinion cited to the contrary. Br.50-51. In *National Federation of Independent Business v. Sebelius* ("*NFIB*"), 567 U.S. 519, 563-574 (2012), the Supreme Court *upheld* the Affordable Care Act as constitutionally authorized under the Taxing Clause. Even the Justices who would not have also sustained that statute pursuant to the Commerce Clause agreed, in separate opinions, that activity like Relentless's could be constitutionally regulated. *See, e.g.*, *id.* at 536-537, 556 (opinion of Roberts, C.J.) ("Our precedents recognize Congress's power to regulate 'class[es] of *activities*'" (quoting *Gonzales v. Raich*, 545 U.S. 1, 17 (2012)); *id.* at 647-648 (opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (acknowledging the continued validity of *Wickard v. Filburn*, 317 U.S. 111 (1942), which held "the economic activity of growing wheat, even for one's own consumption" to be permissibly regulated). And even the Justices who dissented from the Court's judgment acknowledged that regulation "typically imposes costs on the regulated industry" and that Congress has "broad power" to do so "to 'protec[t]' and 'advanc[e]' commerce." *Id.* at 652 (quoting *Nat'l Labor Relations Bd. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937)).

This Court's longstanding jurisprudence confirms broad constitutional power to regulate such matters, including after *NFIB*. *See, e.g.*, *United States v. Burdulis*, 753 F.3d 255, 262 (1st Cir. 2014); *United States v. Roszkowksi*, 700 F.3d 50, 58-59 (1st Cir. 2012). Other appellate courts have decided similarly. *See, e.g.*,

*Miss. Comm'n on Envt'l Quality v. Env't Prot. Agency*, 790 F.3d 138, 182 (D.C. Cir. 2015) ("the Supreme Court has long made clear" that the broad Commerce Clause power permits "regulation of *activities causing* … environmental hazards" with potential "effects in more than one State").

Relentless's suggestion that the regulation "force[s] [it] into a market" (Br.50-51) is confused. Relentless already voluntarily participates in the commercial fishing market, which undisputedly is an interstate market that would be substantially affected—by undercutting the fishery's sustainability—absent this regulation. *See* ADD31-ADD32, ADD17, ADD29-ADD30; *Goethel*, 2016 WL 4076831, at *7 (rejecting a similar challenge because "costs of monitors are part of the permissible regulation of plaintiffs' commercial fishing activities"); *see supra* pp.6, 15-16, 19, 29-32, 49-51. And Relentless has many available options if it wishes not to be subject to the regulation's industry-funded monitoring;[5] it is not "force[d]" to participate in even that ordinary cost-bearing. *See* ADD31.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

---

[5] *See* 50 C.F.R. § 648.11(g), (m)(1)(i), (ii)-(iv), (4)(ii) (providing for industry-funded monitoring only by vessels participating in a regulated fishery—such as this Atlantic herring fishery under permits required based on fishing beyond state waters, including in the U.S. exclusive economic zone (50 C.F.R. § 648.4(a)(10)(i), (iv)(A)); only when they take trips planned to land over 50 metric tons of herring; and only where they do not meet other exemptions and other forms of, and funding for monitoring, are unavailable).

Respectfully submitted,

/s/ Dina B. Mishra
TODD KIM
   *Assistant Attorney General*
ALISON C. FINNEGAN
DANIEL HALAINEN
DINA B. MISHRA
   *Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-9022
dina.mishra@usdoj.gov

Of Counsel:

MITCH MACDONALD
   *Attorney*
Office of the General Counsel
National Oceanic & Atmospheric
Administration

June 3, 2022
90-8-8-08356

# CERTIFICATE OF COMPLIANCE

1.      The foregoing Final Brief for Appellees complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), it contains 12,966 words.

2.      The foregoing Final Brief for Appellees likewise complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

*/s/ Dina B. Mishra*
DINA B. MISHRA
Counsel for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this Final Brief for Appellees with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on June 3, 2022.

I certify that Counsel for Appellants are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


_/s/ Dina B. Mishra_
DINA B. MISHRA
Counsel for Appellees

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

## Magnuson-Stevens Fishery Conservation and Management Act

16 U.S.C. § 1801(a)(1)-(8), (13), (b)(1), (3), (c)(3)...........................................Add.1

16 U.S.C. § 1802(5), (31)-(33), (36)..............................................................Add.3

National Standards One, Two, and Six Through Eight,
　　16 U.S.C. § 1851(a)(1), (2), (6)-(8) ..........................................................Add.4

16 U.S.C. § 1853(a)(1)(A), (5), (b)(1), (8), (14)................................................Add.5

16 U.S.C. § 1855(f)(1) ...............................................................................Add.6

16 U.S.C. § 1857(1)(D)-(F), (L) ...................................................................Add.7

16 U.S.C. § 1858(g)(1)(A)-(D) ....................................................................Add.7

## Regulations

50 C.F.R. § 648.2 (excerpt)..........................................................................Add.8

50 C.F.R. § 648.11(m)(1)(i)(B), (ii)-(iv), (4)....................................................Add.8

**Magnuson-Stevens Fishery Conservation and Management Act**

**16 U.S.C. § 1801(a)(1)-(8), (13), (b)(1), (3), (c)(3)**

§ 1801. Findings, purposes and policy
  (a) Findings
The Congress finds and declares the following:
    (1) The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.
    (2) Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.
    (3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage, interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.
    (4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.
    (5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.
    (6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild

overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

(7) A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

(8) The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

…

(13) While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

…

(b) Purposes

It is therefore declared to be the purposes of the Congress in this chapter—

(1) to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

…

(3) to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

…

(c) Policy

It is further declared to be the policy of the Congress in this chapter—

…

(3) to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and

enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

…

## 16 U.S.C. § 1802(5), (31)-(33), (36)

§ 1802. Definitions

…

(5) The term "conservation and management" refers to all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and (B) which are designed to assure that—

(i) a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;

(ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and

(iii) there will be a multiplicity of options available with respect to future uses of these resources.

…

(31) The term "observer" means any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter.

(32) The term "observer information" means any information collected, observed, retrieved, or created by an observer or electronic monitoring system pursuant to authorization by the Secretary, or collected as part of a cooperative research initiative, including fish harvest or processing observations, fish sampling or weighing data, vessel logbook data, vessel or processor-specific information (including any safety, location, or operating condition observations), and video, audio, photographic, or written documents.

(33) The term "optimum", with respect to the yield from a fishery, means the amount of fish which—

(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

(B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

…

(36) The term "person" means any individual (whether or not a citizen or national of the United States), any corporation, partnership, association, or other entity (whether or not organized or existing under the laws of any State), and any Federal, State, local, or foreign government or any entity of any such government.

## National Standards One, Two, and Six Through Eight, 16 U.S.C. § 1851(a)(1), (2), (6)-(8)

§ 1851. National standards for fishery conservation and management
(a) In general
Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

…

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

…

…

**16 U.S.C. § 1853(a)(1)(A), (5), (b)(1), (8), (14)**

§ 1853. Contents of fishery management plans

(a) Required provisions
Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

> (1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—
>> (A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;
>>
>> ...
>
> …
>
> (5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors,
>
> …

(b) Discretionary provisions
Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may—

> (1) require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to—
>> (A) any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;
>> (B) the operator of any such vessel; or
>> (C) any United States fish processor who first receives fish that are subject to the plan;
>
> …
>
> (8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for

the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

…

(14) prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

## 16 U.S.C. § 1855(f)(1)

§ 1855. Other requirements and authority

   …

  (f) Judicial review

    (1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—

      (A) section 705 of such Title is not applicable, and

      (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.

    …

**16 U.S.C. § 1857(1)(D)-(F), (L)**

§ 1857. Prohibited acts
It is unlawful—
    (1) for any person—
        …
        (D) to refuse to permit any officer authorized to enforce the provisions of this chapter (as provided for in section 1861 of this title) to board a fishing vessel subject to such person's control for purposes of conducting any search or inspection in connection with the enforcement of this chapter or any regulation, permit, or agreement referred to in subparagraph (A) or (C);
        (E) to forcibly assault, resist, oppose, impede, intimidate, or interfere with any such authorized officer in the conduct of any search or inspection described in subparagraph (D);
        (F) to resist a lawful arrest for any act prohibited by this section;
        …
        (L) to forcibly assault, resist, oppose, impede, intimidate, sexually harass, bribe, or interfere with any observer on a vessel under this chapter, or any data collector employed by the National Marine Fisheries Service or under contract to any person to carry out responsibilities under this chapter;
        …
…


**16 U.S.C. § 1858(g)(1)(A)-(D)**

§ 1858. Civil penalties and permit sanctions
    …
    (g) Permit sanctions
        (1) In any case in which (A) a vessel has been used in the commission of an act prohibited under section 1857 of this title, (B) the owner or operator of a vessel or any other person who has been issued or has applied for a permit under this chapter has acted in violation of section 1857 of this title, (C) any amount in settlement of a civil forfeiture imposed on a vessel or other property, or any civil penalty or criminal fine imposed on a vessel or owner or operator of a vessel or any other person who has been issued or has applied for a permit under any marine resource law enforced by the Secretary has not been paid and is overdue, or (D) any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law

Add.7

administered by the Secretary has not been paid and is overdue, the
Secretary may—

(i) revoke any permit issued with respect to such vessel or person, with or
without prejudice to the issuance of subsequent permits;

(ii) suspend such permit for a period of time considered by the Secretary
to be appropriate;

(iii) deny such permit; or

(iv) impose additional conditions and restrictions on any permit issued to
or applied for by such vessel or person under this chapter and, with
respect to foreign fishing vessels, on the approved application of the
foreign nation involved and on any permit issued under that application.

…


## Regulations

## 50 C.F.R. § 648.2 (excerpt)

§ 648.2 Definitions.
…
Observer or monitor means any person certified by NMFS to collect operational
fishing data, biological data, or economic data through direct observation and
interaction with operators of commercial fishing vessels as part of NMFS'
Northeast Fisheries Observer Program. Observers or monitors include NMFS–
certified fisheries observers, at-sea monitors, portside samplers, and dockside
monitors.
…


## 50 C.F.R. § 648.11(m)(1)(i)(B), (ii)-(iv), (4)

§ 648.11 Monitoring coverage.
…
(m) Atlantic herring monitoring coverage—
(1) Monitoring requirements.
(i) In addition to the requirement for any vessel holding an Atlantic
herring permit to carry a NMFS–certified observer described in
paragraph (a) of this section, vessels issued a Category A or B Herring
Permit are subject to industry-funded monitoring (IFM) requirements on
declared Atlantic herring trips, unless the vessel is carrying a NMFS–

certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS–certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS–certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

 …

(B) IFM HVF at-sea monitors shall collect the following information:

 (1) Fishing gear information (e.g., size of nets, mesh sizes, and gear configurations);

 (2) Tow-specific information (e.g., depth, water temperature, wave height, and location and time when fishing begins and ends);

 (3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

 (4) Species, weight, and disposition of all retained catch on unobserved hauls;

 (5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

 (6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

 (7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

 (8) Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

 (9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(ii) Vessels issued a Category A or B Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in paragraph (m)(1)(iii) of this section, then owners of vessels issued a Category A or B Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued a Category A or B Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance of the beginning of the SBRM year (October 31). NMFS will provide vessels owners with selection forms no later than September 1 in advance of the beginning of the SBRM year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (i.e., midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the Federal Register. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued a Category A or B Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and (m)(3) of this section.

…

(4) Procurement of monitoring services by Atlantic herring vessels.

(i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website: https://www.fisheries.noaa.gov/resource/data/observer-providers-northeast-and-mid-atlantic-programs.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

…

…